UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| SCOTT THOMPSON,<br><br>            Movant,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>            Respondent. | 5:16-CV-05035-JLV<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is pending before the court on movant Scott Thompson's *pro se* motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Pending is a motion to dismiss by the respondent the United States ("government").  See Docket No. 75.  This matter was referred to this magistrate judge pursuant to the October 16, 2014, standing order of the Honorable Jeffrey L. Viken, Chief District Judge, and 28 U.S.C. § 636(b)(1)(A) & (B).

**FACTS**

**A.    Pretrial Proceedings**

Mr. Thompson was indicted by a grand jury on May 17, 2011, in an eleven-count indictment, charging him with false claims in violation of 18 U.S.C. § 287 (counts I-III); false documents submitted to a department or agency of the United States in violation of 18 U.S.C. § 1001 (counts IV-VII); wire fraud in violation of 18 U.S.C. § 1343 (counts VII-X); and receiving stolen

government money in violation of 18 U.S.C. § 641 (count XI). See United States v. Thompson, CR 11-50054 (hereinafter "CR"), Docket No. 1 (D.S.D. May 17, 2011).  He made his initial appearance in court on May 27, 2011, at which time Gary Colbath of the Federal Public Defender's (FPD) office was appointed to represent him for the limited purpose of the initial appearance.  At that time, Mr. Thompson was informed he did not financially qualify for the services of the FPD, so he could either retain his own counsel or pay for their services. Thereafter, on June 2, 2011, Mr. George Grassby, also of the FPD, filed a notice of appearance on behalf of Mr. Thompson.

On the same day he filed his notice of appearance, Mr. Grassby filed two motions—a request for notice under FED. R. EVID. 609(b) and a request for notice under FED. R. EVID. 404(b).  See CR Docket Nos. 11 & 12.  On June 10, 2011, two more attorneys (Randall Connelly and Monica Colbath) filed notices of appearance in Mr. Thompson's case, indicating Mr. Thompson had retained them.  See CR Docket Nos. 14 & 15).  On June 14, 2011, Mr. Grassby filed a motion to withdraw (CR Docket No. 17), which the court granted the next day. CR Docket No. 18.  On June 22, 2011, Mr. Thompson's new attorneys moved for a sixty-day continuance, to which Mr. Thompson consented in writing. CR Docket No. 18.  Judge Viken granted the continuance.  CR Docket No. 19. On August 18, 2011, Mr. Thompson's attorneys requested another sixty-day continuance, to which Mr. Thompson again consented in writing.  CR Docket No. 22.  The court granted the motion.  CR Docket No. 23.  On September 12, 2011, a fourth attorney (Bruce Ellison) filed a notice of appearance on behalf of

Mr. Thompson. CR Docket No. 24.  The next day, Mr. Connelly and

Ms. Colbath moved to withdraw (CR Docket Nos. 26 & 27).  The court granted

Mr. Connelly and Ms. Colbath's motions to withdraw. CR Docket Nos. 28 & 29.

On September 21, 2011, attorney Ellison made a third motion for a sixty-day continuance (CR Docket No. 30), to which Mr. Thompson consented in writing. CR Docket No. 32.  On November 11, 2011, attorney Ellison made a fourth motion for a sixty-day continuance (CR Docket No. 33), to which Mr. Thompson again consented in writing.  CR Docket No. 35.  Ultimately, at least twelve continuances would be requested, consented to by Mr. Thompson, and granted by the court.  See generally, CR docket.

On March 1, 2012, Mr. Thompson entered a plea of guilty to count 2 of the indictment.  CR Docket No. 45.  The government agreed to dismiss the remaining counts.  CR Docket No. 42.  On the day scheduled for his sentencing hearing, however (June 15, 2012), Mr. Thompson moved to withdraw his guilty plea.  CR Docket No. 50. The district court granted Mr. Thompson's motion to withdraw his guilty plea.  CR Docket No. 56.

An eleven-count superseding indictment was filed against Mr. Thompson on September 24, 2013.  CR Docket No. 92.  The superseding indictment charged Mr. Thompson with false claims in violation of 18 U.S.C. § 287 (counts I-III); false document submitted to a department or agency of the United States in violation of 18 U.S.C. § 1001 (counts IV-VII); wire fraud in violation of 18 U.S.C. § 1343 (counts VII-X); and receiving stolen government money in violation of 18 U.S.C. § 641 (count XI).

Eventually on November 8, 2013, Mr. Ellison moved to withdraw from his representation of Mr. Thompson.  CR Docket No. 101.  The court granted the motion and, on November 13, 2013, appointed attorney Brett Poppen to represent Mr. Thompson.  CR Docket Nos. 104 & 105.  By this time, Mr. Thompson had become financially eligible for the services of a court-appointed attorney.  See Docket CR 64 & 65.

Attorney Poppen requested and was granted permission to employ the services of an investigator to assist him with Mr. Thompson's case.  CR Docket Nos. 123-125.  Mr. Poppen filed eleven motions *in limine* prior to trial, five of which were granted by the district court.  See generally, CR Docket. Additionally, attorney Poppen moved to dismiss count IV or count V of the superseding indictment or alternatively, to combine those counts into one. CR Docket 179.  The district court granted this motion, and dismissed count IV of the superseding indictment.  CR Docket 203.

## B.    The Jury Trial

### 1.    Dr. Prakash Balan.

Mr. Thompson's jury trial began on October 20, 2014.  See jury trial transcript (hereinafter "TT").[1]  The government's first witness was Dr. Prakash Balan.  TT 64.  Dr. Balan is a program director with the National Science

---

1 The transcript of Mr. Thompson's jury trial is contained in the docket of his criminal case, CR 11-50054, United States District Court, District of South Dakota, Western Division, at Docket Nos. 238-245.  There are eight volumes of the transcript, but the volumes are paginated continuously.  For example, volume I ends at page 119 and volume II begins at page 120.  The court will therefore not refer to the volume number of the transcript, but instead will refer solely to the page number.

Foundation (NSF) and has held that position since February, 2011.  TT 66.

The NSF is an independent agency created in 1950 in support of discovery,

research and science.  Id.  TT 65. It is funded with taxpayer money.  Id.  Part of

the money funds startups and small businesses with innovative ideas.  Id.  And

a very small portion (.35 percent) of NSF's budget is set aside to fund

companies that have partnerships with institutions—that program is referred

to as the Small Business Technology Transfer Program or "STTR."  Id.   The

program that funds businesses is referred to as the Small Business Innovation

Research Program or "SBIR."  Id.  The difference between these programs is as

follows:  SBIR grants require that two-thirds of the awarded money be spent

within the company, and one-third may be outsourced to a consultant or

external partner.  TT 71.  In some cases, the external partner might be a

university, or it might be a machine shop, or it might be a consultant.  Id.

With an STTR grant, the external entity must be a non-profit research

institution.  It may be a university, a community college, or a federally-funded

research facility—but it must be a non-profit.  Id.  And with the STTR grant, a

minimum of 30 percent of the money spent must be spent by the external

institution and a minimum of 40 percent must be spent by the company, with

the remaining 30 percent being spent in a manner that best suits the project.

TT at 71-72.

Dr. Balan's responsibility is to identify novel technology that might have

great societal benefit.  He does this by publishing notices (referred to as grant

solicitations, or announcements) every six months on different areas in which

the NSF might fund interesting ideas.  TT 65, 74.  The notices are aimed at entrepreneurs and people in small businesses.  TT 65. Dr. Balan and others then evaluate the proposals that are submitted to the NSF.  TT 66.

When a company submits a proposal for review by the NSF, the proposal has a fifteen-page description of what the company is going to do.  TT 72.  The proposal describes the company, the team, the market need, and who would benefit from the idea being developed.  Id.  The final two or three pages of the proposal lays out a very careful budget allocating the use of the money to be awarded.  When the NSF reviews the proposal, it already knows the company's plan for the use of the funds it is asking for by way of the grant.  TT 72.  The budget can be modified before the award is made, but when the award is granted, Dr. Balan testified the budget is "set in stone."   TT 73.

The evaluation uses the meta-critical process.  The general public as well as experts give advice on the content of the submitted ideas.  Id.  Another significant portion of Dr. Balan's job is management of the award money.  Id.  After the money is awarded by the NSF, they must closely watch the work being done by the companies that have received the grant award to determine whether they are meeting the objectives set out in their proposals and whether they have successfully completed the work they promised they would do.  Id.  Dr. Balan's job also includes assisting the companies by clarifying policies on how the money can be spent if the project changes directions along the way.  TT 66.

6

Dr. Balan explained that each grant recipient has a point of contact at the NSF called a program officer.  The program officer's name is on the award letter to the company; the contact information is clearly spelled out, including a telephone number.  TT 70.  The program officer is the primary person with whom the grant recipient should communicate at the NSF regarding all issues. Id.

Dr. Balan explained that a fixed-amount award grant is a grant which is given for a fixed amount of money. TT 77.  The person designated in the proposal as the principal investigator ("PI"), or lead researcher, must be employed by the small business that is awarded the grant.  Id.  In other words, during a 40-hour work week the principal investigator must be employed by the company at least 51 percent or more by the company.  The principal investigator must be an employee of the business, and a person who is primarily employed by the business.  Id.

Dr. Balan explained that when reviewing proposals, he closely examines the members of the team--and especially the PI's résumé.  TT 78.  The PI is the primary point of contact at the small business.  Id.  The PI is the person responsible for doing the work and reporting back on the outcome and for managing the money given to the company by the NSF.  Id.  The PI plays a "very central role" in executing the work.  Id.  As such, the PI must be qualified to perform the particular work that is the subject of the proposal.  Id.

Dr. Balan also explained that the PI must be with the small business "at the time of the award."  TT 78-79.  The time of the award is stated in the award

letter.  TT 79.  Phase I STTR awards have a one-year time frame, with the starting and ending dates clearly listed on the award letters.  Id.  During that time frame, beginning to end, the PI must be at least 51 percent employed by the small business.  Id.  So long as the PI is at least 51 percent employed by the small business during the course of the project, however, the PI must spend only a minimum of two months on the NSF project activity.  Id. Dr. Balan explained these requirements as to the PI have been in place at the NSF "always."  TT 229.

Dr. Balan also explained that NSF awards must be used for purely scientific/engineering and research type activities.  TT 81.  The award money cannot be used for certain other expenses such as marketing, advertisement, unrelated travel, etc.  Id.  Likewise, the money cannot be used for seeking private investors.  Id.  He further explained that while the NSF does not prohibit the commercialization of projects it funds by the grantee, the grant money received by the grantee cannot be directly used for costs often associated with commercialization such as sale, marketing, and obtaining a patent.  TT 180-81.

Dr. Balan explained that though NSF funds cannot be used for marketing purposes, part of the evaluation includes the strength of a business's commercial plan. TT 84.  The company should have experienced people who can move the product into the commercial market upon completion when the time comes.  Id.  For this reason the abilities of both the PI and the

other members of the team are very important in the evaluation of the
proposals received by the NSF.  Id.

Dr. Balan explained that for both SBIR and STTR grants, there are two
phases of funding for NSF grants.  TT 85.  Phase I aims toward helping
innovators prove the feasibility of their concept.  Id.  If the grant recipient
completes phase I of the program, they come back to NSF and show the data
and request more money to continue the technology to move the idea to the
marketplace.  Id.  That is phase II.  The phase II proposal carefully looks at the
marketplace to decide if there are consumers who really care about the
innovation. TT 86.  Dr. Balan clarified that program recipients cannot use NSF
grant funds for business development, but they are strongly encouraged to use
the funds they have been given by NSF to strengthen their technical work and
then build a case that the marketplace would be interested in their projects so
they could more effectively compete for phase II funds.  Id.

Dr. Balan explained the part of the grant process called the "workshop."
This is the time of the grant in which the PI of the grant recipient reports back
to the NSF on the progress of the project to the program director at the NSF.
TT 89.  It is also the opportunity for the NSF to share critical information about
funding opportunities for phase II.  Id.  The NSF explains their expectations,
and looks at the financials and accounting and does a presentation regarding
the responsibilities of an NSF grant recipient.  Id.  The workshop presentation
provided by the NSF is put on by a senior official of the OIG,[2] and lasts for a

_____

[2] Office of Inspector General.

day and a half.  TT 90, 228.  The grant recipient's attendance at the workshop is mandatory.  TT 92.

Dr. Balan also explained that if fund recipients have any questions about how to proceed, they are given contact information for people at the NSF they can contact to clarify their questions.  TT 94.  The NSF publishes the names, phone numbers and email addresses of all their program directors on their website.  Id.  Grant recipients are able to submit all of their information through the NSF website through an application called "FastLane."  Id.

If, when a proposal is being evaluated for funding, the program director has questions, it would typically be the PI who the program director would call to ask the questions.  TT 97-98.  Dr. Balan explained how people submitting proposals use the FastLane system to submit their proposals.  TT 99-100. They complete forms by typing in information, which populates the information on the form.  Id.  By submitting the form, the applicant certifies the accuracy of all the information contained on the form.  TT 100.

Dr. Balan explained it is critical for the contact information for the PI listed on the grant proposal to be accurate.  TT 103.  By listing the contact information on the proposal, the person who completed the form (the authorized organizational representative, or AOR) certified it was correct under penalty of law.  TT 103.  In the grant which is the subject of this case, the grant application submitted to the NSF on behalf of Isosceles, LLC, listed the PI as Jing Li and the co-PI (the person who would be affiliated with the academic institution--South Dakota State University) as Qiquan Qiao.  TT 98, 103.

Mr. Scott Thompson signed the proposal, as the AOR.  TT 104.  Typically two people within the company have access to the FastLane program—the PI and the AOR.  TT 101.  Mr. Thompson indicated on the grant application that Jing Li would be primarily employed by Isosceles, LLC, at the time of the award and during the conduct of the research.  TT 104.  The stated purpose for the grant award to Isosceles, LLC was research regarding conjugated polymers for highly efficient polymer photovoltaics.  TT 101. [3]

The grant award for the Isosceles, LLC grant from NSF was made on June 23, 2009.  TT 111.  The grant award letter was sent by email to the PI. Id.  The letter indicated the grant was approved for the project submitted by Isosceles, LLC, as modified by the revised budget which was submitted on May 10, 2009.  TT 112.  The letter indicated that Isosceles, LLC, was allowed to receive $100,000 of the $150,000 grant "up front" and instructed how to go about receiving those funds.  Id.  The final page of the award letter reiterates the final approved budget of the grant—the way the money is to be used by the recipient.   TT 114.  Changes to this budget are allowed only with permission from the NSF's assigned program director.  TT 115.

The award of the NSF grant is subject to terms and conditions, which are attached to the award letter as a hyperlink.  TT 115-16.  Part of the terms and conditions include that the NSF can terminate or suspend the award if the NSF determines it appropriate to do so.  TT 131.  Dr. Balan explained the NSF wants to guard against public funds being used for purposes other than that

---

[3] For the sake of simplicity, for the remainder of this opinion the court simply refers to the Isosceles project.

for which they were awarded under the NSF grants.  Id.  Therefore, if the NSF detects the funds are being wasted, abused, or used in a fraudulent manner, the program director for that award will evaluate the situation and may recommend further review by the Office of Inspector General (OIG).  TT 132.

Once the OIG gets involved, there is usually a resolution reached between the OIG and the division of grants and agreements regarding whether the grant should be terminated.  Id.  Sometimes the grant is merely suspended—meaning further payment is delayed—until the NSF receives further clarity about its concerns.  Id.  But, if the investigation concludes that the grant must be terminated, the NSF will do so.  Id.

Occasionally, a grant recipient will conclude its project without spending all of the money received through its NSF grant.  TT 133.  In that case, when the grant recipient submits its final report to its program director at the NSF, the recipient must ask the program director for permission for ways to spend the leftover money.  TT 133.  Only if approved by the program director, the leftover money can be used by the recipient for other purposes.  Id.  If the grant is terminated, however, the money must be returned to the NSF.  Id.  The money cannot be transferred to the grant recipient's personal accounts. TT 235.

Dr. Balan explained that the "grantee" is the company who receives the NSF grant award.  This includes the PI and the AOR.  TT 134.  It also includes anyone who acts on behalf of the company, relative to the NSF grant. Specifically referring to the NSF grant that was awarded to Isosceles, LLC,

12

Dr. Balan explained that two-thirds of the $150,000 award was required to be spent by the small business and no more than one-third could be spent on out-sourced work, or on sub-awardees/subcontracts.  TT 134-35.  Dr. Balan explained that any deviation from the NSF guidelines would have to be obtained in writing in order to be allowed.  TT 136.  The directives further explained that the grantee was responsible to alert the program director as soon as possible if any issues arose regarding the grant provided by the NSF. Id.  Those "issues" ranged from scientific or technology challenges, to administrative issues such as the PI quitting employment with the small business and having to find a replacement.  Id.  This way, the NSF has an opportunity to help the company in a meaningful way to provide guidance and deal with the challenge in order to succeed in doing the work as provided in the grant proposal.  TT 137.

Dr. Balan also explained the grantee was responsible for ensuring the PI received a copy of the award letter, the budget, the general conditions, and any subsequent changes to the conditions.  TT 137.  This is to ensure the PI is fully aware of what is expected.  Id.

Additionally, prior written approval was required from the program director for changes in certain aspects of the grant award. TT 138.  Those included:  significant changes in the scope of the objective of the project; the project effort (i.e. the technical work to be done to reach the milestones laid out the in the proposal); and any change in the PI for any reason, such as the PI cannot do the work or is impeded from doing the work, quits or leaves the

13

company, or is no longer part of the project for any reason.  TT 138-39.

Dr. Balan explained it is important for the PI to be on board for the entirety of the one-year duration of the grant, because the PI has special qualifications that are necessary to the success of the grant even though the PI is only required to actually work on the grant for two months' duration. TT 139.  This is because the PI has responsibilities for the entirety of the grant duration—such as making sure any other work done by other employees of the small business that has been awarded the grant is being completed and the PI is also responsible for writing the final report back to the NSF regarding how the grant money was spent, what was learned through the research, and how they are hoping to move forward.  TT 141.  For these reasons, the PI must remain primarily employed by the company throughout the entire one year duration, even if the PI completes the PI's portion of the work within the first two months of the grant.  Id.

These requirements that prior approval must be obtained for certain things must be obtained electronically, through the FastLane program. TT 141.  The grantee can log on to Fastlane using a log-in ID and password. Id.  The PI and the AOR each have their own unique log-In ID and passwords. Id.  Dr. Balan explained that it is important for each person to use their own unique log-in ID and password, which should be known only to them, because when submitting information to the NSF through the FastLane system, there are a lot of legal certifications of information made along the way. TT 232.  He explained it would be "highly improper" and "maybe potentially a violation of

14

laws" for a person to log-in with another person's credentials to the FastLane system.  Id.

Should the grant recipient need to change PIs for any reason, the AOR would need to submit a certified principal investigator change request through the FastLane system.  TT 142.  The program director receives that request, and if approved, then the grant officer from the division of grants and agreements issues a formal written letter notifying the company its request to change the PI has been approved and the new PI's name is listed on internal documents.  Id.  Only then does the company have authorization to use NSF funds to pay the different PI.  Id.  In the interim time, the company must stop work on the grant unless they specifically communicate with and obtain written authorization from the NSF.  TT 143.   Dr. Balan explained that if the grantee loses its PI and does not have another qualified person to step in and take over the PI's duties, the NSF gives the company the opportunity to make a good faith effort to find a qualified person by posting a job and seeking a qualified person from the United States job market.  TT 144.  If the company makes every effort and cannot find a replacement PI and it seems unlikely that it will find one, the NSF will recommend the grant be terminated.  TT 144-45.

The NSF also requires the grant recipient to keep a record of the activities it undertakes pursuant to the grant award, including how the money it has received from the grant has been spent.  TT 145.  The recipient must be able to account for all expenditures made, and that those expenditures were made in the course of executing the work laid out in the grant proposal.

15

TT 145-46.  The recipient is also required to document its data, measurements, scientific information, etc. so that it can prove the work it claimed to have done was actually performed.  TT 146.

A portion of the NSF guidelines clearly spells out for the grant recipient what is and is not an acceptable way to spend the grant money.  Id.  A grantee is permitted to seek independent investors for their project during the grant period, but the grantee is not allowed to use grant funds for that purpose. TT 146-47.  Likewise, business development, manufacturing, advertising, and patent costs are not costs that may be paid with NSF grant funds.  TT 148.

Dr. Balan explained that within the award letter, there is a link for the company to follow to complete a form which enables the company to request its first payment of $100,000 from the NSF.  TT 148.  Dr. Balan identified the form from Isosceles, LLC which was submitted via email on June 23, 2009, by Scott Thompson requesting the initial $100,000 payment.  TT 148-49, 152.   The email account used by Mr. Thompson was realtronics@hotmail.com.  TT 153. Dr. Balan explained that the form submitted to obtain the initial grant payment indicated that by submitting the form, the individual certified certain criteria: (1) that the PI and the small business had not accepted funding for the same or overlapping work except as stated in their proposal; (2) proposals for the same or overlapping work had been withdrawn from other agencies; (3) the primary employment of the PI is with this company at the time of the award and will continue during the conduct of the research; and (4) the grantee is a small business as defined in the NSF solicitation or announcement and the PI is an

16

employee of the firm and is currently available to perform the work.  TT 150-51.  The person submitting the form acknowledged that willfully making a false statement or concealing a material fact to the NSF was a criminal offense under 18 U.S.C. § 1001.  TT 151.  The form referred to SBIR, but Dr. Balan explained the form was used interchangeably with STTR grant recipients.  TT 152.  In this instance, the form was submitted by the AOR of Iscosceles, LLC (Scott Thompson).  TT 152.

Dr. Balan explained that usually, it takes between seven to ten days for the funds to be deposited in the grant recipient's bank account after the form requesting the funds is electronically submitted.  TT 153-54.  The money is transferred via electronic wire transfer from the NSF to the bank requested by the grantee in their documentation.  TT 154.  The money is then available to the grantee immediately upon receipt to be spent on grant activities.  Id.

Dr. Balan explained that usually, when a grant expires, the grant recipient is required to submit a final report to the NSF within fifteen days of the expiration date.  TT 156.  Once the program director has read and approved the final report, the program director will initiate an internal request for payment of the final $50,000 of the grant to the small business.  Id.  No separate request need be made for this final payment by the grant recipient.  Id.  The final payment is transferred electronically, just as the initial payment was.  Id.  If the grant is terminated for any reason before the end of the grant period, the final payment is not made.  TT 157.

17

Dr. Balan explained that for the Isosceles, LLC grant, a form was submitted in January, 2010, which indicated that Jing Li had worked the minimum 160 hours (2 months) on the grant.  TT at 159-161.  That was the final report of the grantee. TT at 161.  If a final report is submitted and there is unspent money which has not been approved by the NSF to be used by the grant recipient for another purpose, the grant recipient must return those funds to the NSF.  TT 170.  The final report submitted for Isosceles, however, was missing the certification (cover) page which is manually attached.  TT 209.  It would have been on that page that the submitter would have certified that the PI was employed by the grantee organization.  Id.  Nevertheless, and in the absence of the certification (cover) page, the final report of Isosceles was approved by the NSF on July 15, 2010.  TT 210.  Dr. Balan also explained that if there had been a change in PI request form submitted at any time by Isosceles, it would have been apparent in the final report form.  TT 211.

Dr. Balan understood that, as to the Isosceles, LLC grant award from NSF, Isosceles voluntarily withdrew from the grant because of issues with the PI.  TT 212.  Dr. Balan explained that ultimately, the total funds earned by Isosceles for the grant project was zero.

In the final grant proposal which was submitted by Isosceles, LLC, and accepted by the NSF, the amount in the budget which was to be paid to Jing Li as the PI was $13,605.  TT 219.  The total amount in the budget to be paid to Scott Thompson was $14,788.  Id.  That amount did not include fringe benefits (such as health insurance and FICA taxes) which are also allowed to

18

be paid with grant money.  TT 219-220.  Including those amounts, the total allowed for salaries and benefits was $33,241.  TT 220.

### 2.    Dr. Josephine Yuen.

The government's next witness was Dr. Josephine Yuen.  TT 251. Dr. Yuen works for the University of California at Berkley and is the Executive Director of the Center for Energy Efficient Electron Science.  Id.  The focus of this organization is to invent new, low energy electronic devices to lower energy use in the internet and on wireless devices.  Id.  Her organization is funded through the NSF.  Id.  She received her Ph. D. from Cornell University.   Id. She formerly worked for the NSF as a program director for approximately 18 months, beginning in April, 2009.  TT 253.

Dr. Yuen's job as a program director was to take proposals from small businesses for consideration for funding.  TT 253-54.  She would get assistance from experts to determine whether the proposals should be funded by the NSF. TT 254.  Once the decision to fund through the NSF was made, she supported the grantee by helping them with whatever they needed and making sure they complied with the rules and regulations of the NSF.  Id.  This job required that she be familiar with all the rules and regulations of the NSF.  Id.  During her time at NSF, she had contact with Scott Thompson.  Id.  He was associated with one of the grants she was responsible for during her time at NSF.  Id. Dr. Cynthia Znati was the original program director for that grant (the Isosceles grant).  TT 255.  Dr. Znati worked with Isosceles through the portion of the process until she recommended that NSF award the grant to Isosceles and the

19

grant was awarded; she later left the NSF.  TT 256.   After the grant was awarded to Isosceles, Dr. Yuen became the program director for that grant.  Id.

Dr. Yuen wrote a letter to the PI of the Isosceles grant (Jing Li), welcoming him to the program and outlining her expectations of him.  TT 256. She informed Jing Li that Dr. Znati was no longer the program director and that she (Dr. Yuen) had taken over as program director.  TT 257.  This email welcome letter to Jing Li was sent to the email address realtronics@hotmail.com.  TT 258.  A copy of the letter was also sent to Dr. Qiquan Qiao as the academic partner on the project.  Id.  In the welcome letter, Dr. Yuen explained that Dr. Li was expected to attend the spring, 2010, grantee workshop.  TT 259.  It is typical that the PI attends the workshop, and sometimes the PI is accompanied by another individual from the company.  Id. The letter also explained that in order to change the PI, the company must obtain written approval from NSF.  Id.  She also informed the PI that although the NSF had no formal rules for reporting during the duration of the grant, she would like to hear from him with updates on a regular basis. TT 260.  Dr. Yuen never heard anything back from Jing Li.  TT 260.

Several weeks later, however, Dr. Yuen heard from Mr. Thompson. TT 261.  Mr. Thompson inquired on July 22, 2009, regarding the portion of the budget allocated to the academic partner.  Id.  Mr. Thompson also used the realtronics@hotmail.com email address.  Id.  Mr. Thompson inquired whether, if the university only used 95% of its budgeted money, the company could keep the remainder of the amount budgeted to the university.  Id.  Dr. Yuen

explained that was not allowed.  TT 262-63.  She explained that the company would only be paid for work actually performed by the company, and that the company must provide documentation for that work.  TT 263.

Dr. Yuen also exchanged a series of emails with Mr. Thompson in November, 2009.  TT 267.  Mr. Thompson inquired about changing the academic partner for the grant project.  TT 270.  In response, Dr. Yuen asked about the project PI, because to date, she had still heard nothing from Jing Li. Id.  She reminded Mr. Thompson that he could not substitute himself for Dr. Li as the PI, because Mr. Thompson was already the AOR.  Id.  Dr. Yuen asked, through Mr. Thompson, that Dr. Li provide a way for Dr. Yuen to directly contact him no later than November 18.  TT 271.  Mr. Thompson responded by conceding that Dr. Li had never become eligible to work for Isosceles, LLC because he did not have the correct type of visa.  Id.  For this reason, Mr. Thompson explained, Jing Li did not have an email address with the Isosceles company.  Id.

Dr. Yuen informed Mr. Thompson that Isosceles was not in compliance with the terms of the NSF grant.  TT 272.  She reminded Mr. Thompson that Jing Li was to have been 51% employed by Isosceles (on the Isosceles payroll) for the duration of the grant.  Id.  Dr. Yuen conferred with her supervisor at NSF, who concurred that it was not acceptable to allow Mr. Thompson to become the PI on the Isosceles grant or to allow the grant's academic partnership to be transferred to a different university.  TT 272-73.

21

At that point, Dr. Yuen offered Mr. Thompson two options—he could voluntarily withdraw from the grant, or Dr. Yuen would terminate it.  TT 273. Mr. Thompson chose to voluntarily withdraw.  Id.  Dr. Yuen instructed Mr. Thompson to propose a termination date, and to advise how much of the unused funding would be returned to the government.  Id.  Mr. Thompson inquired whether, should Jing Li's situation change, the NSF would reconsider its position.  TT 274.  Dr. Yuen explained that the NSF's position would not change, because the PI was supposed to have been employed by the company from the beginning of the grant.  TT 275.  Because these discussions were occurring in November, 2009, and Dr. Li should have been employed by Isosceles from the beginning of the grant (July, 2009), she would not reconsider her position.  TT 275.  She gave Mr. Thompson a deadline of November 20, 2009, to voluntarily withdraw from the grant.  Id.

Next, Mr. Thompson explained that he could not provide full justification for how the grant money was spent.  TT 277.  He explained he was on vacation at the time, and needed extra time to put the accounting together.  Id. Dr. Yuen received an email from Mr. Thompson on November 20, withdrawing from the grant program.  Id.  In the letter, Mr. Thompson assured Dr. Yuen that Isosceles would submit invoices for work done by the academic partner (SDSU) by January 15, 2010.  TT 279.  He also indicated he would submit a final expense report by that date, and would return all unused funds.  Id.  The effective date of withdrawal from the grant was December 20, 2009.  Id.

Dr. Yuen explained that the Isosceles final report was submitted through the NSF's FastLane system.  Id.  The report indicated on the cover page that it was submitted by the PI, Jing Li.  TT 280.  But the actual report itself indicated it was submitted by the company, Isosceles.  Id.  She believed, however, that the cover page part of the form would have been automatically populated by the FastLane system.  TT 280-81.  The final report, however, was missing the certification page.  TT 282.  It is not uncommon for the certification page of a final report to be missing, but in order for the grantee to receive their final payment portion ($50,000) they must submit the certification page.  Id.  That is usually what prompts the program director to insist upon receiving the certification page.  Id.  In this instance, that incentive for providing the certification page was not present, so Dr. Yuen did not request the certification page.  TT at 282-83.

When Mr. Thompson submitted his final accounting for the manner in which the NSF grant money was spent, Dr. Yuen learned that, between the company and the academic partner, the money spent exceeded the amount of the grant.  TT 284.  However, the report also indicated much of the work proposed by the grant was already completed, so Dr. Yuen was not so concerned that she believed she would need to pursue the matter further. TT 285.

Sometime in 2010, Dr. Yuen was asked to compare the final Isosceles report she received from the FastLane system to a report she received from the academic partner (SDSU) in the Isosceles project.  TT 287.  She noticed that

23

the report from the academic partner (SDSU) was very similar to the report received from the company through the FastLane system.  TT 288.  She thought this was odd, because she believed the final report submitted to NSF should have contained work from both the academic partner and from the private company (Isosceles).  TT 288.   Based on this information, she could not figure out what work the company did to contribute to the tasks outlined in the grant.  Id.  Mr. Thompson did not receive permission to transfer $13,296 of the grant money to any of his personal accounts, so a transfer of that amount after the termination of the grant would not have been authorized.  TT 288-89.

### 3.    Dr. Qiquan Qiao.

The government's third witness was Dr. Qiquan Qiao.  TT 302. Dr. Qiao is an associate professor of electrical engineering at South Dakota State University (SDSU).  TT 303.  He focuses on solar energy.  TT 304.  He is experienced in obtaining grants from government agencies and knows Mr. Scott Thompson through an acquaintance.  Id.  He and Mr. Thompson only communicated through email and phone, however, and had never met face-to-face.  Id.   He communicated with Mr. Thompson through the email address realtronics@hotmail.com.  Dr. Qiao was never able to communicate with Jing Li through the Realtronics email address.  TT 309.  Dr. Qiao is familiar with the name Isosceles, but he does not know how many people worked for that company.  Id.

Dr. Qiao started working on the Isosceles grant project in July, 2009. TT 310.  Before that time, Dr. Qiao did some "pre-research" on the topic, to get

24

ready for submitting the proposal to the NSF.  TT 311.  He worked with Mr. Thompson to get the proposal ready.  Id.  SDSU was the sub-awardee under the Isosceles grant, and was supposed to do scientific research under the grant.  TT 311.  Dr. Qiao's contract with SDSU allowed him to have employment outside the school, during the summer months, so long as he obtained the school's permission.  Id.  Before they began the Isosceles project, he and the Isosceles company entered into a contract with each other to agree upon who would do which portions of the work.  TT 313.  The agreement was signed by several people, including Scott Thompson, Dr. Qiao and Jing Li. TT 314.  Jing Li was one of Dr. Qiao's post-doctorate students.  Id.  It was also signed by the chair of the chemistry department at SDSU, Denichera Otsuga. TT 314-15.

According to the agreement signed between Dr. Qiao and Isosceles, Dr. Qiao would be able to use SDSU's equipment for the Isosceles project, but he would be billed by SDSU for the use of the equipment.  TT 315.  The Isosceles company would likewise be allowed to use SDSU's equipment, but it would also be billed for using the equipment.  TT 315-16.  This agreement between Isosceles, Dr. Qiao, and SDSU was signed on May 7, 2009.  TT 316. Under the agreement, if Dr. Qiao used the equipment in his own department, he could use it for free.  TT 316.  But if an Isosceles employee used Dr. Qiao's equipment, the Isosceles employee would have to pay to use Dr. Qiao's equipment.  Id.

Dr. Qiao was familiar with the term "PI" and understood that term to mean the person on the grant project who was responsible for doing the research and writing the report.  TT 316.  In this instance, Dr. Qiao suggested Jing Li's name as the PI for the Isosceles project.  TT 317.  Dr. Qiao knew Jing Li was familiar with the subject matter, and Dr. Li was Dr. Qiao's post-doctorate student.  TT 317.  Dr. Qiao testified that if the span of the grant extended beyond the summer months, he (Dr. Qiao) would not be allowed to be a PI.  He would only be allowed to hold the position of the subcontractor awardee.  TT 318.

Dr. Qiao was familiar with the FastLane program.  TT 320.  He was given a FastLane account for the Isosceles project.  Id.  Scott Thompson applied for a FastLane account on the Isosceles project for Jing Li as well. Id.  Jing Li is from China.  Id.  When Jing Li first came to SDSU to work as a post doctorate student, the school applied for a J1 visa for him.  TT 321.  Dr. Qiao described a J1 visa as a "scholar" visa.  TT 321.[4] Dr. Qiao told Scott Thompson he would need to modify Jing Li's status to H1, which is a working visa.  TT 321.

A company can apply for an HI visa on behalf of an individual.  TT 322. Dr. Qiao did not submit documentation to the NSF.  TT 323.  Dr. Qiao did write the technical part of the report which was submitted to the NSF, however. TT 324.  Dr. Qiao did not sign in to the FastLane program under Scott Thompson's name.  TT 504.

---

[4] See also, https://j1visa.state.gov/wp-content/uploads/2017/02/J1-Visa-Fact-Sheet-2017.pdf (last checked March 14, 2018).

26

Dr. Qiao explained that under the proposed budget for the Isosceles program, he was supposed to receive a salary of $9,000.  TT 326.  Under the proposal, there were five tasks that were to be performed.  TT 327.  Under the proposal, Dr. Qiao was supposed to be working for SDSU, and Jing Li was supposed to be working for Isosceles.  TT 327.   As far as he could tell, Isosceles did not provide any of the scientific information for the project— Dr. Qiao provided that part of the project which was given to NSF.  TT 329-30.

Dr. Qiao recognized and identified some emails between himself and Scott Thompson regarding Mr. Thompson trying to hire Jing Li.  TT 330.  The emails indicated Qiao indicated it would be the company's (Isosceles) responsibility to hire Jing Li and to obtain Jing Li's visa.  TT 332. Mr. Thompson indicated he wanted the school to be responsible for obtaining Jing Li's visa.  Id.  Dr. Qiao indicated that obtaining visas is not something he does.  TT 333.  He referred Mr. Thomas to contact someone else at SDSU.  Id. In Dr. Qiao's experience, the PI must be hired by the company as of the first day of the grant award.  Id.  Dr. Qiao has served as a PI and as a co-PI previously in his role at SDSU.  TT 333-34.  As such, he knows that the PI must be employed by the company as of the first day the project begins. TT 334.  The start date for the Isosceles project was July 1, 2009.  Id.

Dr. Qiao identified an email from himself to Scott Thompson asking Mr. Thompson to hire Jing Li as soon as possible.  Id.  In response, Mr. Thompson asked Dr. Qiao whether he had yet started working on his portion of the project.  TT 335.  Dr. Qiao indicated Jing Li was working as the

sub-contractor awardee and re-iterated his plea for Mr. Thompson to hire Jing Li as an employee of Isosceles.  TT 335.  Mr. Thompson responded by indicating he would be contacting the South Dakota School of Mines and Technology.  TT 335.  Dr. Qiao is not associated with the School of Mines. TT 336.

Mr. Thompson advised that someone at the School of Mines told him that if Jing Li had an F1 (scholar exchange) visa, that would be sufficient.  TT 336. These email exchanges were occurring in August, 2009.  Id.  By then the grant had already begun a month earlier in July, 2009.  Id.  Dr. Qiao explained to Mr. Thompson that Jing Li was on a J1 visa, and needed to be moved over to the employment of the company as soon as possible.  Id.   Again in mid-August, 2009, Mr. Thompson requested Jing Li's identification and I-9 information, all of which Dr. Qiao told him he should have done in July, 2009. TT 337.  Nevertheless, Dr. Qiao provided the identification and I-9 for Jing Li to Scott Thompson in mid-August, 2009.  TT 338.

In mid-August, 2009, Dr. Qiao provided Scott Thompson of Isosceles with a standard employment agreement and a time sheet for Jing Li.  TT 339. He asked Scott Thompson to complete those documents regarding Jing Li.  Id. Two days later, Dr. Qiao emailed Mr. Thompson regarding the director of international students at SDSU.  Id.  Mr. Thompson had indicated he would call "Donna" the director of international students, regarding Jing Li's employment issues with Isosceles.  Id.  Donna was very experienced with visa applications.  TT 344.  Dr. Qiao did not believe the director of international

28

students should be involved in such issues.  TT 339-40.  Dr. Qiao understood this should be an issue between Jing Li and Scott Thompson, but was not something for the school officials to become involved in.  TT 340.

The emails exchanged between Dr. Qiao and Mr. Thompson in mid-August, 2009 reveal their relationship had soured.  Dr. Qiao told Mr. Thompson he had received $75,000 of the grant money "for nothing." TT 340.  Again in September, 2009, Dr. Qiao emailed Scott Thompson telling him that he should have had Jing Li hired as of July 1, 2009.  TT 345.  Dr. Qiao was worried that both he, as the academic co-PI, and Jing Li would get into trouble with the NSF for violating their rules because Jing Li had not been employed by Isosceles from the beginning of the project.  TT 345-46.  He was worried if they violated NSF rules, it would affect the viability of any future proposals they might make to NSF.  TT 346.  Again in September, 2009, Dr. Qiao advised Mr. Thompson to get Jing Li hired at Isosceles and to work with the SDSU administration to allow Jing Li to use SDSU's equipment. TT 346.

By November, 2009, Isosceles had still not hired Jing Li.  TT 351.  On November 16, 2009, however, Scott Thompson contacted Dr. Qiao requesting a technical report status update.  TT 353.  In response, Dr. Qiao asked to see the actual request from NSF, in order to discern the content and format desired for the information being sought from him (Qiao) by the NSF.  TT 353. Mr. Thompson refused to provide this information directly to Dr. Qiao, telling Dr. Qiao it was "none of his business."  Instead, Mr. Thompson told Dr. Qiao

that if Dr. Qiao did not provide the information he requested within the time he insisted, Mr. Thompson would simply advise the NSF that Dr. Qiao was refusing to provide it.  TT 354.  Dr. Qiao had not seen NSF's request for information as of the date he testified at trial.  TT 354.   Dr. Qiao explained he had become frustrated with Mr. Thompson because it did not appear Mr. Thompson planned to do any of the work on the Isosceles project, and he never hired Jing Li as the contract had specified.  TT 355.  Mr. Thompson's solution was to terminate the project and return the money to the NSF.  Id. Dr. Qiao learned of the termination of the NSF award on November 17, 2009. TT 356.  Dr. Qiao explained that Jing Li worked for SDSU on the Isosceles project during the grant period even though he was supposed to be employed by Isosceles as the PI .  TT 358.

Dr. Qiao worked full-time on the Isosceles project from August 1-21, 2009.  TT 360.  Jing Li worked 68% of his time on the Isosceles project from July 1 through July 21 2009 (TT 360), 100% of his time from July 22 through August 21, 2009 (TT 361), 100% of his time from August 22 through September 21, 2009 (Id.), 100% of his time from September 22 through October 21, 2009 (Id.) and 82% of his time from October 22 through November 21, 2009. Id.

On cross-examination, Mr. Thompson's attorney established that the Isosceles project was not the first project on which Dr. Qiao and Mr. Thompson had collaborated.  TT 369.  In fact, they had worked on three STTR proposals to the Department of Energy (TT 373) and a different proposal to the NSF in

2008 (TT 374).  For these other proposals, Dr. Qiao had suggested Dr. Yu Xie

or Dr. Jing Li as the PI.  TT 375-76.   None of those other grant proposals

ended up being funded.  TT 502.  Cross-examination also established that

problems arose between Mr. Thompson and SDSU regarding licensing whatever

technology resulted from the work that was funded through the grants that

resulted from their mutual efforts.  TT 377-78.

　　　Dr. Qiao also explained that as a co-PI on the academic side, he could

upload necessary files into the FastLane system, so that all Mr. Thompson had

to do was edit the final draft and hit the "submit" button.  TT 380-81.  Dr. Qiao

wrote the technical portion of the documents, while Mr. Thompson wrote the

commercial portion of the proposal, though Mr. Thompson helped with editing

of the technical section.  TT 381.  Mr. Thompson actually submitted the

proposal.  Id.

　　　Mr. Thompson's attorney also established on cross-examination that

Dr. Qiao told Mr. Thompson to create an Isosceles FastLane account for

Dr. Jing Li.  TT 384.  Mr.  Thompson also inquired to Dr. Qiao whether Dr. Jing

Li was qualified to work in the United States, and whether Dr. Jing Li could get

an H1 visa for the duration of the Isosceles project. TT 384.   Dr. Qiao told

Mr. Thompson he was "pretty sure" Dr. Jing Li was eligible to apply for an H1

visa.  Id.

　　　Dr. Qiao also explained that he obtained Dr. Jing Li's résumé and

forwarded it to Mr. Thompson.  TT 390.  Dr. Qiao also admitted that he gave

Mr. Thompson Dr. Jing Li's new FastLane password after Mr. Thompson

31

created an Isosceles FastLane account for Dr. Jing Li.  Id.  Dr. Qiao also suggested to Mr. Thompson that he should add himself as a senior person on the project and add a salary for himself into the budget.  TT 391.  Initially, Dr. Qiao suggested someone from Isosceles should be the PI, but nobody from Isosceles had the proper background. TT 392.  Then Dr. Qiao suggested one of his post-doctorate students could be the PI and he suggested Dr. Jing Li. TT 391-92.

When Dr. Qiao was interviewed by federal agents, he told them that Mr. Thompson suggested Dr. Li, because when none of the Isosceles personnel could serve as PI, Mr. Thompson wanted Dr. Qiao to select one of his post-doctorate students, and Dr. Qiao selected Jing Li.  TT 392.  Dr. Qiao denied that he completed the cover page for the proposal which was submitted to the NSF.  TT 393.  On cross-examination, Mr. Thompson's counsel also established that the email address on Dr. Jing Li's résumé, was the realtronics@hotmail.com email address.  Dr. Qiao explained that he and Dr. Jing Li discussed whether to list Dr. Jing Li's company and email address as the Isosceles email address (i.e. the realtronics@hotmail.com) on Dr. Jing Li's résumé. TT 396.  Dr. Qiao testified that because Mr. Thompson had created an account for Dr. Jing Li on FastLane, they decided to list Dr. Jing Li's company as Isosceles and his email as the realtronics@hotmail.com on the résumé.  Dr. Qiao testified that Dr. Jing Li knew about this plan and consented to it.  TT 397.  Dr. Qiao asked Dr. Jing Li about being listed on the Isosceles proposal as the PI, and Dr. Jing Li consented to being listed as the PI.  Id.

32

Dr. Jing Li agreed that if any of the proposals that were being submitted by Dr. Qiao and Scott Thompson ultimately got funded, he (Dr. Jing Li) would go to work for Isosceles, LLC.  TT 398.

In May, 2009, when Mr. Thompson was discussing Dr. Jing Li's visa with Dr. Qiao, Mr. Thompson told Dr. Qiao that when he (Mr. Thompson) had worked with the School of Mines in the past, the school had taken care of the paperwork for obtaining foreign students' proper visas for working off-campus. TT 399.  In response, Dr. Qiao assured Mr. Thompson they could "figure this out" after they were awarded the grant.  TT 400.  Dr. Qiao thought that Mr. Thompson knew Dr. Jing Li was no longer a student because he was a post-doctorate, so he did not explain that to Mr. Thompson.  TT 419.  Dr. Qiao found out that the Isosceles project had been funded in mid-June.  TT 402. Shortly thereafter, Mr. Thompson began working with Denny Otsuga to wire one-half of the initial $100,000 received from NSF to SDSU.  TT 403-04. Ultimately, however, Mr. Thompson indicated he would prefer that SDSU bill quarterly for the work SDSU performed under the grant.  TT 416.

In August, 2009, after the Isosceles grant had been awarded, Dr. Qiao explicitly explained to Mr. Thompson the difference between a student and a post-doctorate. TT 419.  Dr. Qiao did this because Mr. Thompson apparently believed Dr. Jing Li only needed a scholar (J1) visa.  TT 420.  In May, 2009, before the grant was awarded, Dr. Qiao told Mr. Thompson he would "look into" the University's policies regarding H1 visas.  Dr. Qiao could not remember if he

did so, however, because he did not consider it his responsibility to hire Dr. Jing Li as an Isosceles employee.  TT 420-21.

Dr. Qiao explained Dr. Jing Li's time sheets from SDSU regarding the Isosceles project.  TT 425-26.  Dr. Jing Li worked at least 160 hours on the project, but Dr. Qiao considered Dr. Jing Li to be working under the subcontract for SDSU, not as the PI.  TT 427.  Dr. Qiao was aware that Dr. Jing Li signed an employment contract with Isosceles. TT 428.  Dr. Qiao was also aware that Mr. Thompson tried to pay Dr. Jing Li by running Dr. Jing Li's payroll from Isosceles via a pass-through in Dr. Qiao's department at SDSU.  TT 433.  That option did not come to fruition, however, because the SDSU administration would not approve it.  TT 434.   After this option fell through, Dr. Qiao asked to transfer Dr. Jing Li's J1 visa to Isosceles so that Mr. Thompson could pay Dr. Li directly through Isosceles.  Id.

In order to accomplish this, Dr. Qiao told Mr. Thompson to contact another SDSU official (John Mann).  Mr. Mann instructed Mr. Thompson to contact the Department of Homeland Security to attempt to switch Dr. Li's visa from a J1 visa to an H1 visa.  TT 435.  This required the completion of a twenty-six page application.  TT 436.  Mr. Thompson worked with Dr. Li to attempt to obtain an H1 visa.  TT 437-38.  The first application was refused. TT 438.  Mr. Thompson began working on a second application. TT 438.  Dr. Qiao agreed that Mr. Thomson did not refuse to hire Dr. Li, but rather Mr. Thomson failed to hire Dr. Li.   TT 439.

Dr. Qiao agreed that as the person in charge of the Isosceles grant on the academic side, (the sub-contract) he was in charge of submitting the invoices for the work done on the grant at SDSU. TT 444. Even though Dr. Li began working on the project right away on July 1, 2009, initially, SDSU only invoiced Isosceles for the time Dr. Qiao spent working on the project, because Dr. Qiao believed Mr. Thompson would be able to get the paperwork straightened out to be able to pay Dr. Jing Li from Isosceles. TT 445-48.

In November, 2009, the source of Dr. Jing Li's payment was changed internally at SDSU so that Dr. Li could be payed from the Isosceles grant funds that were received by SDSU. TT 449. November, 2009, was when Mr. Thompson informed Dr. Qiao that he had withdrawn from the grant. TT 450. Dr. Qiao explained that he did not originally charge Dr. Li's time working on the Isosceles grant to SDSU because he believed Dr. Li would be employed directly by Isosceles. TT 452-53. When Dr. Jing Li was never hired by Isosceles, Dr. Qiao charged Dr. Li's hours for the project to SDSU as a post-doctorate. TT 507. Dr. Qiao had not reported this failure by Isosceles to hire Dr. Jing Li from the beginning of the grant because Dr. Qiao thought Isosceles was still trying to get it done—until Mr. Thompson informed Dr. Qiao that he had withdrawn from the grant. TT 510.

Dr. Qiao explained that the final report on behalf of the work done by the SDSU academic partner on the Isosceles project was written by both himself and Dr. Jing Li. TT 460. He believes that the work done, as reflected in the report is worth $55,000. TT 460-61. Dr. Qiao recalls that when the final

35

invoice was sent to Mr. Thompson for the Isosceles project, Mr. Thompson objected to it. TT 467. He believed he was being over-charged by SDSU. TT 475. Mr. Thompson asked to see time sheets, among other things. Id. On cross-examination, counsel emphasized that the time sheets submitted for Dr. Qiao and Dr. Li for the months in question were blank. TT 477-78. Additionally, there were charges on invoices for materials that were not part of the budget that was approved in the proposal to the NSF. TT 480-83.

Counsel also established on cross-examination that, when it came time to submit their final invoice, it appeared that the finance department at SDSU was combing through invoices trying to come up with a total that matched the amount budgeted for the Isosceles grant, rather than accounting for what had actually been spent on the Isosceles grant. TT 485. Counsel also established that at the time SDSU was still trying to get paid by Mr. Thompson, an investigation was already underway and Dr. Qiao was speaking to investigators from the NSF in Washington, D.C., as early as May, 2010. TT 487-88. Dr. Qiao's department at SDSU is partially funded by the NSF. TT 488. When Scott Thompson voluntarily withdrew the Isosceles project from the NSF grant, Dr. Qiao was concerned that his own credibility with the NSF would be damaged. TT 489. On cross-examination, Mr. Thompson's counsel pointed out that at about the same time Dr. Qiao started cooperating with the NSF's investigators regarding the Isosceles project, Dr. Qiao was appointed to the NSF panel that reviews proposals. TT 491. Also, Dr. Qiao had another grant

36

pending which extended from February, 2010, through 2015 which is worth approximately $400,000.  TT 491-92.

Dr. Qiao explained that when they submitted the proposal to NSF, everyone expected that if the grant was funded by NSF, Dr. Jing Li would be hired by Isosceles and would be employed by Isosceles.  Dr. Jing Li's employment by SDSU would end during the time he was employed by Isosceles.  TT 499-500.

Dr. Qiao did not believe Isosceles did any scientific work on the grant project, because Mr. Thompson did not have the scientific knowledge to do the work and the Isosceles company did not ever hire Dr. Jing Li.  TT 517, 520.

### 4.    Dr. Jing Li.

Next, the government called Dr. Jing Li as witness.  Dr. Li is from China, and was living there at the time of the trial in this matter. TT 539.  He previously came to the United States to work as a post-doctorate student with Dr. Qiao at SDSU in 2008.  Id.  He received his doctorate degree in China, and came to the United States on a J1, or visiting scholar visa.  TT 540.  He always intended to return to China, because his family is there.  Id.

Dr. Li knows Scott Thompson only through email.  TT 541.  Dr. Li explained that he has never been able to receive emails at the realtronics@hotmail.com email address.  TT 543.  This is because he does not have a password for that email address.  Id.  He did not submit information to the NSF for the Isosceles grant.  TT 544.  When he communicated with Mr. Thompson, he used his SDSU email address.  Id.  With regard to the

Isosceles grant, Dr. Li was going to be the PI –employed by Mr. Thompson's company--if that grant was awarded. TT 545-46.  He understood that if he became employed by Mr. Thompson's company, his visa would need to be changed to an H1 visa. TT 546.  Dr. Li's understanding was that an H1 visa would allow him to work off-campus.  Id.

Dr. Li explained that prior to July 1, 2009, Mr. Thompson never asked him to complete any tax or employment –related paperwork.  TT 547.  The first time he was asked to complete any employment paperwork was August 18, 2009.  TT 548.  On that date, Dr. Li completed a time sheet and an employment agreement.  Id.  Dr. Li never received any checks from Mr. Thompson.  TT 550.

Dr. Li signed a sponsored research agreement with Mr. Thompson, but did not consider himself hired by Mr. Thompson at that time.  TT 556.  He believed further steps were necessary in order to be hired by Mr. Thompson. Id.  He was never hired by nor paid by Mr. Thompson or the Isosceles company.  Id.

On September 16, 2009, Mr. Thompson requested numerous documents from Dr. Li, including his I-94 form, his I-797 form, and other USCIS documents. Id.  Dr. Li faxed those documents the following day.  TT 557. Mr. Thompson had never requested any of this information from Dr. Li before September 16, 2009.  Id.  Mr. Thompson also asked for other information, such as Dr. Li's family name, social security number, and the length of time left on his J1 visa. TT 558.  Again, Mr. Thompson had not previously requested this

38

information. Id.  Mr. Thompson requested further information on September 23, 2009.  TT 561.  It appeared at this time that Mr. Thompson was completing the application for Dr. Li's H1 visa. TT 561.  On October 14, 2009, Mr. Thompson reported that the application had been returned and he needed to make some changes, but would keep Dr. Li posted.  TT 562.   Dr. Li could not remember why the first visa application had been rejected.  TT 563.

On October 14, 2009, Dr. Li inquired to Mr. Thompson about the status of the visa application.  TT 565.  Mr. Thompson replied that if investors came in, then he would modify Dr. Li's visa to H1.  Id.   During this same time frame, Mr. Thompson and Dr. Li were having private conversations about Dr. Li coming to work form Mr. Thompson on a separate, non-grant basis.  TT 566-68.  Dr. Li was available to work for Mr. Thompson and intended to work for Mr. Thompson as of July 1, 2009, on the grant program.  TT 569.  When Mr. Thompson did not hire him, Dr. Li worked on the NSF project but it was for SDSU, under the subcontract.  Id.

During the time of the NSF grant, Dr. Li never had any contact with the NSF or with Dr. Josephine Yuen.  TT 570.  Dr. Li had a FastLane account with the NSF that was created by Mr. Thompson.  Id.  Dr. Li did not log on to the FastLane account on January 14, 2010, to file anything.  Id.

Dr. Li agreed that he was willing to be the PI on the Isosceles project, which included working for the Isosceles company.  TT 572-73.  Dr. Qiao discussed this with Dr. Li, and that Dr. Qiao would be working on the project from the university side.  Id.  Dr. Li agreed to put the realtronics@hotmail.com

39

email address on his résumé when the proposal was submitted to the NSF

because they were working with Mr. Thompson at the time, and if the proposal

was awarded, that would be his company email address.  TT 575-76.  But he

never received a password for that email address.  Id.

Dr. Li ultimately did the synthesis of the material –which was the

subcontracted portion of the project that was assigned to SDSU.  TT 576.  He

helped Dr. Qiao prepare the final report that SDSU submitted when the project

was terminated.  TT 577.  Dr. Li agreed that he would go to work for

Mr. Thompson if the NSF Isosceles grant was awarded, but he explained that

he understood Mr. Thompson would handle transferring his J1 visa to an H1

visa, because that was not something he (Dr. Li) could handle himself.  TT 585.

He signed an employment agreement stating that if the proposal was funded,

he would go to work for Isosceles.  TT 585-86.  It was his understanding that

when he signed the agreement, he was not holding himself out as already

working for Isosceles, but rather that he intended to work for Isosceles, and

that if the project was not funded, then the agreement would be invalid.

TT 586.

Dr. Li worked with Mr. Thompson in an effort to obtain an H1 visa for

Dr. Li.  TT 587.  The Isosceles project began on July 1, 2009, so when Dr. Li

began working with Mr. Thompson to obtain an H1 visa in September, 2009,

Dr. Li believed Mr. Thompson's efforts were directed toward allowing Dr. Li to

come to work for the Isosceles company on the separate project he and

Mr. Thompson had discussed, not the NSF grant that had been already been

40

awarded and which began on July 1, 2009.  TT 588-89.   As far as Dr. Li is aware, his H1 visa was never approved.  TT 597.

### 5.    Stephen Makrinos.

The government's next witness was Stephen Makrinos.  TT 598. Mr. Makrinos owns a company called Infofusion in Wall Township, New Jersey. TT 599.  It is a private contracting company that supports the United States Army in Aberdeen Proving Ground, Maryland.  Id.  Mr. Makrinos has a bachelor's degree and a Ph.D. in physics from City College in New York.  Id. Mr. Makrinos worked for another defense contractor (CACI) as its chief scientist and vice president before he started his own company.  Id.; TT 600. Mr. Makrinos met Mr. Thompson through his work after Mr. Thompson gave a presentation at the School of Mines regarding a product Mr. Thompson was developing.  TT 600.  Mr. Thompson travelled to New Jersey to give a presentation regarding the product to the management of CACI. TT 601.  After that presentation, Mr. Thompson attended trade shows with CACI to demonstrate Mr. Thompson's product.  Id.  At that time, Mr. Makrinos had not yet started his own company.  Id.  One of Mr. Makrinos's responsibilities at CACI was to seek out emerging and cutting edge technologies, and adapt those technologies to the needs of the military.  Id.

In his capacity at CACI Mr. Makrinos was familiar with grants, but large companies such as CACI did not deal with grants.  Grants are for universities or small companies.  Large companies deal with "white papers," which means a paper which describes the problem, the solution, as well as the technology.

41

The paper includes estimates for cost and time, and is submitted for consideration to, for example, the Department of Defense (DOD).  TT 602.

As far as Mr. Makrinos knew, Mr. Thompson developed his technology, which was a radar type technology that could see through walls, but Mr. Makrinos believed Mr. Thompson also had a team of engineers working with him. TT 603.  Mr. Makrinos understood that Mr. Thompson had a master's degree in engineering.  Id.  Eventually, Mr. Makrinos's dealings via CACI with Mr. Thompson shifted focus.  Id.  Mr. Makrinos attempted to get funding for the radar program from his customers, but was unsuccessful.  Id.  Mr. Makrinos submitted a white paper and requested $2 million. TT 604.  The paper was accepted and funded at $1.6 million, but when it came time to dispense the money, he was informed the money could not be dispensed to Mr. Thompson at Realtronics.  Id.  Mr. Makrinos was not told why the money could not be dispensed to Mr. Thompson.  Id.

After that, the focus of Mr. Makrinos's work with Mr. Thompson shifted to photovoltaics (solar).  Id.  When he worked for CACI, Mr. Makrinos dealt with many small companies and universities.  TT 604-05.  Mr. Makrinos submitted white papers based upon Mr. Thompson's radar work and upon the work Mr. Thompson was doing with Dr. Qiao at SDSU.  TT 605.  Mr. Makrinos was aware Mr. Thompson was seeking a grant for the photovoltaics work with Dr. Qiao, but he (Makrinos) was not involved in applying for the grant.  Id.

Mr. Makrinos explained that for both Mr. Thompson's radar project and his solar project, Mr. Thompson had wanted Mr. Makrinos to join him and form

42

a new company.  TT 607.   But Mr. Makrinos could not do that while he was still employed with CACI, because it would be a conflict of interest.  Id. Because the funding never came through, Mr. Makrinos did not leave his former company to become an officer in Mr. Thompson's proposed companies. Id.  Mr. Makrinos told Mr. Thompson that he (Mr. Thompson) could not list him as an officer of Mr. Thompson's companies for this reason.  TT 608.

Mr. Makrinos was unaware that Mr. Thompson had listed him (Makrinos) as the CEO of Isosceles, LLC on the NSF grant application in February, 2009.  TT 609.  Mr. Thompson did not inform Mr. Makrinos that he had listed Mr. Makrinos as the CEO of Isosceles.  Id.  Mr. Makrinos explained that he would not have left his prior company for a new start-up unless there had been proven science and enough money ($2 million) to get the new company going.  TT 606.  These two conditions were not met when Mr. Thompson listed Mr. Makrinos on the Isosceles NSF grant application in February, 2009. TT 610.

Mr. Makrinos had heard of Kelly Hoyle—he believes that is Mr. Thompson's sister.  Id.  Mr. Thompson told Mr. Makrinos that Kelly Hoyle would be involved in the ultimate marketing of the product because she had an existing distribution company and sales force.  TT 610-11.  He had also heard of Dr. Jing Li—Mr. Makrinos understood that Dr. Jing Li would be the university researcher on the project. TT 610.   Mr. Makrinos insisted that Mr. Thompson told him these details, but that he (Makrinos) had not agreed to be the CEO of Isosceles because the company did not yet exist, as the

43

technology was not yet viable and they did not have enough money to start a new company.  TT 611.

Mr. Makrinos did not become aware the Mr. Thompson had incorporated Isosceles until an investigative agent visited his office at CACI.  Id. Mr. Makrinos never received any financial compensation from Isosceles, LLC or the NSF grant.  Id.  Mr. Makrinos had, however, provided Mr. Thompson with a copy of his résumé.  TT 612.

Eventually Mr. Makrinos became aware that Mr. Thompson was having problems with SDSU.  TT 617.  Mr. Makrinos had earlier tried to connect Mr. Thompson with a professor at the New Jersey Institute of Technology (NJIT), Dr. Som Mitra.  TT 618.  Mr. Makrinos was attempting to provide his expertise in photovoltaics.  Id.  Mr. Makrinos did not, however, take any trips to the east coast with Mr. Thompson to attempt to get investors for Dr. Qiao's science regarding photovoltaics.  TT 620.  The only trips he and Mr. Thompson took were when he was with CACI, and those were to trade shows to promote Mr. Thompson's radar technology.  Id.

Beginning in 2008, Mr. Makrinos began discussing a commercial venture in solar technology with Dr. Qiao and Mr. Thompson.  TT 621.  They discussed forming a company named Isosceles, LLC which would be based in Virginia. Id.  Mr. Makrinos asked Mr. Thompson to keep him advised about his (Thompson's) relationship with SDSU, and gave Mr. Thompson advice about the terms to be included in an agreement between SDSU and Isosceles. TT 621-22.

On cross-examination, Mr. Thompson's attorney discussed other grant applications that Mr. Makrinos worked on with Mr. Thompson. TT 625. Mr. Thompson's attorney emphasized an email between Mr. Makrinos and Mr. Thompson that was dated in June, 2008, regarding one of these other grant applications in which Mr. Thompson referred to Mr. Makrinos as a "principal" of the grant applicant company (TT 626-27) but Mr. Makrinos insisted that in that situation, he was not a principal of the company, but rather a principal investigator.  TT 628-29.  Mr. Makrinos emphatically insisted he would never be listed as a principal of any company other than CACI during the time he was employed by CACI.  TT 630.  He insisted that any of the dealings he had with Mr. Thompson regarding starting a business with Mr. Thompson were purely draft business plans that never came to fruition because the funding never came through.  TT 629-31, 646-47, 662-63. Mr. Makrinos explained that he and Mr. Thomspon had several draft business plans for several different ideas.  TT 641.  On cross-examination, however, Mr. Thomson's counsel pointed out that Mr. Makrinos had not objected when Mr. Thompson represented work that had actually been done by Mr. Makrinos as having been done by or on behalf of "Isosceles" on a business proposal for a different technology the two were working on together.   TT 664-65. Mr. Makrinos was very surprised to learn from investigators who contacted him about this case that Mr. Thompson represented to the NSF that Isosceles was incorporated as of the date of the NSF grant application (February, 2009), because he (Makrinos) did not believe Isosceles existed as of that date.  TT 678.

### 6.   Kevin Kephart.

The government's next witness was Kevin Kephart.  TT 685.  Mr. Kephart is the vice president for research and economic development at SDSU.  Id.  In that position, he is responsible for the management, protection, and commercialization of the university's intellectual property.   TT 686-87.  In his capacity at SDSU, he became aware of Scott Thompson in May, 2008. TT 687.

A technology transfer office was established at SDSU in 2008.  TT 688. The director of that office was Dr. Denichero Otsuga.  TT 689.  Mr. Kephart familiarized Dr. Otsuga with SDSU's portfolio of intellectual property, what stages they were in, and this included Mr. Thompson's communications with Mr. Kephart.  Id.  From that point on, the responsibility was handed over to Mr. Otsuga.  Id.  Later, Mr. Kephart became aware of the NSF grant involving Isosceles and SDSU as a sub-awardee, with the primary person involved at SDSU being Dr. Qiao.  The person named as the PI was Dr. Jing Li.   TT 689-90.  It was his understanding that the PI needed to be an employee of the primary awardee (the company—Isosceles).  TT 690.  The person representing the company was Mr. Thompson.  Id.  Dr. Qiao was a professor in the electrical engineering department, and Dr. Li was a post-doctoral research associate. TT 690-91.  Mr. Kephart understood that under the terms of the grant, Dr. Li was supposed to have been an employee of Isosceles.  TT 691.

Later, in August, 2009, Mr. Kephart became aware that Isosceles had requested SDSU to handle Dr. Li's payroll on behalf of Isosceles on a pass-through or reimbursement basis.  TT 691-92.  Mr. Kephart denied that request.

46

TT 692.  He believed that would make Dr. Li the employee of SDSU and that was not allowed by the grant, so he disallowed it.  Id.  That was the end of the inquiry and Dr. Li's salary was not run through SDSU on behalf of Isosceles. Id.

Mr. Kephart was aware of an ongoing dialogue between Dr. Qiao and Mr. Thompson regarding Dr. Qiao's growing impatience with Mr. Thompson about getting Dr. Li hired at Isosceles.  TT 693.  Mr. Kephart was also aware of email exchanges between Dr. Qiao and Mr. Thompson regarding submission of a progress report by Dr. Qiao in November, 2009.  TT 694.  Then, Mr. Kephart became aware in an email dated November 17, 2009, that Mr. Thompson terminated the sponsored research agreement between SDSU and Isosceles, LLC.  TT 696-97.

Mr. Thompson claimed that because issues developed between Isosceles and SDSU, he was prevented from getting investor interest in the endeavor, and therefore he notified the university to cease all research, work efforts, and other expenses and to close the project within 60 days.  TT 697. Mr. Thompson's notification cited problems with the university's technology transfer office.  TT 698.  Mr. Kephart had been aware of ongoing difficulties between Dr. Otsuga and Mr. Thompson.  Id.  Specifically, there were disagreements between the two regarding whether SDSU would make a business decision to protect the technologies Dr. Qiao was working on through a patent or not.  TT 698-99.  From the university's standpoint, the information

47

was just not mature enough to agree to the terms Mr. Thompson was looking for.  TT 699.

Mr. Thompson instructed SDSU to submit a final report on the work done on the Isosceles NSF grant project, along with a detailed list of expenditures and that upon review and approval by Isosceles and the NSF, final payment would be submitted to SDSU within 30 days.  TT 700.  Two days later, Mr. Thompson indicated to SDSU officials that NSF required a final technical report within fifteen days.  TT 700.  University officials questioned the short timeline and believed the final report was not due for either 30 or 90 days, so Mr. Otsuga asked Mr. Kephart to contact the NSF directly for clarity. TT 701.  In the meantime, Dr. Qiao was working on drafting the report.  Id. The full sub-award to SDSU was $75,000.  TT 703.  Dr. Qiao believed SDSU spent much more than that on the project.  Id.  Dr. Qiao had the report drafted within twelve days.  TT 702.

Mr. Kephart indicated that from the date of notification by Mr. Thompson (November 17, 2009) no further work was done on the Isosceles NSF grant by SDSU.  TT 704-05.  Bobby Markham from the office of grants and contracts at SDSU worked to pull the final invoice together.  TT 703.  When Mr. Thompson disputed some of the items on the initial invoice sent to Mr. Thompson, Mr. Markham agreed to remove them, just to close out the project.  TT 710-11.  The final invoice from SDSU for $32,486.86 has never been paid by Mr. Thompson.  TT 712.  Mr. Markham did supply Mr. Thompson

48

with the documentation to support the final invoice for the $32,486.86 amount, but Mr. Thompson still did not pay SDSU.  TT 726-27.

Mr. Kephart also explained the time sheets used at SDSU.  TT 715.  He explained the reason that the times sheets have zeros on them is that the sheets are only used to record vacation and leave hours, not hours worked.  Id. If a person is working on a federally funded grant, there is a different document used to record which grant should be charged with your time.  TT 717.  It is called a time and effort certification.  Id.  On those documents, the person estimates what percentage of their time they spend on which grant project. TT 718.

Mr. Kephart agreed that once the Office of Inspector General (OIG) from the NSF got involved, Bobby Markham from the SDSU office of grants and contracts discontinued his communication with Mr. Thompson.  TT 722. Beginning on 2011 or 2012, SDSU hired grant proposal specialists to assist faculty in developing grant proposals to make the university more competitive in receiving grant funds.  TT 723.  The grants and contracts office (Bobby Markham) assists post-award activities, such as financial management, collection of invoices, maintaining accurate time and effort reports, etc. TT 723-24.  The university also has an international student office which assists students and faculty with visa issues.  TT 724.

### 7.    Special Agent Steve Scully.

The government's next witness was Special Agent Steve Scully.  TT 750. At the time of trial, Agent Scully was employed by the United States Postal

Service, but he was previously employed by the Office of Inspector General (OIG) for the NSF.  Id.  While employed with the OIG for the NSF, he investigated Mr.  Thompson.  Id.  In the course of that investigation, he issued subpoenas for various institutions, including banks and credit card companies. Id.

Agent Scully explained that Mr. Thompson had opened a bank account for Isosceles, LLC at Dacotah Bank on June 23, 2009.  He signed for the account using the name Scott Thompson-Kirchoff.  TT 752-53.  Mr. Thompson opened the account with a $100 deposit.  TT 753.  On July 6, 2009, the account indicated a $100,000 deposit from the NSF.  TT 754.  Thereafter the account indicated activity making payments to various credit cards and other institutions, such as Mr.  Thompson's insurance agent, health insurance company, the phone company, etc.  TT 750 through 917.  Agent Scully summarized how the $100,000 which was received into the account from the NSF was distributed, and how he matched the withdrawals from the Isosceles account to payments made on Mr. Thompson's personal credit cards and other accounts.  Id.  Agent Scully subpoenaed the records from the Dacotah bank account and Mr. Thompson's various other bank and credit card accounts to accomplish this task.  Id.  Trial EX 10.  Mr. Thompson withdrew the following from the Dacotah Bank account, which was funded with the $100,000 deposit from the NSF:  $3,258 for insurance; $13,296.25 for an IRA account; $3,250 for telephone bills; $3,550.76 to Blue Cross/Blue Shield; $105 for service charges; and $56,781.52 to pay credit card bills.  See Trial EX 10.  None of

these items were in the name of Isosceles, LLC.  TT 805.  The ending balance in the account was $519.31.  TT 761.  Mr. Thompson also made a deposit of $7,000 into the account in December, 2010, by writing a personal check from a different bank account. TT 762-63.  In that same month, Mr. Thompson wrote himself a check from the Isosceles account for $10,813, noting that it was for "payroll" for work done in July, 2009.  TT 762-63, 916.

### 8.    Special Agent Michael Pritchard.

The government's next witness was Special Agent Michael Pritchard. TT 806.  Agent Pritchard is also a Special Agent for the OIG at the NSF.  Id.  He is responsible for investigating allegations of fraud, waste, and abuse as they pertain to NSF programs.  Id.  He was involved in the investigation of Mr. Thompson.  TT 807.  It is his recollection that the investigation began in approximately April, 2010.  Id.

Agent Pritchard and Agent Scully attempted to contact Dr. Jing Li at the Virginia address that was listed for Realtronics after the text in the Isosceles proposal was flagged when it had been run through a software program to detect replication from websites or scientific papers.  TT 808.  In response to that letter, they received a phone call from a person named Kelly Hoyle, indicating she had never heard of Dr. Jing Li.  TT 809.   The letter was mailed to Jing Li because he had been named the principal investigator on the face of the proposal.  TT 809.  Next, they Googled Dr. Jing Li to figure out where to reach him.  TT 810.  Then they heard from Mr. Thompson, who had received the letter that his sister (Kelly Hoyle) had forwarded to him.  Id.  Shortly after

all of this happened, they issued a subpoena to Isosceles, LLC seeking financial documentation.  TT 811.

Specifically, they sought information about how the NSF grant funds had been spent, a general ledger, and an accounting for how the funds were spent. Id.  They also requested supporting documentation such as time and effort records, time sheets, receipts, etc.  TT 812.  The subpoena was issued on June 28, 2010, and Mr. Thompson responded on July 21, 2010.  Id.  He responded with a letter and a CD containing attachments.  TT 814.  After they received Mr. Thompson's response, they continued to communicate with Mr. Thompson via email through September, 2010.  TT 812.

The investigators spent a few weeks reviewing the information Mr. Thompson provided in response to the subpoena.  TT 816.  Then, they contacted him and requested further information and documentation.  TT 816. Mr. Pritchard specifically had questions about where the facilities were located in which the work on the grant had been done and where Realtronics was operating out of.  TT 817.  Also, the description of the work that had been done needed to be clarified.  Id.  Agent Pritchard also requested clarification about the identity of Mr. Thompson's investors and partners.  Id.

In his correspondence with Agent Pritchard, Mr. Thompson stated that he had not yet paid SDSU the amount it had invoiced because he (Thompson) believed SDSU had overbilled Isosceles.  TT 818.  Mr. Thompson questioned whether SDSU had really done any new research, because Dr. Qiao told him he had not had a chance to do much work on the project on the day

52

Mr. Thompson terminated the collaborative research agreement.  TT 818-19.

Mr. Thompson intimated to Agent Pritchard that he believed the report

submitted to Isosceles (and to the NSF) was not "new" research, but that he

was unable to prove it.  TT 819.  Mr. Thompson also told Agent Pritchard that

because of all these outstanding issues, he had not yet paid himself, either.

TT 820.

     A review of the accounts, of course, revealed that Mr. Thompson had

paid himself, because by that point in time he had spent a large portion of the

NSF funds that had been deposited into the Isosceles bank account.  Id.

Mr. Thomson told Agent Pritchard, however, that because he had not yet paid

SDSU or himself, he would not be able to list the majority of the costs of the

grant project.  Id.  Specifically regarding the Isosceles lab facilities,

Mr. Thompson stated that the facilities were owned by Realtronics and made

available to Isosceles.  TT 822.  He attached a photo of the facilities in an email

attachment (TT 821) and described the facilities as having power supplies,

celioscope, single generators, computers, laptops, office equipment, office

furniture, lab space, and 1,500 square feet.   TT 822.  Mr. Thomspon also

asserted he owned several commercial buildings which made space available

for the project.  TT 824.  Mr. Thompson explained that he owned Realtronics,

which owned all of the previously described building and equipment which was

loaned to Isosceles for the project.  TT 822.    He also explained he was the sole

Isosceles employee who worked on the NSF grant project.  Id.

Agent Pritchard also spoke with Mr. Thompson in person on October 19, 2010.  TT 822.  Agent Pritchard showed Mr. Thompson the photo of the facilities Mr. Thompson had emailed earlier.  Mr. Thompson immediately said he no longer had access to those facilities, and that they had not been used on the grant project.  TT 823.  Mr. Thompson explained the photos depicted in the email were actually part of a hotel property that he owns in North Dakota, which is rented out to hunters.  Id.  Agent Pritchard has never seen anything that establishes any part of the hotel is a 1,500 square foot research facility. Id.  Mr. Thompson also admitted he did not have access to SDSU's equipment during the time of the grant period.  TT 824.

Additionally, Mr. Thompson explained to Agent Pritchard that he (Thompson) spent 83 hours of his time trying to get Dr. Li's paperwork in order to hire Dr. Li.  TT 824-25.  But, Agent Pritchard explained, Dr. Li was supposed to have been hired before the grant period began.  TT 824.  Mr. Thompson also claimed to have spent a "few days" discussing the project and the equipment and facilities with Dr. Li.  TT 825.  The remaining time he worked on the project, Mr. Thompson asserted was spent on progress and financial reporting. Id.  He explained that outside of writing the reports, his role in the grant project was to have been measuring the current voltage curve on the photovoltaics samples provided by SDSU.  Id.  But, Mr. Thompson asserted, he could not perform this part of his assignment, because the project was cancelled before SDSU submitted a set sample.  TT 825-26.  He continued by explaining that most of the hours he submitted were spent working on the

54

Phase II portion of the project, the commercialization plan.  TT 826.  That time was spent trying to negotiate an acceptable commercial license agreement with SDSU and seeking private capital for the project.  Id.

In response to Agent Pritchard's inquiry about Mr. Thompson's partner, Mr. Thompson explained he had three different partners he'd worked with over the years, including Mark Gatanas, Stephen Makrinos, and David Villain. TT 826-27.  Agent Pritchard asked Mr. Thompson to specify which expenses of the grant had been paid to date, and to supply the supporting documents for those charges, including indirect costs, such as utilities.  TT 828.  The reason for this request was, Agent Pritchard could not tell from Mr. Thompson's initial response compared to his email exchanges whether these expenses had been paid or not.  Agent Pritchard was trying to determine what Mr. Thompson had actually spent the grant money on to date at that point.  TT 828.  Basically, Agent Pritchard wanted to see how the $100,000 in NSF grant money had been spent.  Id.

Agent Pritchard also asked for a list of people who worked at the facility and who worked on the grant award.  TT 829.  There were several people named in the proposal, so they wanted to know if those people were at the facility doing some sort of work.  Id.  In his written response, Mr. Thompson explained the facility was in Hettinger, North Dakota, and that he was the only Isosceles employee who worked on the grant proposal.  Id.  In the in-person interview, Mr. Thompson admitted that the photos he submitted in the email he sent were not really of this North Dakota facility.  TT 830.

55

The time sheets that were attached to the August 10 response Mr. Thompson sent to Agent Pritchard's subpoena were missing some information.  TT 831.  One column, which contained the description of the work performed, was cut off so that Agent Pritchard could not discern what Mr. Thompson did with his time.  Id.  Agent Pritchard therefore asked Mr. Thompson to re-send the time sheets.  Id.  Mr. Thompson re-sent the time sheets on August 13.  Id.  These time sheets had been updated and the columns which contained the amount of time spent had been altered from the earlier version Mr. Thompson sent to Agent Pritchard on August 10.  TT 835. In some instances the category describing how Mr. Thompson spent the time worked changed.  Id.; TT 836.  Mr. Thompson did not explain in the email conveying the second set of time sheets that he had changed them.  TT 836. During his October, 2010, in-person interview, Mr. Thompson explained that he must have gone back and made corrections in the time sheets before he re-sent them.  Id.

Mr. Thompson also explained that in or around November, 2009, his computer malfunctioned, causing him to lose the financial information pertaining to the grant.  TT 837.  The time sheets also revealed that Mr. Thompson charged time for another, completely unrelated project.  TT 838. In the documentation he provided, Mr. Thompson showed $106,670.25 of pending payroll expenses due to Isosceles, LLC.  TT 843.  He also showed that the $32,486.86 final invoice due to SDSU had not been paid.  TT 845.

Agent Pritchard also asked Mr. Thompson for documentation about the hiring of Dr. Jing Li.  TT 846-47.  Agent Pritchard received a copy of a form Mr. Thompson completed to attempt to move Dr. Li's visa, but that was after the award period.  TT 847.  Agent Pritchard never received any documentation to show that Dr. Li had been hired by Isosceles.  TT 848.

Eventually Agent Pritchard asked Mr. Thompson for the names and contact information of people who could verify he (Thompson) had actually done the work on the Isosceles grant, including people connected with a different grant Mr. Thompson was working on and people at New Jersey Institute of Technology (NJIT).  TT 850.  Agent Pritchard also inquired about obtaining Mr. Thompson's computer.  Id.  Mr. Thompson agreed to obtain the contact information, but informed Agent Pritchard that though his computer did not "crash" he had updated it to a different form of Windows and the memory stick he had been using was "blown away".  Id.

In the personal interview with Agent Pritchard, Mr. Thompson explained that in approximately November, 2009, he wanted to move the sub-award to from SDSU to NJIT.  Id.  Mr. Thompson could not remember the name of the individual at NJIT, but later emailed that it was Dr. Som Mitra.  TT 851.  There were emails between Mr. Thompson and Dr. Mitra in which Mr. Thompson claimed that, on November 13, 2009, he had approximately $30,000 to $40,000 of the grant money left.  TT 852.   It did not appear to Agent Pritchard that Mr. Thompson ever told Dr. Mitra that the NSF grant money could not be transferred to a different academic partner.  TT 854.

57

Mr. Thompson also told Agent Pritchard via email in December, 2010, that he "stored" some of the grant funds on credit cards that were set aside solely for the Isosceles project. TT 856.  He did not believe that was specifically prohibited.  Id.  He insisted that at the end of the project, all funds were spent in accordance with grant conditions.  Id.  Mr. Thompson also requested advice from Agent Pritchard about how much of his own administrative time was permissible, and indicated that if he did not hear from Mr. Pritchard by a certain date, he (Thompson) would assume he could retain the funds.  TT 857. Agent Pritchard advised Mr. Thompson that he could not get an answer to him so quickly.  TT 858.  At trial, Agent Pritchard explained it is not his job to give legal advice, but rather to investigate.  Id.   At no time did Agent Pritchard voice an objection to Mr. Thompson to paying the SDSU invoice or to Mr. Thompson paying himself from the NSF grant funds.  TT 858-59.

Agent Pritchard explained that Mr. Thompson had been involved in many other SBIR and/or STTR grants from the NSF before the Isosceles grant. TT 860-63.  In the majority of those grants, Mr. Thompson himself was listed as the PI.  TT 861.  Each time he received one of these grants (six times he received a Phase I), it would have been mandatory that he attend the NSF workshop which details the rules of the program.  TT 874.  Mr. Thompson told Agent Pritchard that he did attend those workshops between six and a dozen times.  Id.  He quit attending after 2003 because, according to Mr. Thompson, he made a conscious decision to get out of the SBIR rules.  TT 875.

58

Agent Pritchard discussed the talk that is given at the SBIR/STTR workshop program regarding the program rules. TT 884-85. The talk includes the strict requirement regarding primary employment of the PI. TT 885. A specific example used during the talk is one where the PI was employed by the university partner rather than the company. TT 886. The talk discussed why such an arrangement is not allowed under the program rules. Id. The talk warned of what could happen if the program rules were not followed, including criminal charges and penalties. Id. The talk also clearly advised the program awardees to always keep avenues of communication open. TT 887. It also warned to be sure that all information provided was accurate and that certifications were true before submitted to the government. Id. Finally, the talk emphasized the importance of keeping the grantee's program director advised of any changes that occur during the course of the grant. TT 888. When Agent Pritchard talked with Mr. Thompson about the 6-12 times in the past that he had attended NSF grant workshops, Mr. Thompson said he recalled receiving the presentation from the OIG on what he could not do with the grant funds. TT 889.

Agent Pritchard also recalled that during Mr. Thompson's interview, he shared that he got away from SBIR type funding for a time around 2003. TT 890. Instead, he sought venture capital funding for his work. Id. In approximately 2006, however, that type of funding dried up. Id. As a result, Mr. Thompson was forced to look for other ways to finance his business

ventures, including friends and family.  TT 890.  He also incurred nearly $600,000 in credit card debt.  Id.

When Agent Pritchard talked to Mr. Thompson about Dr. Jing Li, Mr. Thompson admitted he was never able to hire Dr. Li.  TT 891. Mr. Thompson admitted he knew it was a mistake to submit the initial request for payment to the NSF, and that he wouldn't do it again.  Id.  Mr. Thompson admitted to Agent Pritchard, "that's what I did wrong."  Id.  Mr. Thompson admitted he used his own contact information for Jing Li in the proposal because it would not have looked good to use Dr. Li's SDSU contact information.  Id.  Mr. Thomson said he just never got around to setting up an Isosceles email domain, so he used the Realtronics email address.  TT 892.

Regarding the issue of the PI needing to be an employee of the company, Mr. Thompson told Agent Pritchard that before when he had acquired NSF grants and worked with the School of Mines in the early 2000's, it had been easy to just transfer student visas over to his company.  Id.  Mr. Thompson claimed he had changed a PI midway through a project before and never had a problem with it.  TT 893.  He did not provide any specific examples of changing PIs midway through a project, or of not having a PI hired before the project began, however.  Id.

Mr. Thompson also admitted Isosceles was not really able to work on the NSF grant project because, he claimed, the Isosceles portion was dependent on SDSU to finish their portion of the tasks first.  TT 893.  This did not make sense to Agent Pritchard because if Dr. Li had been hired by Isosceles, then

60

Dr. Jing Li could have begun work on task on behalf of Isosceles, but Dr. Li could not do any of the Isosceles tasks because he was never hired. TT 893-94. Mr. Thompson could not produce any documentation to show he had ever hired Dr. Li, but claimed they had an informal or verbal agreement.  TT 894. Mr. Thompson told Agent Pritchard that he began trying to change Dr. Li's visa in late July, 2009.  Id.   The documentation Mr. Thompson eventually supplied to Agent Pritchard, however, showed that he began the visa process for Dr. Li in September, 2009.  TT 896.  The application was denied because it was either inaccurate or incomplete.  Id.  After further questioning, Mr. Thompson said that he did not try to get Dr. Li hired earlier because he was too busy and he was more focused on trying to keep his investors happy.  TT 897-98.

Mr. Thompson explained to Agent Pritchard that his (Thompson's) relationship with SDSU went downhill at about the same time that the NSF grant money was awarded. TT 899.  This was the same time that Denichero Otsuga was hired to run the Technology Transfer office at SDSU.  Id. Mr. Thompson believed Mr. Otsuga was putting unreasonable limitations on Mr. Thompson's ability to market Dr. Qiao's technology to potential investors. Id.  As a result of that conflict, Mr. Thompson wanted to move the grant to NJIT.  TT 900.  Mr. Thompson told Agent Pritchard he stuck with the venture too long, and that he should have moved it to NJIT.  Id.  Mr. Thompson admitted later in the interview with Dr. Pritchard that his part in the grant work amounted to "wordsmithing" the final report that was submitted to the NSF.  TT 901.

Mr. Thompson still maintained to Agent Pritchard, however, that he had been overbilled by SDSU.  TT 902.  He did not claim he had paid the outstanding invoice for over $32,000 which had been submitted to him by SDSU, but told Agent Pritchard he was awaiting some further supporting documentation from SDSU.  Id.  Agent Pritchard testified, however, that the final report which Mr. Thompson had submitted indicated on its face that SDSU had already been paid $55,150.05 from Isosceles.  TT 1011.

Agent Pritchard understood that the final report which was submitted indicated it on the cover page that it had been submitted by Dr. Jing Li. TT 903.  Agent Pritchard already knew, however, from speaking with Dr. Li that Dr. Li had not submitted the report.  Id.  Agent Pritchard asked Mr. Thompson how he arrived at the actual expense numbers in the final report, Mr. Thompson again explained that because he lost information on his computer in November, 2009, the numbers submitted for actual expense were a rough estimate.  TT 904.  Mr. Thompson explained he had gone back through his emails and other documentation to try to recreate how he had spent his time during the course of the grant period, because he had not kept a detailed calendar.  Id.  It appeared Mr. Thompson had submitted expenses including a salary amounts for both himself and Dr. Li, even though he had never hired Dr. Li and Dr. Li never worked for Isosceles.  TT 905-07.  Mr. Thompson was not able to provide any documentation to support these expenses other than his own time sheets.  TT 907.  Mr. Thompson submitted $34,471 in actual

salary/benefits expenses.  TT 906.  This was slightly above the amount approved for both his and Dr. Li's salary/benefits ($33,241).  Id.

At the time of Agent Pritchard's interview with Mr. Thompson (October, 2010), Mr. Thompson claimed that between $50,000 and $60,000 remained in the Isosceles bank account. TT 908.  In reality, on the date of Mr. Thompson's interview with Mr. Pritchard, the balance in the account was $5,605.29. TT 909.  Mr. Thompson did not initially admit during the interview that he had used over $50,000 of the NSF funds to pay credit card bills.  Id.  At some point during the interview, Agent Pritchard confronted Mr. Thompson with the bank statement from Dacotah Bank, showing the actual amount in the account. TT 909.  Faced with this documentation, Mr. Thompson admitted he had used the funds to pay off credit card bills unrelated to Isosceles in order to avoid interest charges.  TT 910.  Mr. Thompson justified this decision by theorizing that once the credit cards were paid off, they could be re-dedicated to solely pay expenses incurred by the NSF grant project.  Id.  Agent Pritchard found, however, that those credit cards were subsequently used to pay for other things, such as charges to restaurants, Wal-Mart, etc.  TT 911.  Additionally, Mr. Thompson had never contacted the NSF and gotten its permission to use the grant funds in this fashion.  Id.

Later in the interview, however, Mr. Thompson admitted to Agent Pritchard that he "probably was not driving in a straight line" and that he was "probably not squeaky clean" with regard to his use of the NSF funds to pay his credit card bills. TT 911.  Agent Pritchard asked Mr. Thompson about the

monthly auto-payments that were set up for one of the personal credit cards from the Isosceles bank account, and Mr. Thompson claimed that must have been something his wife had set up.  TT 912.  Mr. Thompson admitted the phone bill that was paid from the Isosceles account was unrelated to the NSF grant program, but claimed he was using the allowed 7% discretionary amount from the grant budget to pay the phone bill.  Id.

Agent Pritchard identified the final report which was submitted upon request of Josephine Yuen after the grant was terminated.  TT 913-14.  The "submitted by" in the report was dependent upon the user ID that was used to log on to the FastLane system.  TT 914.  The final report indicated it was submitted by Dr. Jing Li, the principal investigator (PI) because that is whose password and ID was used to log on to the FastLane system.  Id.

During their email exchanges spanning from December, 2010, through January, 2011, Mr. Thompson explained that he deposited funds back into the Isosceles account to cover expenses, and that he would do the same again to cover any remaining expense.  Id.  This reference referred to Agent Pritchard's review of the records which revealed there was little or no money left in the Isosceles account.  TT 914-15.  So, Agent Pritchard could not understand how Mr. Thompson planned to pay the outstanding SDSU invoice.  Id.
Mr. Thompson's explanation was that he had "stored" the grant funds on his various credit cards, and that he had deposited funds back into the account when necessary, and planned to do the same thing again when it came time to pay the remaining expenses.  TT 915.

As part of his investigation into this matter, Agent Pritchard obtained the time and effort reports from SDSU.  TT 918.  From those, he learned that Dr. Li had reported he worked over 160 hours on the Isosceles project.  TT 919.  Dr. Li was listed as a senior personnel project participant in the final report which was submitted to the NSF.  Id.  Though the final report did not specifically state that Dr. Li worked on the project as an Isosceles employee, the report itself indicated on its face that it was submitted by Dr. Li as the PI on the project.  TT 919-20.  Agent Pritchard testified that the "submitted by" portion of the final report is filled in on the final report form depending upon who logged into the FastLane system to complete the form. TT 921.  Agent Pritchard also confirmed that the only person allowed to complete the final report form is the PI.  TT 921.   Agent Pritchard clarified, however, that just because the form was "auto filled" by the system did not prevent the person who submitted it from adding clarifying information in the text box portions of the form, where the submitter is allowed to add whatever information they wish.  TT 993.  So, for instance, in those sections of the final report form, Mr. Thompson could have indicated that Dr. Li did not work for Isosceles as the PI, even though the remainder of the form appeared to have been submitted by   Dr. Li as the PI on behalf of Isosceles because of the auto-fill feature of the FastLane program, and because of the limitation that the final report could only be completed by the PI from the company.  Id.

In his conversations with Agent Pritchard, Mr. Thompson justified his non-payment to SDSU by citing an email received from Dr. Qiao shortly after

the grant was terminated.  TT 957.  That email from Dr. Qiao stated "[i]t's really bad news to cancel the award. I have not spent much of the STTR grant money yet."  TT 958.  Agent Pritchard believed there was a difference between that statement and concluding that Dr. Jing Li had not done anything.  Id.  Two weeks after that email, Mr. Thompson received SDSU's report summarizing their efforts.  Id.  Agent Pritchard conceded that the Isosceles proposal and the final report looked very similar to someone who is not an expert in photovoltaics.  TT 959.

Mr. Thompson had email communications with Agent Pritchard, asking Agent Pritchard to either affirm or object to Mr. Thompson's plan to disburse funds to both himself (Thompson) and to SDSU.  TT 964.  Mr. Thompson asked Agent Pritchard to do this on or before December 31, 2010.  Mr. Thompson also asked Agent Pritchard to advise him about whether he (Thompson) needed to return any of the grant funds to the NSF.  Id.  Agent Pritchard explained, however, that this is not his function as a law enforcement officer.  TT 965, 968-69, 1003-04.  Mr. Thompson should have been asking these questions to his program officer, not to Agent Pritchard.  TT 965-66, 968-69.  As such, Agent Pritchard did not give Mr. Thompson legal advice about whether he had improperly used the NSF grant funds.  TT 969-70.

On cross-examination, Agent Pritchard conceded that certain costs such as fringe benefits, insurance, health insurance, and indirect costs are allowed under the NSF guidelines.  TT   972-978.  But, Agent Pritchard emphasized that those amounts still needed to be within the amount budgeted in the

proposal.  TT 977-78, 980.  For example, fringe benefits for company employees working on the grant are allowable.  Mr. Thompson, however, paid from the Isosceles grant funds $300 per month for his health insurance plus a $13,000 payment into his IRA account.  TT 1021.   In this instance, considering the fact that Dr. Li never became an employee of Isosceles, the maximum grant budget amount for fringe benefits for Isosceles employees would have been $4,848. TT 1023.

On the eighth day of trial, the government rested its case.  TT 1042.  At that time, Mr. Thompson's counsel made a motion for judgment of acquittal regarding counts 1 and 4 (false statements in the initial proposal as to Mr. Makrinos being the CEO of Isosceles).  TT 1044.  The district court denied the motion as to both counts.  TT 1057.  Next, Mr. Thompson's counsel made a motion for judgment of acquittal as to counts 3 and 6 (false statements in the final report as to Dr. Li having been employed as the PI for Isosceles and having worked 160 hours).  TT 1058.  The district court denied the motion as to these counts as well. TT 1063.  Next, counsel moved for judgment of acquittal on counts 2 and 5 (false statements regarding Dr. Li's employment with Isosceles as of June 23, 2009, the date of the request for the initial payment of $100,000).  TT 1064.  The court also denied the motion as to these counts. TT 1066-67.  Counsel moved for judgment of acquittal as to counts 7-9 (wire fraud as to the initial proposal, request for payment, and final report). TT 1067.  The court denied these motions. TT 1068.  Counsel also moved for acquittal on count 10 (receipt of stolen government property).  TT 1068.  The

67

court also denied this motion.  TT 1074.  After these motions were resolved the defense put on its case.

### 9.    **Bobby Markham**.

Mr. Thompson called Bobby Markham as a witness.  TT 1078.  He is an accounting analyst for SDSU.  Id.  He handles approximately 200 grants on a monthly basis.  Id.  He worked on the accounting for the subcontract for SDSU for the Isosceles grant.  Id.  Mr. Markham acknowledged the "first final" invoice that SDSU sent to Isosceles in mid-December, 2009, was challenged by Mr. Thompson. TT 1080.  On December 23, 2009, the revised invoice with the amount $32,046.86 was created, but Mr. Markham could not find a corresponding email sending it to Mr. Thompson.  TT 1082.  Mr. Markham believes the invoice was sent to Mr. Thompson, but he could not locate the email sending the invoice.  Id.  Mr. Markham conceded it was possible that the first time Mr. Thompson received the revised invoice was in February, 2010. (TT 1082) but he believes Mr. Thompson had received it before then, because Mr. Thompson requested all the receipts and documents to support it. TT 1082-83.  The government clarified that Mr. Thompson did make one payment to SDSU for the work it did on the Isosceles grant—the first quarterly invoice for $10,500 which was billed in October, 2009.  TT 1084.  Beyond that, none of SDSU's invoices were ever paid.  Id.  The defense called no other witnesses.  TT 1085.

Mr. Thompson's counsel again moved for judgment of acquittal on all counts after the close of all the evidence. TT 1088.  The district court again

denied the motion as to all counts. Id.  The jury received the case at 11:27 a.m. after closing arguments on the morning of the eighth day of trial (October 29, 2014). TT 1214, Docket 213, p. 10 (minutes of the jury trial).  At 1:45 p.m. the following day (October 30, 2014) the jury indicated it had reached a unanimous verdict, which was read in court at 2:06 p.m. TT 1219; Docket 213, p. 10 (minutes of the jury trial).  The jury found Mr. Thompson guilty on counts 2, 3, 5, 6, 8, 9, and 10 of the (revised) superseding indictment, and not guilty on counts 1, 4, and 7.  CR Docket Nos.  213, p. 10 (jury trial minutes); 217 (verdict form).[5]

## C.     Post-trial, Sentencing and Appeal

The district court originally set Mr. Thompson's sentencing for February 2, 2015.  CR Docket 220.  Attorney Poppen, however, moved for an extension of time to move for a judgment of acquittal or for a new trial under FED. R. CRIM. P. 29 and 33.  CR Docket 221.  The district court granted the motions for extensions of time (CR Docket 222) and Attorney Poppen promptly moved to withdraw from the case. CR Docket 223.  Attorney Poppen cited a conflict of interest because Mr. Thompson had indicated his intent to file a § 2255 motion to vacate based upon ineffective assistance of counsel.  Id.  The district court denied attorney Poppen's motion to withdraw (CR Docket 230), and attorney

---

[5] The counts of the superseding indictment were renumbered when presented to the jury after the district court dismissed count IV upon Mr. Thompson's motion and the government's agreement to the same.  Count V became count IV, count VI became count V, and so on.  As such, the jury received only ten counts instead of the eleven that were in the original superseding indictment. Compare jury instructions (CR Docket 208, pp. 5-16) and verdict form, CR Docket No. 217 with CR Docket No. 92 (superseding indictment).

Poppen then filed another motion for extension of time.  CR Docket 231.  The district court again granted the extension.  CR Docket 232.  Sentencing was re-scheduled for January 27, 2015.  CR Docket 235.

Counsel moved to continue the sentencing and for another extension of time to file Rule 29 and 33 motions.  CR Docket 236.  These motions were granted, and sentencing was set for March 5, 2015.  CR Docket 237.  Attorney Poppen filed another motion to withdraw, again citing a conflict of interest and a breakdown in communication.  CR Docket 247.  The district court denied this motion as well. CR Docket 252.  Sentencing was re-set for May 28, 2015.  CR Docket 254.  On March 30, 2015, Attorney Poppen filed motions for judgment of acquittal and for a new trial under FED. R. CRIM. P. 29 and 33. CR Docket No. 255, 256.  Supporting briefs were filed approximately one month later.  CR Docket 262.

In the meantime, the presentence report was completed, and Attorney Poppen filed a motion for a downward variance, along with a supporting memorandum and several supplements thereto, as well as several letters in support of Mr. Thompson.  CR Docket Nos. 267-74.  Attorney Poppen also filed several objections to the presentence report.  CR Docket No. 234.

On May 28, 2015, the district court entered its order denying Mr. Thompson's motions for judgment of acquittal and for a new trial.  CR Docket 279.  On that same afternoon, the court held Mr. Thompson's sentencing hearing. CR Docket No. 301 (transcript of sentencing hearing,

hereinafter referred to as "ST").  The district court discussed Mr. Thompson's objections to the PSR one-by-one.

Mr. Thompson's first objection was to language in the PSR which referred to the program requirements and other details regarding the NSF grant award. ST at 12-16.  This objection was sustained.  ST 14.

Mr. Thompson's next objection to the PSR regarding a footnote to ¶ 8 (information about the principals and ownership details of Isosceles, LLC) had already been corrected by the pretrial writer, so it was moot.  ST at 16.

Mr. Thompson's third objection was to ¶9 of the pretrial report.  That paragraph explained that NSF had made the initial $100,000 grant payment to Isosceles, and that Mr. Thompson had paid $10,805.49 to SDSU, but then had made several payments to his own personal credit cards.  Following this explanation was a table which outlined the various payments, the dates of the payments, and to what entity the payment was made.  Also included in the table were payments to Mr. Thompson's insurance agency, telephone company, IRA account, health insurance company, and service charges to his bank.  See PSR, ¶ 9.  Mr. Thompson wished to have an addition to ¶9 which explained "the award allowed grantees to approve pre-award costs incurred within the ninety calendar day period immediately preceding the effective date of the award.  The defendant worked on the project for several months before the effective date of the award and thereafter.  The defendant submits that he believed he earned the funds. However, he intended to use the credit cards to pay other costs on the award.  The defendant told OIG officials that he had

71

done this on grants in the past and did not know it was an issue."   The district court denied this objection, because it found there was no evidence in the record to support it.  ST at 18-19.

Mr. Thompson's fourth objection to the PSR was to the wording of ¶ 10 regarding deposits into the Isosceles bank account.  The objection was mooted by the pretrial writer's amendment to the paragraph.  ST at 19.

Mr. Thompson's fifth objection to the PSR was to ¶ 11. This paragraph focused on Mr. Thompson's efforts or lack thereof to hire Dr. Li to work for Isosceles.  Mr. Thompson's objection proposed an entire re-wording of the paragraph, with the exception of the first two sentences.  The district court observed that Mr. Thompson's proposed change to ¶11 appeared to be a statement of the defense version of facts, which was inconsistent with the jury's verdict. ST at 19.  The district court allowed a change in the third sentence to read "[h]owever the defendant made ~~no~~ *some* effort to hire Jing Li, and he assumed it would be easy to get Li an H1 visa."  The district court denied the balance of the objection.  ST at 22.

Mr. Thompson's sixth objection to the PSR was to a technicality in the wording of ¶ 12 of the PSR.  The pretrial writer's amendment to that paragraph mooted this objection.  ST at 22.

Mr. Thompson's seventh objection to the PSR also pertained to a technicality regarding the description of the principals of Isosceles, LLC in ¶ 13 of the PSR.  Again, the pretrial writer's amendment to the PSR mooted this objection.  ST at 22.

72

Mr. Thompson's eighth objection was to the language in ¶ 14 regarding the final report.  The pretrial writer amended the fourth sentence of ¶ 14, rendering part of the objection moot. After the district court, during the sentencing hearing, verbalized its opinion that the remainder of the objection amounted to nothing more than Mr. Thompson's theory of the defense, which was contrary to the verdict, Mr. Thompson withdrew the remainder of the objection. ST at 23.

Mr. Thompson's ninth objection to the PSR was to ¶ 15, which compared and summarized the expenses which were budgeted (projected) in the NSF proposal and which were later claimed by both Isosceles and SDSU in the final report.  Mr. Thompson withdrew this objection during the sentencing hearing as well. ST 23.

Mr. Thompson's tenth objection was to ¶ 16 of the PSR.  This paragraph detailed the amount of money which was due in restitution.  To figure this amount, the pretrial writer discussed how much of the $100,000 NSF grant money was legitimately payable to SDSU and how much, if any, was legitimately payable to Isosceles, LLC.  During the sentencing hearing, Mr. Thompson withdrew the majority if this objection as well. ST at 24.  The second sentence of ¶16 was changed to read, "[t]he total amount was negotiated down from what SDSU originally requested from the defendant in 2010."  ST 25.

Mr. Thompson's eleventh objection was to ¶ 17 of the PSR.  This issue dealt with the amount of the intended loss versus actual loss under USSG

§ 2B1.1 n.3(a)(i) and (ii).  The pretrial writer had suggested the loss amount was $150,000 because Mr. Thompson submitted the fraudulent documents with the intent of receiving $150,000.  Mr. Thompson would have received the final $50,000 had the conditions been met and the second payment been made from the NSF to Isosceles.  The district court emphasized during the sentencing hearing that the amount of the loss ($100,000 versus $150,000) would have an effect on the federal sentencing guideline calculation.  ST at 25.

Mr. Poppen argued the counts of the superseding indictment which involved the initial proposal (i.e. the intent to receive the entire $150,000) were the counts upon which Mr. Thompson was acquitted.  Therefore, the intended loss should not be more than the actual loss.  Ultimately, the district court sustained this objection, and found that the intended loss amount was $100,000, and the actual loss was $87,639,89 (the amount of the grant money which was spent on Mr. Thompson's personal expenses).  ST at 40-41.  Both those amounts resulted in the same guideline calculation under guideline 2B1.1(b)(1)(E), which is the loss of more than $70,000 but less than $120,000.  ST 41.  That this objection was sustained changed Mr. Thompson's total offense level from 17 to 15.  ST at 41.  As a result, the guideline range for imprisonment dropped from 24-30 months to 18-24 months.  Compare, Docket 231, ¶ 64 with Docket 265, ¶ 64; ST 41.

Mr. Thompson's twelfth and thirteenth objection related to ¶¶ 24, 28 and 31 of the PSR and also dealt with the amount of loss under USSG § 2B1.1(b)(E) and (F), which affected the guideline range calculation. ST 42.  The district

court's sustaining Mr. Thompson's previous objection mooted these objections. Id.

Mr. Thompson's fourteenth objection was to ¶ 47 of the PSR, which had listed the year Mr. Thompson and his wife met as 1996 rather than 1998. The pretrial writer amended the report to reflect the proper year, mooting this objection. ST at 42.

Mr. Thompson's fifteenth objection to the PSR was to correct information in ¶ 60 to update his participation in managing rental properties. Again, this objection was mooted by the pretrial writer's amendment to the report. ST 42.

Mr. Thompson's sixteenth objection to the pretrial report was to ¶ 64 of the report, which was the offense level calculation and resulting guideline imprisonment range. This objection was sustained based upon the district court's ruling on the intended loss-actual loss issue, and ¶ 64 was amended accordingly. The paragraph was amended to reflect a total offense level of 15, criminal history category I, and a guideline range of 18 to 24 months' imprisonment. ST at 42. Compare Docket 233, ¶ 64 (total offense level of 17, criminal history category I, guideline range 24 to 30 months' imprisonment).

Mr. Thompson's seventeenth objection pertained to ¶ 78 of the PSR, and to his argument for a downward departure. ST 43. Mr. Thompson objected to the pretrial writer's observations that there were no grounds warranting a departure from the guidelines. While he recognized there were probably no grounds for a downward departure, he wanted to preserve his objection, and referred the court to his separately filed motion and brief in support of a

motion for a downward variance (CR Docket Nos. 267 and 268) in support of a downward variance.  ST 43.

Mr. Thompson's final objection was to ¶ 81 of the PSR, which indicated Mr. Thompson waived his right to appeal, except if the court departed upward from the sentencing guidelines.  The pretrial writer removed this paragraph, thereby mooting the objection.  ST 43.

Attorney Poppen argued vigorously for a downward variance in the form of a sentence of probation only.  ST at 55-56.  Mr. Thompson addressed the court personally, ST at 57-62.  Mr. Thompson primarily explained why he disagreed with the jury's verdict and why he believed he was justified in not paying the invoice from SDSU.  Id.  Next, the government argued vigorously in support of the high end of the guideline range (24 months' imprisonment). ST at 64-74.  Ultimately, the district court applied a downward variance and sentenced Mr. Thompson to five years of probation for each of the seven counts of conviction, each to run concurrently.  ST 84.  The district court also ordered Mr. Thompson to pay restitution in the amount of $87,637.89.  ST 85. Judgment was entered on May 29, 2015.  CR Docket No. 283.

During the sentencing hearing, an issue arose regarding the accurate amount of Mr. Thompson's monthly expenses as reported in the PSR.  See ST at 66-67.  As such, though the total amount of Mr. Thompson's restitution was set, the district court did not set a monthly amount for Mr. Thompson's payments during the sentencing hearing.  Id.  Instead, the court held a hearing on August 27, 2015, at which time the court heard arguments from the

76

government and from attorney Poppen regarding the appropriate amount for monthly restitution payments.  See CR Docket 294.  The court ordered progressive monthly payments, with a beginning amount of $100 per month, not to exceed $1000 per month, until the entire balance is paid.  Id.

On December 17, 2015, Mr. Thompson requested permission to make filings with the district court on a *pro se* basis.  See CR Docket text entry dated December 17, 2015.  Mr. Thompson did not file a direct appeal.  On May 27, 2016, Mr. Thompson filed the instant petition to set aside, vacate, or correct his sentence pursuant to 28 U.S.C. § 2255.  See Docket 1.  On November 26, 2016, Mr. Thompson filed a motion to stay his restitution payments pending the outcome of his "appeal" (referring to his § 2255 petition).  CR Docket No. 303.  The district court denied the motion to stay, but entered a 2nd and then a 3rd amended judgment, lowering the amount of the monthly restitution payments, because of Mr. Thompson's changed life circumstances.  See CR Docket Nos. 312 & 313.

## D.    Mr. Thompson's § 2255 Motion

Mr. Thompson filed several amendments and supplements to his original petition.  See generally, Docket.  Many of these filings had voluminous attachments.  Id.  Then, on March 3-6, Mr. Thompson filed an amended § 2255 petition (Docket 36) along with a supporting memorandum (Docket 37) and several supplements.  Docket Nos. 38-53.  Again, these filings contained numerous and voluminous exhibits/attachments.  Id.  The government moved to quash Mr. Thompson's memorandum/supporting supplements because they

far exceeded the page length (25 pages) allowed by Local Rule 7.1(B)1.  Docket 54.  This judge noted Mr. Thompson's amended § 2255 petition was supported by a 231 page memorandum, and 2,606 pages of exhibits.  See Docket No. 55, Order dated March 28, 2017.  This court denied the government's motion to quash, but granted its alternative request to order Mr. Thompson to re-submit a memorandum which complied with Local Rule 7.1(B)(1).  Thereafter, this court granted Mr. Thompson's request to file a memorandum in excess of the Local Rule's 25 page limit by 16 pages.  See Docket No. 63.  The memorandum this court has considered, therefore, is Mr. Thompson's memorandum (Docket 64) which is in compliance with the court's order, along with his reply brief (Docket No. 85).

In his amended motion (Docket 36), Mr. Thompson articulated four grounds for relief.  In his supporting memorandum, however (Docket 64), Mr. Thompson articulated eight grounds.  The claims articulated by Mr. Thompson in his memorandum are as follows:

1.  Subverting the fact-finding process (this ground contains several sub-parts, all constituting Mr. Thompson's challenges to the veracity of the evidence presented by the government at trial);

2.  Ineffective assistance of counsel (this ground contains several sub-parts, consisting of Mr. Thompson's theories as to how Mr. Poppen was ineffective);

3.  Prosecutorial misconduct (this ground contains several assertions as to  how the government's alleged misconduct during trial purportedly prejudiced Mr. Thompson);

4.  Broadening the indictment;

5.  Dirty hands-fraud on the court;

6.    Vindictive prosecution;

7.    Malicious prosecution in bad faith;

8.    Actual innocence.

The government asserts Mr. Thompson's first ground for relief is barred by the doctrine of procedural default.   The government defends the remaining grounds on their merits.  Though the court analyzes each of Mr. Thompson's grounds for relief and will refer to the grounds for relief as they are numbered in Mr. Thompson's supporting brief, they do not necessarily appear in the same order in this opinion as they appear in Mr. Thompson's brief.

The government now moves to dismiss Mr. Thompson's § 2255 motion for failure to state a claim upon which relief can be granted.  See Docket No. 75.  Mr. Thompson resists the motion.  See Docket Nos. 36, 64, 85.

**DISCUSSION**

**A.    Standard Under Rule 12(b)(6)**

The government's motion is made pursuant to Fed. R. Civ. P. 12(b)(6) and Rule 12 of the Rules Governing Habeas Actions.  These rules allow dismissal of a pleading if the movant has failed to state a claim upon which relief can be granted.  Movants must plead "enough facts to state a claim to relief that is *plausible* on its face."  Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)(emphasis added).

Under Federal Rule of Civil Procedure 8(a)(2), a movant must plead only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Id. at 554-55 (quoting FED. R. CIV. P. 8(a)(2)).  A complaint does not

need "detailed factual allegations" to survive a motion to dismiss, but a [movant] must provide the grounds for his entitlement to relief and cannot merely recite the elements of his cause of action.  Id. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).  There is also a "plausibility standard" which "requires a complaint with enough factual matter (taken as true)" to support the conclusion that the [movant] has a valid claim.  Id. at 556.  The movant's motion must contain sufficiently specific factual allegations in order to cross the line between "possibility" and "plausibility" of entitlement to relief.  Id.

There are two "working principles" that apply to Rule 12(b)(6) motions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  First, courts are not required to accept as true legal conclusions "couched as factual allegation[s]" contained in a motion.  Id. (citing Papasan, 478 U.S. at 286).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (quoting Twombly, 550 U.S. at 555).  Rule 8 "does not unlock the doors of discovery for a [movant] armed with nothing more than conclusions."  Iqbal, 556 U.S. at 678-79.

Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679 (quoting decision below Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)).  Where the movant's allegations are merely conclusory, the court may not infer more than the mere possibility of misconduct, and the complaint has alleged–but has not "show[n]"–that he is entitled to relief as required by Rule 8(a)(2).  Iqbal, 556 U.S. at 679 (emphasis added).

80

The Court explained that a reviewing court should begin by identifying statements in the motion that are conclusory and therefore not entitled to the presumption of truth.  Id. at 679-680.  Legal conclusions must be supported by factual allegations demonstrating the grounds for a movant's entitlement to relief.  Id. at 679; Twombly, 550 U.S. at 555; Fed. R. Civ. P. 8(a)(2).  A court should assume the truth only of "well-pleaded factual allegations," and then may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679.  These are the principles guiding the court's evaluation of respondents' motion.

Rule 12(b)(6) requires the court to evaluate the sufficiency of a petitioner's pleading of a claim by examining his or her petition.  See Fed. R. Civ. P. 12(b)(6); Iqbal, 556 U.S. at 679.  Rule 56, the rule for summary judgment, allows the court to consider affidavits, documents, deposition transcripts and other items extraneous to the petition in determining whether to grant the motion.  See Fed. R. Civ. P. 56.

Courts evaluating a Rule 12(b)(6) motion are not strictly limited to evaluating the petition alone, however.  Dittmer Properties, L.P. v. F.D.I.C., 708 F.3d 1011, 1021 (8th Cir. 2013).  They may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."  Id. (citing Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 n.3 (8th Cir. 2012)

(quoting 5B Charles A. Wright & Arthur R. Miller, <u>Fed. Practice & Procedure</u> § 1357 (3d ed. 2004))).

When a respondent files a response to a § 2255 action, whether it be an answer or a motion to dismiss, the respondent is directed to furnish to the court any briefs or transcripts of the prior proceedings not available to the court which the respondent considers to be relevant.  <u>See</u> Governing Rule 5(c). The responded is *required* to address whether the movant has previously availed himself of other federal remedies.  <u>See</u> Governing Rule 5(b).  Here, the parties have submitted numerous documents and transcripts from the underlying criminal action.  Because these documents are required by Governing Rule 5(c), and because these documents are of the type which the court would be allowed judicially notice, the court considers these documents in ruling on respondents' Rule 12(b)(6) motion.  <u>Dittmer Properties, L.P.</u>, 708 F.3d at 1021; FED. R. EVID. 201(b); Governing Rule 5(c).

**B.    Scope of a § 2255 Motion**

Section 2255 of Title 28 of the United States Code was enacted to supersede habeas corpus practice for federal prisoners.  <u>Davis v. United States</u>, 417 U.S. 333, 343-44 (1974).  Prior to the enactment of § 2255, habeas claims had to be brought in the district where the prisoner was confined, resulting in overburdening those districts where federal correctional institutions were located and presented logistical issues because the record in the underlying criminal case were often in a distant location.  <u>United States v. Hayman</u>, 342

U.S. 205, 212-16 (1952).  The enactment of § 2255 resolved these issues by requiring that the motion be filed in the sentencing court.  Id.

The scope of a § 2255 motion is seemingly broader than the scope of a habeas petition, the latter of which is typically limited to allegations of a constitutional dimension.  Section 2255 allows a federal prisoner to "vacate, set aside or correct" a federal sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  See 28 U.S.C. § 2255.  Where the allegation for relief is *not* based on a violation of a Constitutional, federal statutory right or an assertion that the court was without jurisdiction, the Supreme Court has read a "fundamentality" requirement into § 2255–relief is available for only those errors which constitute a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."  Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999).

Generally, petitioners are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal.  United States v. Frady, 456 U.S. 152, 167-68 (1982); McNeal v. United States, 249 F.3d 747, 749 (8th Cir. 2001).  When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either:  (1) actual innocence or (2) that the procedural

83

default should be excused because there was both cause for the default and actual prejudice to the petitioner.  Bousley v. United States, 523 U.S. 614, 621-22 (1998); McNeal, 249 F.3d at 749.  Therefore, barring a claim of actual innocence, a petitioner must show both cause for why he failed to raise an issue on direct appeal as well as actual prejudice caused by the alleged errors.

Appellate courts generally refuse to review claims of ineffective assistance of counsel on direct appeal; such claims are, therefore, properly addressed in a 28 U.S.C. § 2255 motion such as the one here.  See United States v. Campbell, 764 F.3d 880, 892-93 (8th Cir. 2013); United States v. Lee, 374 F.3d 637, 654 (8th Cir. 2004) (ineffective assistance of counsel claims are not generally cognizable on direct appeal and will be heard only to prevent a miscarriage of justice or in cases where the district court has developed a record on the issue).  Therefore, no procedural default analysis is required before examining a movant's claims of constitutionally-deficient counsel.

**C.    Mr. Thompson's Second Ground For Relief:  Sixth Amendment Right to Effective Assistance of Counsel**

**1.    Strickland Standard**

Mr. Thompson's second ground for relief asserts his trial counsel was ineffective.  The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel.  The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.' " Strickland v. Washington, 466 U.S. 668, 698 (1984) (citing McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970)).  Strickland is the benchmark case for determining if counsel's assistance was so defective as

to violate a criminal defendant's Sixth Amendment rights and require reversal
of a conviction.  Id. at 687.  "When a convicted defendant complains of the
ineffectiveness of counsel's assistance, the defendant must show that counsel's
representation fell below an objective standard of reasonableness."  Id. at 687-
688.  The defendant must also show that counsel's unreasonable errors or
deficiencies prejudiced the defense and affected the judgment.  Id. at 691.  The
defendant must show "there is a reasonable probability that, absent the errors,
the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.
In sum, a defendant must satisfy the following two-prong test:

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so
> serious that counsel was not functioning as the 'counsel'
> guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it
> cannot be said that the conviction or death sentence resulted from
> a breakdown in the adversary process that renders the result
> unreliable.

Id. at 687.

"There is a presumption that any challenged action was sound trial
strategy and that counsel rendered adequate assistance and made all
significant decisions in the exercise of professional judgment."  Hall v.
Luebbers, 296 F.3d 685, 692 (8th Cir. 2002).  It is the petitioner's burden to
overcome this presumption, and a "petitioner cannot build a showing of
prejudice on a series of errors, none of which would by itself meet the prejudice
test."  Id.  Judicial scrutiny of attorney performance is highly deferential, with a

strong presumption that counsel's conduct falls within the range of reasonable professional conduct.  <u>Strickland</u>, 466 U.S. at 698.

### 2.    Ineffective Assistance at Trial

Mr. Thompson alleges his trial counsel was ineffective in several ways. Attorney Poppen has submitted an affidavit addressing these claims.  <u>See</u> Docket 77.  The court addresses each of Mr. Thompson's claims below.

### a.    Failure to investigate the law

In this portion of his ineffective assistance claim, Mr. Thompson asserts his attorney inadequately researched various NSF regulations and laws, including 48 C.F.R. § 31.2 (pertaining to how grant money may be spent); 22 C.F.R. § 62.23(f)(3)(6) (pertaining to the limitations on employment for foreign students who are participating the exchange visitor program); and 31 U.S.C. §§ 6301, 6304 and NSF SBIR-1, § 1 (directing when executive agencies should use grant agreements to transfer things of value to recipients, regarding Mr. Thompson's assertion that he was not guilty of counts 3, 6, 9, and 10 because once the grant funds were transferred to Isosceles, they no longer belonged to the United States).

Attorney Poppen's affidavit (Docket 77, ¶ 11) explains that he did indeed research these portions of the law in addition to numerous other related provisions.  Mr. Poppen explained that he used his professional judgment to

---

[6] Mr. Thompson's brief referred to 22 C.F.R. § 12.23(f)(3), however the court has not been able to location any such section of the Code of Federal Regulations. Mr. Poppen's affidavit refers to 22 C.F.R. § 62.23, which refers to foreign students.  The court therefore assumes Mr. Thompson meant to criticize Mr. Poppen for failing to properly research this section of the Federal Regulations.

decide how to use each of them.  He used 48 C.F.R. § 31.2 to cross-examine Dr. Balan.  Id.  See also, TT at pp. 210 (citing the conditions of the grant award and referring to 48 C.F.R. § 31.2).  The court also notes that pursuant to 48 C.F.R. § 31.201-2(a)(4), in order to determine whether a cost is allowable, one of the requirements to consider is whether the cost is consistent with the terms of the contract with the government.  Therefore, the NSF award contract with Isosceles was necessarily part of the equation.  Though Mr. Thompson is critical of attorney Poppen's alleged failure to understand 48 C.F.R. § 31.2 and apply it to the manner in which Mr. Thompson spent the grant money, Mr. Thompson offers no specifics.  Such conclusory assertions are insufficient to show prejudice under Strickland.  Richardson v. United States, 577 F.2d 447, 452  (8th Cir. 1978); Bryson v. United States, 268 F.3d 560, 562 (8th Cir. 2001) (rejecting ineffective assistance claim because petitioner's claims were brief, conclusory, failed to cite to the record, and failed to make any affirmative showing of what the evidence or testimony would have been).

Mr. Thompson's assertion that attorney Poppen failed to argue the applicability of 31 U.S.C. § 6301[7] through 6304 for the proposition that once the grant money was transferred to Isosceles, it was not a "thing of value" to the United States government, fails.  The record reveals that attorney Poppen did make this argument (TT 1068-73), but the district court rejected it, not because it was untimely as Mr. Thomson claims, but because it was based

---

[7] In the heading of this section, Mr. Thompson refers to 31 U.S.C. § 1301, but in the body of the section he refers to both 31 U.S.C. § 1301 and §§ 6301 and 6304.  The court assumes Mr.  Thompson's referral to § 1301 was a typographical error.

upon civil, not criminal statutes.  See TT 1073.  Again, Mr. Thompson has failed to show any prejudice under Strickland.

Finally, Mr. Thompson asserts attorney Poppen failed to adequately investigate 22 C.F.R. § 62.23(f).  The subject of this federal regulation is the exchange visitor program for foreign students.  Id.  Mr. Thompson asserts that in the past, he had hired many foreign students without applying for or obtaining a visa.  See Docket 64, p. 16.  Attorney Poppen's affidavit (Docket 77, ¶ 11) indicates attorney Poppen did investigate this federal regulation and that he exercised his professional judgment in determining whether to present it at trial.   Mr. Thompson's defense at trial was to emphasize that (1) he believed Dr. Li would be employed by Isosceles before the grant began,  (2) he believed SDSU would take care of the paperwork to transfer Dr. Li's visa to Isosceles; and (3) he believed it would be easy to transfer Dr. Li's visa once the grant was awarded.  The evidence at trial showed that, regardless of Mr. Thompson's *belief* was about what he needed to do to hire Dr. Li as the PI for Isosceles, Mr. Thompson certified that Dr. Li *was* the PI as of the date Mr. Thompson requested the initial payment but Dr. Li *never became* employed by Isosceles during the grant period and Dr. Li *never received a paycheck* from Isosceles.

The jury found Mr. Thompson not guilty on the count which referred to the proposal.  The verdict therefore reflected that the jury believed Mr. Thompson had the *intent* to hire Dr. Li, but Mr. Thompson did not follow through on this intent.  Mr. Thompson fails to explain how this federal regulation applied to Dr. Jing Li, or how it would have changed the jury's

88

verdict.  This portion of Mr. Thompson's ineffective assistance claim is likewise

conclusory and insufficient to show the prejudice required to prevail under

Strickland.  Richardson, 577 F.2d at 452; Bryson, 268 F.3d at 562.

### b.    Failure to impeach witnesses

Next, Mr. Thomspon asserts he instructed attorney Poppen to "confront

and impeach" witnesses Steineke,[8] Markham, Otsuga, Qiao, Li, and Kephart

about their "false testimony" regarding the work performed by SDSU and the

costs incurred by SDSU in reference to the Isosceles grant.  See Docket 64,

p. 17.   Mr. Thompson opines these witnesses fabricated "hundreds" of false

documents which were used to convict him.  Id.  Mr. Thompson also asserts he

wanted to testify on his own behalf to "fill the gaps" but that attorney Poppen

advised he was not prepared for Mr. Thompson's testimony.  Id.

Attorney Poppen did thoroughly cross-examine Dr. Qiao, Dr. Li, and

Mr. Kephart.  Attorney Poppen called Mr. Markham in Mr. Thompson's case-in-

chief regarding the manner in which the SDSU final report and invoice were

compiled, for purposes of its submission to Mr. Thompson and ultimately to

the NSF.  See e.g. TT at 362-502; 531-36 (Dr. Qiao); TT at 571-95; 596-98

(Dr. Li); TT at 717-25; 733 (Mr. Kephart); TT at 1078-1083, 1084-1085

(Mr. Markham).  Neither the government, nor Attorney Poppen on behalf of

---

[8] The court assumes Mr. Thompson refers to Kimberly Steineke, who is a
program assistant in the Electrical Engineering and Computer Science
Department at SDSU, and is referred to in several of the email exchanges that
were marked as exhibits and received into evidence during the trial.  See e.g.
trial EX 764.

Mr. Thompson, called Denichero Otsuga or Kimberly Steineke as witnesses in Mr. Thompson's criminal trial.

Despite attorney Poppen's direct examination of Mr. Markham and cross-examination of the other witnesses in an attempt to persuade the jury that Mr. Thompson was justified in not paying SDSU any of the NSF grant funds after having receiving the revised invoice and report from SDSU, the jury convicted Mr. Thompson on counts 3, 6, 9, and 10.[9] Mr. Thompson offers no specific manner in which attorney Poppen could have more effectively or thoroughly questioned these witnesses to have better brought the integrity of the SDSU report and invoice into question.    Likewise, Mr. Thompson offers no insight about what further or other evidence favorable to Mr. Thompson could have been extracted had attorney Poppen called Mr. Otsuga or Ms. Steineke to the stand.  "Complaints of uncalled witnesses are not favored . . . because allegations of what the witness would have testified [to] are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002).   "[T]he petitioner ordinarily should explain  . . . with some precision, the content of the testimony they would have given at trial."  Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990).

In this same section, Mr. Thompson asserts that he "repeatedly" told attorney Poppen he (Thompson) wanted to testify, but that when the time came, attorney Poppen did not put Mr. Thompson on the stand because attorney Poppen had not prepared for Mr. Thompson's testimony.  Though not

---

[9] These are the (revised) counts which charged Mr. Thompson with false or fraudulent acts having to do with his submission of the final report to the NSF.

clearly articulated in his petition as separate claim, Mr. Thompson apparently wishes to assert his counsel denied Mr. Thompson his constitutional right to testify on his own behalf.

The United States Supreme Court has explicitly stated that, under the Fourteenth Amendment due process clause, the Sixth Amendment compulsory process clause, and the Fifth Amendment prohibition against compelled testimony, criminal defendants have a constitutional right to choose whether to testify on their own behalf.  Rock v. Arkansas, 483 U.S. 44, 51-53 (1987). Because the right to testify is a fundamental constitutional right, only the defendant is empowered to waive it.  United States v. Bernloehr, 833 F.2d 749, 751 (8th Cir. 1987) (citing Jones v. Barnes, 463 U.S. 745, 751 (1983)) (other citations omitted).  The defendant's waiver of this right must be made voluntarily and knowingly.  Bernloehr, 833 F.2d at 751.  In Bernloehr, the court rejected the habeas petitioner's claims that his desire to testify at his own criminal trial was "overcome" by his attorney, and that the trial court had an affirmative duty to inquire of him whether he wished to testify.  Id.  The court found that Mr. Bernloehr was a "mature and sophisticated businessman" who was represented by able counsel.  Id.  Further, Mr. Bernloehr made no objection when his counsel rested the defense case without calling Mr. Bernloehr to the stand.  In such circumstances, the court found, the defendant must act affirmatively to assert his right rather than sit idly by and indicate his apparent acquiescence with his attorney's advice.  Id.  "The defendant may not, as Bernloehr did, indicate his apparent acquiescence in his

91

counsel's advice that he not testify, and then later claim that his will to testify was 'overcome.' " Id. (citing Hollenbeck v. Estelle, 672 F.2d 451, 453 (5th Cir. 1982)).

The Eighth Circuit has repeatedly held that a post-conviction petitioner may not prevail under such circumstances, whether in the context of an ineffective assistance claim, or whether the claim is grounded solely in the petitioner's constitutional right to testify. See e.g. Frey v. Schuetzle, 151 F.3d 893, 897-98 (8th Cir. 1998) (petitioner's claim he did not knowingly and voluntarily waive his right to testify at trial rejected where petitioner claimed he told his attorney he wanted to testify, the attorney advised against it, and petitioner voiced no objection when the attorney rested the defense without calling petitioner to testify); Possick v. United States, 975 F.2d 866 (8th Cir. 1992) (per curium) (ineffective assistance claim rejected where petitioner argued counsel denied him his right to testify, but petitioner admitted he was aware of his right at trial but did nothing to assert it).

Here, Mr. Thompson asserts he wanted to testify and repeatedly told attorney Poppen as much.  Attorney Poppen's affidavit (Docket 77, ¶ 19) explains that he advised Mr. Thompson of the right to testify on his own behalf. Attorney Poppen's affidavit indicates that Mr. Thompson alone ultimately made the decision not to testify.  Id.  This statement is supported by attorney Poppen's on-the-record (out of the presence of the jury) statement to the court that he *intended* to call Mr. Thompson to the stand.  See TT at p. 946, and by the prosecutor's statement that she intended her cross-examination of

92

Mr. Thompson to be "extensive."  Id.  The following day, however, when attorney Poppen rested the defense case without calling Mr. Thompson to the stand, Mr. Thompson sat quietly by without objecting or expressing a desire to testify.  Under these circumstances, Mr. Thompson cannot be heard to now complain that his attorney's ineffectiveness prevented him from testifying or that he was deprived of his constitutional right to testify.  Frey, 151 F.3d at 897-98; Possick, 975 F.2d 866; Bernloehr, 833 F.2d at 752.

### c.    Failure to call favorable witnesses

In this section of his memorandum, Mr. Thompson asserts attorney Poppen should have called Suzi Aadland, Yu Xie, Greg Wymer, and Dennis Helder as witnesses for Mr. Thompson's defense.  Mr. Thompson asserts Suzi Aadland and Greg Wymer could have testified about the appropriate procedures for obtaining and/or transferring Dr. Li's visa to Isosceles. Mr. Thompson asserts Yu Xie could have provided information to impeach Dr. Qiao and Dr. Li regarding the invoices and the final report submitted by SDSU to Mr. Thompson and ultimately to the NSF in support of their request for payment under the terms of the grant (i.e. that Mr. Thompson was justified in his failure to pay SDSU from the NSF grant funds which he had in his possession).  Finally, Mr. Thompson asserts his attorney should have called Mr. Helder, along with Bobby Markham and Kimberly Steineke as witnesses because they participated in the "fabrication" of "dozens of fictitious documents" that were used as evidence to convict Mr. Thompson.

93

"[A] meaningful opportunity to present a complete defense does not translate into the right of a defendant to present any evidence he may deem important to his defense." Strickland v. Lee, 471 F. Supp. 2d 557, 617 (W.D. N.C. 2007).  Instead, to prove prejudice, Mr. Thompson must show the proposed uncalled witnesses would have testified in his defense, that their testimony would have been favorable, and that their testimony "probably would have changed the outcome of the trial." See Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990); Stewart v. Nix, 31 F.3d 741, 744 (8th Cir. 1994).  In assessing ineffective assistance claims under the Strickland standard, "[t]he decision not to call witnesses is a virtually unchallengeable decision of trial strategy." United States v. Staples, 410 F.3d 484, 488 (8th Cir. 2005) (citations omitted, punctuation altered).  The habeas court must avoid "the distorting effects of hindsight and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time." Id. (citations omitted, punctuation altered).

In his affidavit, attorney Poppen explains that he interviewed Suzi Aadland regarding employment authorizations for foreign employees at the School of Mines.  Docket 77, ¶ 14.  He also considered the various emails which were exchanged between Mr. Thompson and SDSU employees (John Mann, the International Student Advisor, International Student Affairs, and Dr. Qiao) regarding Dr. Jing Li's visa, and various possibilities for facilitating Dr. Li's employment by Isosceles.  Id.  Attorney Poppen also independently researched the law regarding visas for foreign employees.  Id. ¶ 13.  Ultimately,

94

he exercised his professional judgment not to call Suzi Aadland or John Mann as witnesses at trial.  Id. at ¶ 14.  Attorney Poppen does not recall being aware of Mr. Wymer.

Attorney Poppen also explains that he thoroughly prepared to impeach the government's witnesses regarding how the fund allocations were prepared for purposes of preparing the invoice which was submitted to Mr. Thompson and the NSF, and how the internal bookkeeping process worked at SDSU. Docket 77, ¶ 16.  He exercised his best professional judgment in how to show that Mr. Thompson reasonably questioned the charges contained in the invoice and final report SDSU presented to Mr. Thompson.  Id.

Finally, attorney Poppen explains the reason he decided not to call Dennis Helder as a witness in Mr. Thompson's trial.  Dr. Helder is the father of attorney Poppen's personal friend.  Docket 77, ¶ 17.  Dr. Helder is Dr. Qiao's department head at SDSU.  See trial EX 696.  During the time Mr. Thompson was trying to figure out a way to get Dr. Li hired at Isosceles, one of the options was to do a payroll "pass through" to pay Dr. Li through SDSU.  In order to accomplish this, Dr. Qiao instructed Mr. Thompson to write a letter to Dr. Helder to make those arrangement, which Mr. Thompson did.  See trial EX 696, 698.  Dr. Helder also signed Dr. Li's time and effort certifications, which certified that Dr. Li worked 160 hours for the Isosceles project on behalf of SDSU.  See trial EX 5.

When Dr. Helder's name arose in the case, but before the extent of Dr. Helder's involvement or knowledge of the facts of the case were known to

attorney Poppen, attorney Poppen discussed the issue with Mr. Thompson. Mr. Thompson consented to attorney Poppen's continued representation. When it became clear that Dr. Helder may be called as a witness in the case, attorney Poppen again brought the matter to Mr. Thompson.  At that time, Mr. Thompson signed a waiver of any conflict of interest that might be presented by attorney Poppen's friendship with Dr. Helder's son.  See Docket 77-1.  Ultimately, the relevant matters within Dr. Helder's knowledge were presented at trial through other witnesses (primarily Dr. Qiao), and attorney Poppen exercised his professional judgment to refrain from calling Dr. Helder as a witness at trial.  Docket 77, ¶ 17.   Failure to call a witness who would present evidence which would have been merely cumulative does not meet the prejudice prong of Strickland.  Hall v. Luebbers, 296 F.3d 685, 693 (8th Cir. 2002).

Mr. Thompson has not shown that any of his now-proposed witnesses at trial probably would have changed the outcome of his criminal proceedings. Lawrence, 900 F.2d at 130.  Mr. Thompson has failed to carry his burden to show any of his proposed witnesses (1) would have been willing to testify as he claims they would have on his behalf; (2) what their testimony would have been or, most importantly; (3) that had such witnesses testified, the outcome of Mr. Thompson's criminal trial probably would have been different.

### d.    Failure to investigate witnesses

This section of Mr. Thompson's ineffective assistance claim focuses on Mr. Thompson's assertion that attorney Poppen "barely" cross-examined the

government's first witness, Dr. Balan.  Dr. Balan is employed by the NSF as a program director.  The majority of Dr. Balan's testimony on direct examination centered on how NSF grant funds can and cannot be spent.  See TT 64 through 170.  Mr. Thompson criticizes attorney Poppen for failing to properly investigate the relationship between Dr. Balan and Special Agent Pritchard, which investigation Mr. Thompson asserts would have led attorney Poppen to discover that Dr. Balan and NSF OIG Special Agent Pritchard are colleagues and that they often do presentations together regarding SBIR investigations.  Even assuming this is true, given both of their job descriptions and the subject of their testimony at Mr. Thompson's trial this information would hardly have been surprising or damaging to their credibility.

Next, Mr. Thompson asserts that had attorney Poppen done his research he (Poppen) would have been able to show at trial that "all expenses charged to the STTR grant by Isosceles were allowed."  (Recall that Mr. Thompson used over $56,000 of the grant money to pay his credit card bills).  Mr. Thompson further claims he provided attorney Poppen with a list of experts who could have testified to the same.  Mr. Thompson asserts attorney Poppen did not investigate these proposed experts, who could have shown that the testimony from Dr. Balan, Dr. Yuen, and Agent Pritchard regarding the manner in which Mr. Thompson spent the grant money (which was based upon NSF policy and documentation thereof presented at trial) was incorrect.

Attorney Poppen's affidavit (Docket 77, ¶ 22) states he spent many hours preparing for Dr. Balan's testimony.  Attorney Poppen explains he cross-

examined Dr. Balan "extensively."  Id.  The trial transcript reveals attorney

Poppen cross-examined (TT 171-213), re-crossed (TT 236-246) and re-re-

crossed (TT 247-50) Dr. Balan.  Attorney Poppen successfully impeached a

portion of Dr. Balan's testimony by forcing Dr. Balan to admit that in 2009

when Mr. Thompson submitted the Isosceles proposal, the NSF program

solicitation itself did not clarify the definition of "primary employment" of the PI

to mean the PI must be at least  51% employed by the small business.  While

Dr. Balan insisted this had been NSF's definition of "primary employment" all

along, Attorney Poppen pointed out that, in later NSF program solicitations (at

least by 2013) this definition was included within the program solicitation

itself.  See TT 200-202, and compare, trial EX 1B (program solicitation from

2009) with trial EX 817 (program solicitation from 2013).

Attorney Poppen also explained in his affidavit that several exhibits were

received into evidence regarding what expenses were allowable under the grant.

Docket 77, ¶ 23.  Attorney Poppen made a strategic decision to use those

documents to cross-examine Dr. Balan.  Id.   While Mr. Thompson criticizes

attorney Poppen's failure to call expert witnesses at trial to support

Mr. Thompson's claims that all the NSF grant money he spent was proper

under NSF rules, Mr. Thompson does not support this criticism with any

specific expert testimony or opinions which would have changed the outcome of

his trial.  See Ashker v. Class, 152 F.3d 863, 876 (8th Cir. 1998); Ellefson v.

Hopkins, 5 F.3d 1149, 1150-51 (8th Cir. 1993)(trial counsel's strategy to forego

calling expert and rely on cross-examination of prosecution expert deemed not

ineffective assistance of counsel).  See also Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (petitioner failed to show ineffective assistance because he did not demonstrate how his case was prejudiced by not retaining an expert; "[petitioner] offered no evidence that an . . .expert would have testified on his behalf at trial.  He merely speculates that such an expert could be found.  Such speculation, however, is insufficient to establish prejudice . . . speculating as to what [an] expert would say is not enough to establish prejudice.").

### e.    Failure to investigate exculpatory evidence

In this portion of his ineffective assistance claim, Mr. Thompson asserts attorney Poppen failed to investigate several matters which Mr. Thompson asserts would have exculpated him.  Specifically, Mr. Thompson claims attorney Poppen should have investigated (1) SDSU financial records; (2) Dr. Li's employment history at SDSU; and (3) whether Dr. Li was assigned to work on the Isosceles project as a sub-awardee before it was terminated. Mr. Thompson asserts that "despite having SDSU records, Poppen failed to present such a challenge to repetitive false claims Li spent 100% of his time working as a university employee on the Isosceles sub award."

In his affidavit (Docket 77, ¶ 24) attorney Poppen explains he subpoenaed records from SDSU and received a large number of documents as a result.  Id.  Attorney Poppen thoroughly reviewed these documents and used the ones which were relevant or potentially exculpatory to cross-examine witnesses at trial.  Id.

99

The court also notes that Dr. Qiao was questioned at trial about why Dr. Li's time was not originally documented/billed out as working on the Isosceles project as an employee of the sub-awardee (SDSU), but instead it appeared that Dr. Li's status changed at some point and Dr. Li's time was considered by SDSU as that of an SDSU post-doc under as the NSF grant sub-awardee.  See TT 507, 515.  And compare trial EX 7A (October invoice from SDSU to Isosceles which only bills for Dr. Qiao's time and effort hours) with trial EX 5 (showing both Dr. Qiao and Dr. Li worked on the Isosceles project during this time frame).  Dr. Qiao explained that until the time Mr. Thompson informed him (Qiao) that the grant had been terminated, Dr. Qiao held out hope that Mr. Thompson would get Dr. Li hired on at Isosceles.  Id.  Only when it became clear (at the grant termination) this was not going to happen did Dr. Li's time spent working on the project get transferred to SDSU's portion of the grant budget, or "dime" so to speak.  Id.  See also, trial EX 522A at p. 28 (email from Mr. Thompson to Dr. Qiao suggesting this procedure).

Next, Mr. Thompson asserts attorney Poppen should have aggressively pursued the theory that Thompson's use of the NSF grant funds to pay his credit card bills was justified because he "regularly paid the full balance of his credit cards every month" and that he "maintained combined bank balances in excess of $100,000 [the full amount of the STTR grant] in his various company checking accounts throughout the duration of the STTR project."  In support of this argument, Mr. Thompson asserts the prosecution "cherry picked" his credit card statements to create the "illusion" that he (Thompson) improperly

used the NSF grant money to pay off his credit card debt.  Mr. Thompson opines that this evidence rendered the prosecution witness's testimony "false," that Mr. Thompson had no motive to convert the NSF funds, and that it was unnecessary for him to do so, and that Mr. Thompson did not lie to investigators.

The court finds this portion of Mr. Thompson's claim completely without merit.  Hundreds of pages of documentation regarding Mr. Thompson's bank accounts and credit card statements were introduced into evidence at trial. See trial exhibits 9-47 (bank statements from June, 2009, through May, 2012); EX 48-100 (Citi Bank credit card statements from January, 2006, through May, 2010); EX 101-174 (JP Morgan Chase credit card statements from January, 2004, through February, 2010); EX 175-284 (Bank of America credit card statements from January, 2006, through August, 2006); EX 285-505 (US Bank credit card account records for Mr. Thompson and his various related companies from March, 2006 through November, 2010).  These are among the accounts for which the NSF grant funds were used to pay.   The statements clearly disavow Mr. Thompson's claim that he paid the entire balance on his credit cards every month.  Because these are the credit cards for which Mr. Thomson used the NSF grant funds to pay, and because the prosecution put several *years'* worth of statements preceding the date of the grant funds into evidence, Mr. Thompson's claim that the government "cherry picked" these statements in order to mislead the jury is simply ludicrous.  The court finds that this portion of Mr. Thompson's claim suffers the same conclusory

101

deficiencies as his previous claims.  As such, Mr. Thompson has failed to show prejudice.  Richardson, 577 F.2d at 452; Bryson, 268 F.3d at 562.

### f.    Failure to object when prosecutors broadened the indictment

In this section of his brief, Mr. Thompson asserts that during the trial, the prosecution "broadened the indictment" by failing to clarify to the jury that (1) the criminal charges against him did not include logging onto the FastLane system using Dr. Li's username and password; and (2) the criminal charges against him did not include converting grant funds that were intended for SDSU.  Mr. Thompson asserts attorney Poppen should have objected to this "broadening of the indictment" or alternatively should have requested a mistrial, as a result of this alleged misconduct by the prosecution.

Mr. Thompson bases his assertion regarding his logging on to the FastLane program as Dr. Li upon the fact that during their deliberations, the jury asked a question which centered on Mr. Thompson's log-on during the submission of the final report.  See CR Docket 214-215.[10]

Attorney Poppen did not perceive the prosecution's evidence broadened the indictment.  See Docket 77, ¶ 25.  Instead, the evidence presented which showed Mr. Thompson logged into the FastLane program using Dr. Li's login ID

---

[10] The jury's question was, "please clarify if the PI is the only person who has access to the final report—or could Scott have signed in under his own name & completed the form?"  See CR Docket 214.  The jury also asked for a copy of the transcript and clarification on counts 3, 6, and 9 (these were the counts having to do with the final report).  Id.  Judge Viken answered this jury question by telling the jury the transcript was not available to them, to rely on their own recollection of the evidence, and to refer to the jury instructions as a whole.  CR Docket 215.

and password were relevant to show whether Mr. Thompson presented claims or statements to the NSF--required elements of the charges against him contained in the indictment.  Id.  This court agrees.  There was no contention at trial that Dr. Li logged on to the FastLane program for the purpose of submitting the final report.  Dr. Li testified that he never logged on to FastLane through the Isosceles account to submit anything to the NSF because he never had the password for the realtronics@hotmail.com email address.  TT at 543-44.

Instead, the issue at trial was whether, when Mr. Thompson logged on to submit the final report (as he was instructed to do by Dr. Yuen), he intended to submit a false statement to the NSF by indicating Dr. Li had in fact worked 160 hours *as the PI on behalf of Isosceles* rather than as a post-doctoral researcher on behalf of SDSU.

During his testimony, Dr. Balan testified that both the PI and the AOR had their own login and password, and that it would be "highly improper" and "maybe illegal" for one person to sign into the Fastlane program using another person's credentials.  TT 232.  There was much testimony at trial about the fact that certain fields in the final report were "pre-populated" (i.e. were automatically filled in) and could not be changed, based upon the information that was by provided to the NSF by Mr. Thompson and/or Dr. Qiao at the outset of the grant.

Mr. Thompson's position at trial was that there was no intent to defraud the NSF by submitting the final report through FastLane because the final

103

report could only be submitted by the PI, and Dr. Yuen had instructed Mr. Thompson to submit the final report even *after* Mr. Thompson told Dr. Yuen that Dr. Li had never been hired on at Isosceles as the PI.  The government's witnesses asserted, however, that there were other "text box" sections in the final report where Mr. Thompson could have clarified that the 160 hours worked by Dr. Li were being claimed as hours that should be compensated to Dr. Li under SDSU's salary budget portion of the grant—not the Isosceles payroll.

That the FastLane program would only allow the PI to sign on to submit the final report, that certain sections of the final report were "pre-populated," and that Mr. Thompson signed on using Dr. Li's (who was supposed to be but never became the Isosceles PI) credentials did not prevent Mr. Thompson from completing other "fill-in-the-blank" or "text box" sections of the final report. Those "text box" sections could have clarified that Dr. Li's 160 hours of work should have been creditable to SDSU's portion of the grant money that had been budgeted for payroll instead of Isosceles.  The government witnesses further argued Mr. Thompson could have indicated in one of these "fill-in-the-blank" text boxes that, due to the unusual circumstances, it was Mr. Thompson as the AOR who was actually submitting the final report, even though it appeared Dr. Li was submitting the report as the PI.

In summary, though the PI was the only person who was allowed to complete the final report in the FastLane system, the government witnesses insisted that under the unusual circumstances which led to the involuntary

104

termination of the Isosceles grant, Mr. Thompson still could have clearly explained—or at least attempted to explain-- within the confines of the final report he submitted through the FastLane system-- that (1) it was actually Mr. Thompson—not the PI--who submitted the report; and (2) Because Dr. Li never became the PI at Isosceles, the 160 hours which were claimed to have been worked by Dr. Li in the final report, and for which the grant money was being claimed in the report, were justifiably due to SDSU and not to Isosceles.

Most importantly though, the government never argued to the jury that it was Mr. Thompson's act of using Dr. Li's credentials to sign on to FastLane to submit the final report that constituted fraud as to the submission of the final report. Rather, the government argued it was Mr. Thompson's representation that Dr. Li worked 160 hours *for Isosceles* that constituted the fraud. That it *may have* constituted a criminal act for Mr. Thompson to use Dr. Li's credentials to log on to FastLane was never mentioned again after Dr. Balan's offhand and unsolicited statement during his direct testimony. Neither the verdict form nor the jury instructions cited Mr. Thompson's use of Dr. Li's credentials as having anything whatsoever to do with the elements of any of the crimes with which he was charged, and the prosecutor certainly did not emphasize that portion Mr. Thompson's actions when describing the elements of counts 3, 6, and 9 (those counts pertaining to Mr. Thompson's electronic submission of the final report to the NSF).

Attorney Poppen forcefully argued during closing argument (TT 1160-92) that Mr. Thompson did not intend to defraud the government when he signed

105

on to FastLane using Dr. Li's credentials to submit the final report, because by then, Dr. Yuen was fully aware that Dr. Li had never been hired as the PI at Isosceles and she was also fully aware that the FastLane system limited the ability to submit the final report to the PI.  Nevertheless, attorney Poppen argued, Dr. Yuen instructed *Mr. Thompson* to submit the final report.  The prosecutors, on the other hand, just as forcefully argued in closing arguments (TT 1139-60; 1192-1206) that *despite* Dr. Yuen's instructions to Mr. Thompson, *despite* certain portions of the final report being pre-populated, and *despite* Dr. Yuen's knowledge that  Dr. Li had never been hired as the PI at Isosceles, *because* it was Mr. Thompson who submitted the final report, and *because* certain portions of the final report were pre-populated, Mr. Thompson could and should have alerted the NSF to the fact that Dr. Li  had never been hired as the PI. The government further argued Mr. Thompson could and should have alerted the NSF that Isosceles was *not* trying to claim entitlement to payment for Dr. Li's 160 hours of work by noting as much in the "fill-in-the-blank" portions of the final report.  See TT 1139-60 and 1192-1206.

Constructive amendment "occurs when the essential elements of the offense set forth in the indictment are effectively altered by the prosecutor or the court after the grand jury has passed on them."  United States v. Gill, 513 F.3d 836, 849 (8th Cir. 2008).  The amendment is constructively amended by the jury instructions when the instructions allow the jury to convict the defendant of an offense other than the one charged in the indictment.  Id.  If the presentation of the evidence and the jury instructions so modify the

essential elements of the offense that there is a "substantial likelihood" the defendant may have  been convicted of an offense other than the one charged in the indictment, the indictment has been constructively amended.  Id. (citing United States v. Hathaway, 798 F.2d 902, 910 (6th Cir. 1986); United States v. Whirlwind Soldier, 499 F.3d 862, 870 (8th Cir. 2007)).

The indictment was not constructively amended in Mr. Thompson's case. The presentation of the evidence stressed that Mr. Thompson signed into the FastLane program using Dr. Li's credentials, but that evidence was presented for the sole purpose of establishing that it was indeed Mr. Thompson—not Dr. Li-- who submitted the final report.  Mr. Thompson's use of Dr. Li's credentials was never made an element of any of the charges in the indictment and the jury instructions did not allow the jury to convict Mr.  Thompson of an offense other than those charged in the indictment by virtue of the fact that Mr. Thompson used Dr. Li's credentials to sign in to the FastLane program. The jury instructions (CR Docket 208) did not mention Mr. Thompson's use of Dr. Li's credentials to sign in to the FastLane program.  Because the indictment was not amended or "broadened," therefore, Attorney Poppen could not have been ineffective for failing to object to the same.  For these reasons, this portion of Mr. Thompson's ineffective assistance claim fails.

### g.   Strategic choices made without investigating the law

In this section of his ineffective assistance claim, Mr. Thompson simply re-hashes his criticism of attorney Poppen for allegedly failing to conduct adequate legal research of various issues (see subsection D.2.a above), but

adds that the inadequate research led to attorney Poppen's incorrect strategic decisions at trial.  "Trial counsel's strategic decisions are virtually unchallengeable unless they are based on deficient investigation, in which case the 'presumption of sound trial strategy  . . . founders on the rocks of ignorance.' "  Forsyth v. Ault, 537 F.3d  887, 892 (8th Cir. 2008) (citing Link v. Luebbers, 469 F.3d 1197, 1204 (8th Cir. 2006)) (other citations omitted).  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006) (quoting Strickland, 466 U.S. at 690).

This court has already explained why Mr. Thompson's ineffective assistance claim which is based upon his allegation of inadequate legal research fails:  Mr. Thompson's claims contain no specifics, are wholly conclusory, are betrayed by the actual record, and are contradicted by Mr. Poppen's affidavit which explains that he did thoroughly research the very subjects about which Mr. Thompson complains.  Because the underlying premise of this portion of Mr. Thompson's ineffective assistance claim (inadequate research) fails, so too does his assertion that the strategic trial decisions attorney Poppen made which were based upon such research are subject to challenge under Strickland.  For these reasons, this portion of Mr. Thompson's ineffective assistance claim should likewise be dismissed.

### h.   Compelled Thompson's waiver of a conflict of interest

In this section of his memorandum, Mr. Thompson acknowledges that when attorney Poppen saw Dr. Helder's name appear on documentation that

was produced in Mr. Thompson's case, attorney Poppen alerted Mr. Thompson that Dr. Helder was the father of attorney Poppen's friend.  Mr. Thompson asserts, however, that attorney Poppen was "pulled in the opposite direction of his duty to represent Thompson" and therefore his assistance as defense counsel was ineffective.  Docket 64, p. 24.

Mr.  Thompson asserts Dr. Helder was involved, along with Dr. Qiao, Mr. Kephart, Dr. Li, Ms. Steineke, and Mr. Markham, in creating false evidence which was used at trial to convict Mr. Thompson.  Mr. Thompson asserts that because Dr. Helder was involved in creating this false evidence, Mr. Thompson's waiver of any conflict of interest was therefore uninformed and not intelligent.  Id.

Attorney Poppen addressed this claim in his affidavit (Docket 77, ¶ 17). Attorney Poppen explains that he told Mr. Thompson about his relationship to Dr. Helder when Helder's name arose in the case, and when the possibility that Dr. Helder might be called to testify at trial, attorney Poppen revisited the issue with Mr. Thompson.  Id.  At that time, Mr. Thompson signed a written waiver of any potential conflict of interest that might be present.  Docket 77-1.  That document spells out the relationship between attorney Poppen and Dr. Helder, that Dr. Helder was expected to be called as a witness, and attorney Poppen's belief that these facts would not prevent attorney Poppen from providing Mr. Thompson with competent and diligent representation.  Id.  Mr. Thompson indicated he consented to attorney Poppen's continued representation and that Mr. Thompson accepted attorney Poppen's belief that the facts did not prevent

109

such competent and diligent representation.  Id.  Mr. Thompson further indicated he realized he (1) had the right to refuse attorney Poppen's continued representation; (2) if he so refused, Mr. Poppen would move to withdraw; and (3) if attorney Poppen moved to withdraw, the court would appoint new counsel.  Id.  There is no indication in the record that Mr. Thompson ever indicated anything to the contrary to the district court.  Mr. Thomspon signed the waiver on August 8, 2014—roughly two and one-half months before his trial began.

Vague and conclusory allegations of ineffective assistance which are grounded upon an alleged conflict of interest are insufficient to warrant an evidentiary hearing on a § 2255 motion.  Kindle v. United States, 46 F.3d 1136 (8th Cir. 1995) (table).  The petitioner must allege specific facts tending to prove an actual conflict of interest; conclusory allegations will not suffice.  Id. And when a petitioner fails to assert counsel's conflict of interest *before* trial, in order to prevail on such a claim on a § 2255 petition, he must show an actual conflict of interest that affected the adequacy of his representation.  Noe v. United States, 601 F.3d 784, 789 (8th Cir. 2010) (citing Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980).  An actual conflict, for purposes of the Sixth Amendment, is a "conflict of interest that adversely affects counsel's performance."  Noe, 601 F.3d at 790 (citing Mickens v. Taylor, 535 U.S. 162, 172, n. 5 (2002).  "The effect must be actual and demonstrable, causing the attorney to engage or not to engage in particular conduct."  Noe, 601 F.3d at 790 (citing Covey v. United States, 377 F.3d 903, 908 (8th Cir. 2004).   To

make this showing, the § 2255 petitioner must identify an alternative defense strategy the attorney might have pursued, show that such strategy was objectively reasonable, and establish that counsel's failure to pursue the alternative strategy was attributable to the actual conflict. <u>Noe</u>, 601 F.3d at 790 (citing <u>Winfield v. Roper</u>, 460 F.3d 1026, 1039 (8th Cir. 2006) (other citations omitted).

In this case, attorney Poppen has explained he decided not to call Dr. Helder at trial because what little relevant information Dr. Helder possessed was already covered by other witnesses.  Docket 77, ¶ 17.   Mr. Thompson's theory is that Dr. Helder was part of a group of people who falsified the SDSU billing documents and invoices that were presented to Isosceles and ultimately to the NSF.  Attorney Poppen questioned other witnesses (Dr. Qiao, Dr. Li, and Bobby Markham, for example) about this very issue at trial.   <u>See</u> <u>Bucklew v. Luebbers</u>, 436 F.3d 1010, 1020 (8th Cir. 2006) (no <u>Strickland</u> prejudice where uncalled witnesses' testimony would merely have been cumulative of other evidence already before the jury).

Mr. Thompson has not identified what objectively reasonable "alternate strategy" attorney Poppen might have pursued but did not pursue because of any conflict that was presented by his acquaintance with Dr. Helder.  <u>Noe</u>, 601 F.3d at 790.

Mr. Thompson's vague, conclusory, and unsubstantiated assertions that attorney Poppen had knowledge of, but did not want to publicly reveal Dr. Helder's involvement in an un-proven conspiracy with his colleagues to

fabricate evidence against Mr. Thompson is insufficient to satisfy the Strickland standard.  For these reasons, this portion of Mr. Thompson's ineffective assistance claim should be dismissed.

### i.   Presented an inadequate adversarial response

In this section of his ineffective assistance claim, Mr. Thompson re-hashes his general assertions that attorney Poppen was "grossly unprepared" to challenge "false evidence" regarding nearly every aspect of his trial, ranging from the visa requirements for legally hiring Dr. Li as an Isosceles employee, to how NSF grant funds could properly be spent, to whether Dr. Li worked as an employee of SDSU during the NSF grant period.  Mr. Thompson also generally asserts that attorney Poppen "failed to provide an adequate challenge to false evidence and charts that were false or altered to be made false and more than 100 false statements about NSF policy . . ."  Attorney Poppen's affidavit explains (Docket 77, ¶ 7) that he conducted extensive legal research, investigated and interviewed numerous witnesses, subpoenaed and received extensive documentation, reviewed extensive discovery from the United States and SDSU, met with and spoke to Mr. Thompson often.  In fact, attorney Poppen spent over 1,000 hours (the court notes this would be working full-time for nearly one-half of an entire year) and reviewed thousands of documents. He studied over 800 exhibits in preparation for trial.  Id.   During trial, he cross-examined numerous witnesses, including five who held a Ph.D.  Id.

"A habeas corpus petitioner, alleging ineffective assistance of counsel, must show that a particular act or omission fell below the standard acceptable

for attorneys in the same or similar circumstances." <u>Beard v. Lockhart</u>, 779 F.2d 23, 26 (8th Cir. 1985) (citing <u>Strickland</u>, 466 U.S. at 693). A general allegation, such as that counsel was not "fighting" the defendant's case properly, is insufficient to warrant habeas relief. <u>Id.</u> Mr. Thompson is highly critical of attorney Poppen's performance in general. But Mr. Thompson has failed to explain how, had attorney Poppen better researched or understood a *particular* provision of federal law or NSF policy which applied it to the *particular* facts of Mr. Thompson's case, there would have been a reasonable probability that Mr. Thompson would not have been convicted. As such, this portion of Mr. Thompson's ineffective assistance claim must also be dismissed.

### j.   Failed to challenge the indictment

In this section of his ineffective assistance claim, Mr. Thompson asserts attorney Poppen should have moved to examine the minutes of the prosecution's presentation to the grand jury and should have, based upon the grand jury minutes, moved to dismiss the indictment. <u>See</u> Docket 64, p. 25. Attorney Poppen addresses this claim in his affidavit. Docket 77, ¶ 29. Attorney Poppen explains that, contrary to Mr. Thompson's assertion, he (Poppen) did obtain grand jury transcripts in preparation to cross-examine the witnesses who were anticipated to testify at trial. <u>Id.</u>

Nevertheless, Mr. Thompson asserts his attorney should have obtained the grand jury transcripts earlier, in an attempt to attack the credibility of the grand jury proceedings. The pre-trial disclosure of grand jury transcripts is governed by FED. R. CRIM. P. 6(e)(3)(c)(ii). In order to justify the disclosure of

113

grand jury materials, the defendant must make a showing of "particularized need." Thomas v. United States. 597 F.2d 656, 658 (8th Cir. 1979).  A defendant's bare allegation that the records of the grand jury are necessary to determine whether there is a defect in the grand jury process does not constitute a showing of particularized need.  United States v. Broyles, 37 F.3d 1314, 1318 (8th Cir. 1994).  Mr. Thompson has offered nothing but bare allegations that the grand jury proceedings were irregular, and therefore cannot show his counsel was ineffective for failing to obtain grand jury transcripts in an effort to dismiss the indictment.

Further, the criminal docket reveals that attorney Poppen did successfully move to dismiss at least part of the indictment.  See CR Docket 179, 190, 201, 203.  Mr. Thompson has failed to make a showing that attorney Poppen's representation regarding the indictment "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-688.   For all of these reasons, this portion of Mr. Thompson's ineffective assistance claim should be dismissed.

### k.    Lacked experience to defend a highly complex case

Next, Mr. Thompson asserts his counsel was ineffective because Mr. Thompson's was attorney Poppen's first criminal trial.  This lack of experience, Mr. Thompson asserts, was reflected "ubiquitously" throughout trial.  Mr. Thompson opines he was convicted upon weak and fictitious evidence—not because he was actually guilty, but because of attorney Poppen's inexperience.

Attorney Poppen addressed this claim in his affidavit (Docket 77, ¶ 30). Though it was attorney Poppen's first criminal trial, he had been by that time practicing law for five years.  Id.  His experience in civil litigation prepared him for the document-intensive nature of Mr. Thompson's case.  Id.  Attorney Poppen believed he presented the most thorough defense he could have for Mr. Thompson.  Id.

"The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation."  United States v. Cronic, 466 U.S. 648, 665 (1984).  In Cronic, the United States Supreme Court reversed the Tenth Circuit for a finding of ineffectiveness based solely on the petitioner's claim that his lawyer was appointed shortly before the trial began, and that he was inexperienced (it was his first trial).  Id. at 666.[11]  The petitioner had been charged with mail fraud involving a "check kiting" scheme, and the lawyer was appointed to represent the petitioner only 25 days before the trial began.  Id. at 649.  The newly appointed lawyer was young and inexperienced, and his regular practice was in real estate law.  Id.  The government, on the other hand, had spent four and one-half years preparing the document-intensive case.  Id.  The Tenth Circuit had reversed the petitioner's conviction, finding he was not afforded effective counsel under the

---

[11] The Court remanded to the Tenth Circuit for an evaluation of whether the young lawyer made any *specific* mistakes which rose to the level of ineffective assistance.  Id. at 667.

Sixth Amendment—but the Tenth Circuit did <u>not</u> determine that counsel made any specific errors.  <u>Id.</u> at 650.

The United States Supreme Court reversed.  <u>Id.</u> at 667.  The Court rejected the petitioner's claim that his counsel was ineffective merely because he was inexperienced, noting that "[e]very experienced criminal defense attorney once tried his first criminal case."  <u>Id.</u> at 665.  Moreover, the court noted, the lawyer's real estate experience might have served him better in the petitioner's particular type of criminal case (i.e. a document-intensive charge) than prior experience in trying typical criminal cases--armed robbery prosecutions, for example.  <u>Id.</u>  The same can be said here—nearly 800 exhibits[12] were admitted into evidence in Mr. Thompson's criminal trial. Attorney Poppen's experience as a business lawyer may well have been an asset rather than a detriment in such a case.  As in <u>Cronic</u>, this court rejects Mr. Thompson's assertion that Mr. Poppen was ineffective merely because he was inexperienced in criminal law at the time of Mr. Thompson's trial.  For these reasons, this portion of Mr. Thompson's ineffective assistance claim should be dismissed.

### 1.    Failures at trial impacted the verdict

In this section of his ineffective assistance claim, Mr. Thompson simply re-visits the claims he made in the previous sections, apparently arguing that in total, all of these alleged errors combined constituted ineffective assistance. For the reasons explained in the above sections, this court has determined that

---

[12] More than 800 exhibits were marked, but not all of them were admitted into evidence.  <u>See</u> CR Docket 219 (Trial Exhibit list).

none of Mr. Thompson's claims, standing alone, rises to the level of ineffective assistance.  The Eighth Circuit does not aggregate ineffective assistance of counsel claims as a ground for habeas relief.  United States v. Brown, 528 F.3d 1030, 1034 (8th Cir. 2008) (citing Middleton v. Roper, 455 F.3d 838, 846-51 (8th Cir. 2006)) (finding no deficient performance on any of petitioner's four individual claims of ineffective assistance of counsel, and rejecting argument that the four claims should be considered cumulatively to determine prejudice); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) (cumulative effect of counsel's errors not grounds for habeas relief).  The court therefore rejects this portion of Mr. Thompson's ineffective assistance claim as well.

In summary, the court concludes that Mr. Thompson has not shown facts which, if true, would entitle him to relief as to any portion of his ineffective assistance claim.  Accordingly, the court recommends this ground for § 2255 relief be denied in its entirety.

**D.   Mr. Thompson's Procedurally Defaulted Claim(s) For Relief:  First Ground for Relief:  Subverting the Fact-Finding Process**

The government asserts that because he did not file a direct appeal, Mr. Thompson's first ground for relief is procedurally defaulted (subverting the fact-finding process).  In this claim for relief, Mr. Thompson again makes several sub-claims.  Mr. Thompson claims that at trial, the government violated federal law (18 U.S.C. §§ 1621 and 1623)[13] and the 4th, 5th, 8th and 14th amendments to the United States Constitution by introducing evidence at trial

---

[13] 18 U.S.C. § 1621 is the perjury statute and § 1623 is the statute prohibiting false statements before a federal grand jury or court.

117

which the government knew to be false and by suppressing evidence it knew to be exculpatory to Mr. Thompson.  Mr. Thompson further alleges that because the prosecutors knowingly presented this purportedly false evidence, they convicted him of behavior which they knew was not illegal.  The specific claims Mr. Thompson makes in this ground for relief are that the following false evidence was presented at trial:

### 1.    The final report

Mr. Thompson asserts the government's evidence at trial (timesheets, lab notebook, journal vouchers, etc.) regarding the work done by SDSU as reflected in the final report submitted to the NSF was all "fictitious" and that the prosecutors knew it.  He also asserts he never received the revised invoice from SDSU until February 1, 2010, and that prosecutors knew this (i.e. that Mr. Thompson did not have the lower invoice when he submitted the final report to the NSF).  Mr.  Thompson also asserts the government knowingly "suborned perjury" when Dr. Qiao testified Mr. Thompson caused Dr. Li's name to appear in the pre-populated portions of the initial proposal, because it was Dr. Qiao who suggested Dr. Li to be the PI in the first place and Dr. Qiao created and uploaded the draft initial proposal in the FastLane system.

### 2.    Initial payment request

Mr. Thompson asserts the government's claim that he (Thompson) knew Dr. Li was not employed by Isosceles was a false statement.  Mr. Thompson argues the government's theory that Dr. Li's J1 visa was insufficient to employ Dr. Li outside the university setting was simply wrong, thereby undercutting

the government's trial theme that Dr. Li was never, and could never have been legally employed by Isosceles absent Mr. Thompson obtaining an H1 visa for Dr. Li before the grant period began.  Mr. Thompson also asserts that Dr. Li's trial testimony that he was under the impression Mr. Thompson's efforts to obtain the H1 visa were in an effort to help Dr. Li become a full-time employee for Isosceles for reasons unrelated to the NSF grant were false, because Dr. Li did not become aware of that "side" job offer until months after he began working with Mr. Thompson to obtain the H1 visa.  Finally, Mr. Thompson asserts the timeline presented by the government at trial regarding Mr. Thompson's efforts to employ Dr. Li as the principal investigator was purposefully misleading, because it omitted key information and evidence.

### 3.    Conversion

Mr. Thompson asserts prosecutors submitted false evidence about Mr. Thompson's claim that he (Thompson) owned lab facilities.  He also asserts the conversations between himself and Mr. Makrinos were "sanitized" to present a false version of their relationship to the jury.  He further alleges the evidence presented which showed Mr. Thompson took more than $80,000 of the NSF grant funds for personal gain was presented to the jury through "fabricated fictitious charts" because prosecutors knew full well that the expenses used were legitimately incurred by the grant.

### 4.    Declarations of SDSU incurred project expenses

Here, Mr. Thompson explains that, because Dr. Qiao did not really do any work on the Isosceles project, he (Thompson) was fraudulently billed by

119

SDSU for work done on the Isosceles project that was not actually done. Mr. Thompson alleges the prosecutors knew of and concealed this fraud. Because they allegedly knew of the fraudulent billing but nevertheless presented the SDSU final invoice to the jury, the prosecutors, according to Mr. Thompson, suborned perjury.  Mr. Thompson further opines that prosecutors knew that Dr. Li held out work in the final report as his own, all the while knowing that the work in the final report had actually been done by another SDSU post-doctoral researcher (Xie).

### 5.    Thompson memorandum[14]

In this section, Mr. Thompson asserts prosecutors submitted false information to the grand jury (in the form of a Memorandum of Investigation), regarding Mr. Thompson's previous credit card debt.  Mr. Thompson claims this document created the false impression that he converted grant funds to satisfy his credit card debts.  Mr. Thompson also claims other statements made in the memorandum are false and that the memorandum was presented to the grand jury and to the petit jury with the express purpose of impugning Mr. Thompson's credibility.

### 6.    NSF policy

 In this section Mr. Thompson asserts prosecutors knowingly presented false testimony at trial regarding NSF policy. Mr. Thompson argues, among

---

[14] This section refers to Agent Scully's seven page typed "Memorandum of Investigation" a typed document which records the agents' collective memory of their in-person interview of Mr. Thompson which occurred on October 19, 2010.  This court has reviewed the exhibit list from Mr. Thompson's jury trial (CR Docket No. 219) and it does not appear the memorandum was marked, offered, or received as an exhibit during the trial.

other things, that he was not required to obtain prior approval before changing how the grant money was spent, particularly with respect to the wages and salaries of senior personnel.  Mr. Thompson argues that the full amount of the grant was awarded to him without regard to the actual costs incurred by the project, and that none of the funds he (Thompson) received from the grant belonged to the United States once he received them.

### 7.  Federal regulations

In this section, Mr. Thompson asserts prosecutors knowingly offered misleading statements at trial regarding federal regulations for NSF grants.  In particular, he asserts prosecutors knowingly offered incorrect testimony regarding the prohibition on payment of direct costs after the project termination date, payment of indirect costs as salary expenses, indirect costs for payment of commercialization expenses, for attracting investors, for fringe benefits, for retirement contributions, for utilities, and for other expenses not related to the direct research aspects of the grant. Mr. Thompson cites Dr. Balan's testimony in particular as being misleading and/or false regarding NSF law, regulation, and policy.

### 8.  Suppression of exculpatory evidence (Brady violations)

Mr. Thompson also asserts the prosecutors suppressed exculpatory evidence.   Here, Mr. Thompson again urges that SDSU really did no work on the project and that prosecutors knew this.  Mr. Thompson also asserts prosecutors knew that, to form their final invoice to Isosceles, the SDSU personnel invoiced work from other, unrelated research projects to the

Isosceles grant.  Mr. Thompson also asserts prosecutors knew that Josephine Yuen knew or should have known that the final report submitted by SDSU was not significantly different than the initial proposal and therefore, the SDSU researchers did little, if anything on the project.  Mr. Thompson asserts the prosecutors knew the SDSU personnel records show that Dr. Li was not working on the Isosceles project during the time Dr. Qiao was asking Mr. Thompson to pay Dr. Li.  Mr. Thompson asserts that "evidence concealed by prosecutors showed neither Qiao nor Li worked on the [Isosceles] project."

In its brief in resistance to Mr. Thompson's motion, the government does not argue the merits of these claims, but instead asserts they are procedurally defaulted by Mr. Thompson's failure to raise them on direct appeal.  See Docket 76, pp. 3-6.  The government further argues Mr. Thompson has failed to show cause for his failure.  Id. Finally, the government observes that Mr. Thompson raised some, if not all, of these arguments in his *pro se* filings (allowed and considered by the district court) on his motions for judgment of acquittal or for a new trial.  These arguments, the government asserts, have therefore already been litigated--but not appealed—by Mr. Thompson.

Though the subjects raised by Mr. Thompson in these claims have been litigated subsequent to his conviction, he did *not* complete the process by appealing the district court's rejection of these claims to the Eighth Circuit Court of Appeals.  Specifically, Mr. Thompson moved for a judgment of acquittal or for a new trial (See CR Docket No. 255).  The district court rejected these claims.  CR Docket No. 279.

After the conclusion of the criminal proceedings, the government brought civil proceedings against Mr. Thompson in the form of a False Claims Act suit, seeking damages under that statute as well as for common law fraud, unjust enrichment, and payment by mistake.  <u>See</u> generally, Civ. No. 15-5060, United States District Court, District of South Dakota, Western Division.  Mr. Thompson brought counterclaims against the government in that civil action, alleging the government committed fraud during his criminal trial.  Mr. Thompson's counterclaims in the civil case made the same claims he made in his motion for judgment of acquittal or for a new trial in his criminal case, which in turn are the same claims he makes in this case—i.e. that during his criminal trial, the prosecutors acted in bad faith, suborned perjury, perpetrated a fraud on the court, manufactured the evidence against him, purposefully misstated the law, etc.  <u>See</u> generally, CR Docket No. 255 & 256, Civ. No. 15-5060, Docket Nos. 8, 20.  The government moved to dismiss Mr. Thompson's civil counterclaims, however, and the district court granted the motion.  <u>Id.</u> at Docket No. 44.  Mr. Thompson is currently appealing the district court's decision in that *civil* matter.  <u>Id.</u> at Docket 53.  This *civil* appeal, however, comes much too late to have an effect on his ability to directly appeal his *criminal* conviction under the time allowed (14 days after entry of the judgment) by FED. R. APP. P. 4(b).

This court has explained in DISCUSSION, Section B, above that a § 2255 petition does not serve as a substitute for a direct appeal in federal criminal matters.  <u>Frady</u>, 456 U.S. at 167-68; <u>McNeal</u>, 249 F.3d at 749.  "To obtain post-

conviction relief on a claim that was not previously raised on direct appeal, 'a prisoner must clear a significantly higher hurdle than would exist on direct appeal.' " United States v. Fernau, 2007 WL 430208 at * 2 (D.N.D. Feb. 2, 2007) (citing Frady, 456 U.S. at 164).  Section 2255 relief is not available to correct errors which could have been raised at trial or on direct appeal, absent a showing of cause and prejudice, or that the alleged errors resulted in a fundamental defects resulting in a complete miscarriage of justice or that the petitioner is actually innocent.[15]  Ramey v. United States, 8 F.3d 1313, 1314 (8th Cir. 1993) (citing Frady, 456 U.S. at 167 and United States v. Smith, 843 F.2d 1148, 1149 (8th Cir. 1988)).  In Ramey, as in Mr. Thompson's case, the § 2255 petitioner failed to file a direct appeal before he filed his § 2255 petition. Ramey, 8 F.3d at 1314.

In order to show the "cause" necessary to excuse procedural default, a petitioner must show there was something external to him which prevented him from raising the claim.  Murray v. Carrier, 477 U.S. 478, 492 (1986).  The external impediment, whether government interference or the absence of the factual basis for the claim, must have *actually* prevented the petitioner from raising the claim.  McClesky v. Zant, 499 U.S. 467, 497 (1991).  To show prejudice, the petitioner must show that the alleged errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Frady, 456 U.S. at 170.  If the petitioner fails to

---

[15] In his amended petition, but not in connection with a procedural default argument, Mr. Thompson asserts he is actually innocent.  That portion of Mr. Thompson's petition is discussed later in this opinion in Section H of the DISCUSSION.

show cause, the court need not consider prejudice.  Cagle v. Norris, 474 F.3d 1090, 1099 (8th Cir. 2007).

The claims Mr. Thompson attempts to raise in this section of his § 2255 petition (false or incorrect/insufficient evidence, prosecutorial misconduct, perjured testimony, Brady violations) are all claims which are subject to the doctrine of procedural default.  See e.g. Shepersky v. Wengler 2010 WL 6367122  at * 3 (D. Minn., Sept. 10, 2010) (Brady violation claim barred by procedural default because petitioner did not raise it on direct appeal); Jackson v. Symmes, 2011 WL 1300930 at * 11 (D. Minn. Jan. 18, 2011) (insufficiency of the evidence and prosecutorial misconduct claims dismissed as procedurally defaulted because they were not raised on direct appeal);  United States v. Fernau, 2007 WL 430208 at * 16-17 (D.N.D. Feb. 2, 2007)(claims that a witness gave false testimony during petitioner's criminal trial and prosecutorial misconduct claims barred by the doctrine of procedural default).

The government raised the procedural default defense in its memorandum in support of its motion to dismiss Mr. Thompson's amended petition (Docket No. 76) and explained why Mr. Thompson's first ground for relief and all its sub-parts are barred by procedural default.  The government further argued that Mr. Thompson, though he had the trial transcript available to him long before sentencing and the date the judgment of conviction was entered, failed to show any cause for not raising all of these issues when they should have been raised—on direct appeal.

Mr. Thompson thereafter submitted a reply brief (Docket 85), but simply reiterated his arguments regarding false evidence, perjured and/or incorrect testimony, and the many ways he believes the prosecutors and witnesses misstated the law during his criminal trial. Mr. Thompson's reply brief did not ever address the showing he must make to establish cause and/or prejudice in order to overcome his procedural default. And though Mr. Thompson asserts his actual innocence, for the reasons discussed below in section H, he has not made a sufficient showing, based upon new and reliable evidence, to overcome his procedural default. Schlup v. Delo, 513 U.S. 298, 327 (1995). This court therefore recommends that Mr. Thompson's first ground for relief (subverting the fact-finding process), along with all of its sub-parts, be dismissed.

**E.      Third ground for relief:  Prosecutorial misconduct**

In this section of his amended petition, Mr. Thompson asserts that the prosecutors who handled his criminal trial committed improprieties so grievous as to rise to the level of a due process violation. Mr. Thompson re-asserts his claims, discussed in section D above, that:

- the prosecutors mis-stated or misrepresented to the jury the law and NSF policy;
- made incorrect statements regarding how NSF grant funds could be spent, including suggestions that Mr. Thompson charged un-allowable expenses to the NSF grant;
- made false arguments of fact to the jury regarding Mr. Thompson's actions in relationship to work performed on the grant and as to his use of the grant money;
- incorrectly implied that Mr. Thompson used the NSF grant money to solve his personal credit problems;
- falsely claimed that Thompson did not have lab facilities to which NSF funds could have been properly applied;
- made improper closing arguments; and

126

- actively presented false testimony about Mr. Thompson's interview with Agent Pritchard and his intention to hire Dr. Li.

As the government has already noted above in Section D, these are all arguments which should have been, but were not raised on direct appeal. As such, they are procedurally defaulted. See e.g. Wilbourn v. United States, 2013 WL 4552858 at * 2 (D.S.D. Aug. 28, 2013) (prosecutorial misconduct claim consisting of petitioner's argument that prosecutors knowingly offered false testimony at his trial was procedurally defaulted because petitioner did not raise it on direct appeal). Because Mr. Thompson has not shown cause or even attempted to show cause for his failure to raise all of these claims on direct appeal, these claims are procedurally defaulted and should be summarily dismissed on that basis.

Even if not defaulted, these claims fail on their merits. The court notes that most, if not all, of Mr. Thompson's prosecutorial misconduct claims amount to his assertions that the government presented false or perjured testimony in order to convict him. Mr. Thompson's conclusory allegations do not come close to meeting the required showing that (1) the prosecution used perjured testimony; (2) the prosecution actually knew or should have known of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict. United States v. Funchess, 422 F.3d 698, 701 (8th Cir. 2005); United States v. Peterson, 223 F.3d 756 (8th Cir. 2000). In Peterson, the Eighth Circuit emphasized that a mere presence of a conflict between witness's testimony is insufficient to establish perjury. Id.

at 763.  In this case, it is Mr. Thompson's view of the evidence in his case that is in conflict with the testimony of most, if not all of the witnesses who testified for the prosecution.  Mr. Thompson's disagreement, however, is insufficient to establish that the government's witnesses perjured themselves or that the government's evidence was false.

"Prosecutorial misconduct does not warrant federal habeas relief unless the misconduct infected the trial with enough unfairness to render [petitioner's] conviction a denial of due process." Louisell v. Dir. of Iowa Dep't of Corrs., 178 F.3d 1019, 1023 (8th Cir. 1999) (alteration in original) (quoting Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998)).   To violate due process, a prosecutor's conduct must be so egregious as to render a defendant's trial fundamentally unfair. Stringer v. Hedgepeth, 280 F.3d 826, 829 (8th Cir. 2002).  To make this showing, Mr. Thompson must show a reasonable probability that the alleged misconduct affected the outcome of the trial—i.e., that absent the alleged prosecutorial misconduct the verdict probably would have been different Id. (quoting Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995)).  Having failed to meet his burden to show that prosecutorial misconduct occurred at all, Mr. Thompson cannot show his trial was rendered fundamentally unfair.  For these reasons, Mr. Thompson's third claim for relief should be dismissed.

## F.   Fourth ground for relief:  Broadening the indictment

This claim has already been discussed in the DISCUSSION Section C.2.f, above, under Mr. Thompson's assertion that attorney Poppen was ineffective

for failing to object when the prosecution "broadened" the indictment.  For the reasons already explained in that section, the government did not "broaden" or amend the indictment-- in its presentation of the evidence, in the jury instructions, or in the verdict form.  This claim should be dismissed.

## G.      Fifth ground for relief:  Dirty hands/fraud on the court

This claim again re-hashes Mr. Thompson's assertions that the prosecutors "lied about NSF policy and law."  In this section, however, Mr. Thompson asserts a slightly different claim.  Mr. Thompson asserts that because he was held to a different standard, the prosecutors violated his "4th Amendment right to equal protection."  Docket 64, p. 38.  Mr. Thompson's assertions that the prosecutors "lied about NSF policy and law" are rejected for the reasons already explained in sections DISCUSSION C-E, above.  Further, assuming Mr. Thompson intends to claim that by skewing or misrepresenting the NSF policies and law, the prosecutors selectively prosecuted him in violation of his *Fifth* Amendment right to equal protection[16] under the law, this claim, too, fails.   To establish selective prosecution, Mr. Thompson must establish he was singled out for prosecution while similarly situated individuals have not been prosecuted.  United States v. Aanerud, 893 F.2d 956, 960 (8th Cir. 1990).  He must also show that the government's discriminatory selection

---

[16] Mr. Thompson cites a 4th amendment right to equal protection, and he also cites Kenner v. CIR, 387 F.3d 689 (8th Cir. 1968) in support of his "fraud on the court" argument.  The equal protection clause is grounded in either the 14th Amendment to the United States Constitution (as it pertains to the states) or in the 5th Amendment to the United States Constitution (as it pertains to the federal government).  The Kenner case is found in F.2d and in that case, the court found that the petitioner failed to show fraud on the court.

is based on an impermissible ground such as race, religion, or the exercise of a constitutional right.  Id.  Mr. Thompson has not sufficiently alleged,[17] let alone made, any of these showings.  For these reasons, this claim for relief should be dismissed.

## H.  Sixth and Seventh Grounds for Relief:  Vindictive/Malicious Prosecution

In his sixth and seventh claims for relief, respectively, Mr. Thompson alleges vindictive and malicious prosecution.  Again in these sections of his petition, Mr. Thompson asserts that the witnesses in his criminal trial misstated NSF policies and the law.  For the reasons already explained, the court rejects this basic factual underpinning of Mr. Thompson's vindictive/malicious prosecution claims.

"To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' " United States v. Goodwin, 457 U.S. 368, 372 (1982) (citing Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)).  The United States Supreme Court has long recognized that while an individual may penalized for violating the law, he may not be penalized for exercising a constitutional or statutory right.  Id.  So long as there is probable cause to believe a defendant has committed a crime, a prosecutor's decision to indict is within his broad discretion.  United States v. Kelley, 152

---

[17] Mr. Thompson does assert that he was prosecuted in retaliation for refusing to meet a second time in person with Agent Pritchard (which Mr. Thompson characterizes as an exercise of his 5th Amendment right).  Mr. Thompson offers nothing, however, other than his own bare assertion in support of his claim that his refusal to meet in person a second time with Agent Pritchard had any influence at all upon the manner in which his criminal case was tried.

F.3d 881, 886 (8th Cir. 1999).  The defendant, however, bears a heavy burden to show through objective evidence that he was indicted as a punishment for exercising a constitutional right.  United States v. Kriens 270 F.3d 597, 602 (8th Cir. 2001) (citing Goodwin, 457 U.S. at 384, n. 19); Kelly, 152 F.3d at 885-86.

In Goodwin, the United States Supreme Court explained why there should not be a presumption of vindictiveness when a criminal defendant invokes his constitutional rights at the pre-trial stage:  a defendant is *expected* to invoke procedural rights that inevitably impose a burden upon the prosecutor, therefore it is unrealistic to assume that a prosecutor's probable response to such behavior is to seek to penalize and deter.  "The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates."  Goodwin, 457 U.S. at 381.  Therefore, in order to prove vindictive prosecution, the defendant must show by objective evidence that he was indicted for a vindictive reason (i.e. exercising his constitutional right).  Id. at 384.

Mr. Thompson asserts criminal charges were ultimately brought against him because he (Thompson) refused further personal interviews with Agents Pritchard and Scully after the October, 2010 interview.   See Docket 64, p. 38.  In support of this assertion, Mr. Thompson cites an exhibit (which this court has been unable to locate in the record) in which he asserts it is the policy of the OIG to "put the hurt" on NSF grant recipients who refuse to cooperate with OIG investigators.  Id.  Mr. Thompson theorizes that because he refused to

meet with OIG investigators a second time, they decided to "put the hurt" on him by bringing invalid charges against him. Id.

But Mr. Thompson ignores the fact that, when Agents Pritchard and Scully interviewed him in October, 2010, the agents had already subpoenaed or obtained from other sources many, if not most of the documents (bank records, credit card billings) and emails which were introduced as the evidence against Mr. Thompson during his criminal trial. See trial testimony of Agents Pritchard and Scully. Also, Agent Pritchard repeatedly emphasized that his role is to investigate. It is the prosecutor, not Agent Pritchard, who makes the decision about whether to bring formal charges (i.e. indictment) as the result of the NSF investigation process. See, e.g. TT at 965, 968-69, 1003-04 (Agent Pritchard's testimony explaining that his job duties are to gather facts and advise the appropriate parties—including the U.S. Attorney-- as to his findings and recommendations). In short, Mr. Thompson has presented this court with no objective evidence to support his claim that he would not have been criminally charged but for his refusal to meet with personally with Agent Pritchard a second time. As such, Mr. Thompson has failed to carry the heavy burden necessary to support his claim of vindictive prosecution. Kriens 270 F.3d at 602; Kelly, 152 F.3d at 885-86.

Mr. Thompson makes the very same arguments in support of his claim for "malicious prosecution." He claims that despite the lack of evidence supporting his guilt, prosecutors "actively and willfully engaged in the presentment of fictitious evidence, false declarations, false declarations of law,

132

and perjured testimony . . . . to procure the indictment and convictions against him in bad faith." Docket 64, p. 39.  Malicious prosecution, however, is a "state-law tort and does not, without something more, implicate constitutional grounds that could provide a basis for overturning [a] conviction." United States v . Bailey, 2014 WL 4656111 at * 4 (D. Neb., September 16, 2014) (distinguishing federal prisoner's claims of vindictive and malicious prosecution and rejecting both claims).  Because this court has rejected the factual underpinnings for Mr. Thompson's vindictive prosecution claim (i.e. that he was prosecuted for exercising a statutory or constitutional right) his state-law tort claim, without something more, so too must fail.

## I.     Eighth ground for relief:  Actual innocence

Mr. Thompson's final ground for relief is that he is actually innocent of all the charges of which he stands convicted.  Docket 64, p. 39.  He explains "this brief corrects false declarations of law left uncontroverted at Thompson's trial and shows he incurred legitimate expenses and the funds he spent did not belong to the NSF when he spent them."

"Actual innocence" has not been recognized by the United States Supreme Court as an independent constitutional claim upon which habeas relief can be granted; instead, it is "a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits." Schlup, 513 U.S. at 315; McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) (affirming that actual innocence exception may be invoked to overcome AEDPA statute of limitations, but declining to

133

decide that it should be recognized as a freestanding claim).  Actual innocence means factual innocence, it does not mean mere legal insufficiency.  Bousley, 523 U.S. at 623.  Actual innocence claims are rarely successful as they require the petitioner to carry an exacting burden.  Schlup, 513 U.S. at 324.  The Eighth Circuit recently described the distinction between the hypothetical, yet-to-be recognized actual innocence "freestanding" claim and actual innocence as a "gateway" to revive an otherwise defaulted habeas claim:

> The Supreme Court has not decided whether a persuasive demonstration of actual innocence after trial would render unconstitutional a conviction and sentence that is otherwise free of constitutional error.  See House v. Bell. 547 U.S. 518, 554-55 (2006).  The Court has established, however, that the threshold for any such claim, if it were recognized, would be "extraordinarily high."  Herrera v. Collins, 506 U.S. 390, 417 (1993).  The threshold, if it exists, would require "more convincing proof" than the "gateway" standard that allows for consideration of otherwise defaulted constitutional claims upon a showing of actual innocence.  House, 547 U.S. at 555; see Schlup v. Delo, 513 U.S. 298, 315 (1995).  Thus, on a freestanding claim of actual innocence, it is not sufficient that a petitioner shows even that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  Id. at 327.  The "extraordinarily high" threshold, if recognized, would be even higher.  House, 547 U.S. at 555.

Dansby v. Hobbs, 766 F.3d 809, 816 (8th Cir. 2014).

With those caveats in mind, in order to make a showing of actual innocence sufficient to overcome his procedural default, Mr. Thompson must (1) produce "new reliable evidence" not presented previously; and (2) he must "show that, in light of all the evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt of the crime for which he . . . was convicted."  Schlup, 513 U.S. at 324; United States

v. Apker, 174 F.3d 934, 938-39 (8th Cir. 1999).  Evidence is "new" only if it was not available at the time of the trial and if it could not have been discovered earlier through the exercise of due diligence.  Johnson v. Norris, 170 F.3d 816, 818 (8th Cir. 1999).  A petitioner can make the new evidence showing only where he demonstrates that the factual basis for the evidence did not exist at the time of the trial and could not have been presented earlier.  Id. The evidence must not only be "new" but it must also be "reliable."  Schlup, 513 U.S. at 324.

Here, the court first recognizes that, as a *pro se* petitioner, Mr. Thompson probably did not grasp the difference between a freestanding actual innocence claim and one presented for the purpose of excusing his procedural default.  The court, therefore, considers this claim as if it was presented for the purposes of excusing procedural default.  Schlup, 513 U.S. at 315.

Proceeding in this manner, Mr. Thompson has not made a sufficient showing.  None of the arguments he makes in support of his actual innocence claim present new evidence.  Mr. Thompson argues that the law and NSF regulations allowed him to spend the NSF grant money in the fashion that he did, and that the SDSU grant participants doctored or manufactured their documentation in order to make it appear that Mr. Thompson owed them part of the grant money when in fact, he did not.  He further argues that he could have properly hired Dr. Jing Li as an Isosceles employee without switching the status of Dr. Li's visa.  The facts upon which these arguments are based, even

if the court assumes they are true (an assumption the court is not willing to make because Mr. Thompson has supported his claims with nothing but his own conclusory statements) were certainly available to Mr. Thompson before and during his criminal trial. And, for the reasons which have been already stated in this opinion, Mr. Thompson has likewise not shown that the basis for his actual innocence claim is "reliable." Namely, Mr. Thompson's arguments are long on generalities but short on specifics.

Much of Mr. Thompson's "new evidence" consists of Mr. Thompson's naked assertions of fact which he himself makes. For example, he makes long diatribes against the NSF investigators, the SDSU employees, and the government prosecutors, stating that all of them lied and manufactured evidence against him. Others examples are statements of witnesses or documents that were in existence, if not introduced into evidence, at the time of his criminal trial. All this evidence is historical and obviously was known to Mr. Thompson at the time of his jury trial. It is not new and does not satisfy Mr. Thompson's burden to show new and reliable evidence of his factual innocence. Schlup, 513 U.S. at 324; Norris, 170 F.3d at 818. The court finds Mr. Thompson has not demonstrated actual innocence for purposes of excusing his procedural default. It necessarily follows that if Mr. Thompson has not met this lower standard, he has not supplied the "more convincing proof" which would be required to meet the threshold for a freestanding actual innocence claim—even assuming such a claim is cognizable as an avenue for

relief.  <u>Dansby</u>, 766 F.3d at 816.  Accordingly, the court recommends dismissal of this ground for relief.

**J.     No Evidentiary Hearing is Warranted**

A § 2255 motion can be denied without holding an evidentiary hearing if (1) the movant's allegations, even if true, would not entitle him to relief; or (2) the movant's allegations cannot be taken as true because they are contradicted by the record, they are inherently incredible, or they are conclusions rather than factual statements.  <u>Hyles v. United States</u>, 754 F.3d 530, 534 (8th Cir. 2014).  "If [the court] can determine from the motion and the supporting record in the case that [the movant] is not entitled to § 2255 relief, then no hearing was, or is now, required."  <u>Saunders v. United States</u>, 236 F.3d 950, 952 (8th Cir. 2001).

Here, the court concludes that no evidentiary hearing is warranted.  Even assuming Mr. Poppen was deficient in any respect, Mr. Thompson has failed to demonstrate prejudice.  The court finds no merit to Mr. Thompson's remaining grounds for relief.  There is no issue of fact or credibility to be determined by holding an evidentiary hearing.  Therefore, the court recommends no such hearing be held.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends that the government's motion to dismiss [Docket No. 75] be granted and that Mr. Thompson's amended motion to vacate, set aside, or correct [Docket No 36] be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED March 16, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

138