UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| SCOTT THOMPSON,<br><br>                    Movant,<br><br>   vs.<br><br>UNITED STATES OF AMERICA,<br><br>                  Respondent. | CIV. 16-5035-JLV<br><br><br>ORDER |

**INTRODUCTION**

Mr. Scott Thompson, appearing *pro se*, moves the court to overturn his criminal conviction under 28 U.S.C. § 2255. (Dockets 1 & 36). Following a ten-day jury trial, Mr. Thompson was convicted of two counts of making a false claim to a federal agency, two counts of submitting a false document to a federal agency, two counts of wire fraud, and one count of receiving stolen government money. (Dockets 213 & 218). The convictions stem from Mr. Thompson's improper representations to the National Science Foundation ("NSF") in a grant application and report and his improper use of NSF grant funding. He now claims his trial was marred by ineffective assistance of counsel, false testimony, and prosecutorial misconduct. (Docket 64). He also claims he is actually innocent of the crimes for which he was convicted. Id. The government seeks to dismiss Mr. Thompson's § 2255 motion. (Docket 75).

Mr. Thompson's motion was referred to Magistrate Judge Veronica L. Duffy pursuant to the court's standing order of October 16, 2014, and

28 U.S.C. § 636(b)(1) for a report and recommendation ("R&R").  After extensive

briefing, the magistrate judge issued an R&R concluding Mr. Thompson's

motion should be denied in full without an evidentiary hearing.  (Docket 86).

Mr. Thompson timely objected to the R&R.  (Docket 93).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files

written objections to the magistrate judge's proposed findings and

recommendations, the district court is required to "make a de novo

determination of those portions of the report or specified proposed findings or

recommendations to which objection is made."  Id.  The court may "accept,

reject, or modify, in whole or in part, the findings or recommendations made by

the magistrate judge."  Id.  For the reasons given below, the court overrules Mr.

Thompson's objections to the R&R and adopts that thorough document in full.

The court denies Mr. Thompson's requests for discovery and an evidentiary

hearing.  The court denies Mr. Thompson's § 2255 motion.

## ANALYSIS

### I.     Facts and Procedural History

Mr. Thompson does not specifically object to the factual findings made by

the magistrate judge.  However, he presents a short factual recitation that

differs in material respects from the magistrate judge's findings.  (Docket 93 at

pp. 2-4).  Given Mr. Thompson's *pro se* status, the court will construe his

factual recitation as objections to the magistrate judge's findings.  See Erickson

v. Pardus, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally

construed[.]") (internal quotation omitted).  The court denies these factual

objections below.  <u>See</u> <u>infra</u> Section III.

The magistrate judge exhaustively summarized the complex testimony

presented at Mr. Thompson's jury trial.  (Docket 86 at pp. 5-69).  The summary

is adopted in full.  In its order denying Mr. Thompson's motions for acquittal

and a new trial, the court also made factual findings of its own regarding the

trial testimony.  (CR. Docket 279 at pp. 3-8).[1]  Given the extensive factual

summary presented in the R&R and the order denying defendant's post-trial

motions, the court will not repeat the facts here.  As necessary, the court will

recite facts from those sources pertinent to Mr. Thompson's objections.

A brief explanation of the procedural history of this case is necessary to

note the pleadings the court considered in reaching its decision.  Mr.

Thompson first filed his § 2255 motion on May 27, 2016.  (Docket 1).

Following four extensions, Mr. Thompson filed an amended motion and a 231-

page brief in support of the motion.[2]  (Dockets 36 & 37).  The government

moved to require Mr. Thompson to comply with the local rules governing brief

length.  (Docket 54).  The magistrate judge granted that motion.  (Docket 55).

---

[1]Mr. Thompson's criminal case may be found at this court's docket
number CR. 11-50054.  The court will cite to documents filed in the criminal
case as "(CR. Docket ___)".

[2]The court notes Mr. Thompson filed his amended motion untimely.
<u>Compare</u> Docket 14 (requiring Mr. Thompson to file his amended motion by
February 15, 2017) <u>with</u> Docket 36 (amended motion filed on March 3).  The
magistrate judge was untroubled by Mr. Thompson's tardiness.  Given his *pro
se* status, the court will not penalize Mr. Thompson for his violation of the
magistrate judge's order.

Mr. Thompson then petitioned the magistrate judge three times to file an overlength brief, whittling the proposed page number down each time. (Dockets 56, 58 & 62). The magistrate judge permitted Mr. Thompson to file a 41-page brief. (Dockets 63 & 64). The court only considers that brief.

In support of his amended motion, Mr. Thompson also filed, by the magistrate judge's count, 2,606 pages of exhibits. (Docket 86 at p. 78) (referencing Dockets 38-53). The magistrate judge did not indicate whether she considered any of Mr. Thompson's voluminous exhibits.[3] The Rules Governing Section 2255 Proceedings state "[if] the motion is not dismissed, the judge *may* direct the parties to expand the record by submitting additional materials relating to the motion. The judge may require that these materials be authenticated." Governing Rule 7(a) (emphasis added). Neither the magistrate judge nor this court permitted Mr. Thompson to supplement the existing record.[4] Finally, the existing record is itself most detailed, including more than 1,200 pages of trial transcript, hundreds of trial exhibits, and hundreds more pages of briefing and orders regarding Mr. Thompson's 2255 motion. The court has all the information it needs to resolve this matter without delving into Mr. Thompson's exhibits. Accordingly, the court does not consider Mr. Thompson's

---

[3]To the extent Mr. Thompson intended to object to the magistrate judge's refusal to consider his exhibits, the court overrules that objection. For the reasons given in this section, the magistrate judge did not err in declining to consider Mr. Thompson's excessive and improper exhibits.

[4]Contrast that silence with the magistrate judge's order directing the government to supplement the record with Mr. Poppen's affidavit. (Docket 71).

exhibits, which were neither submitted with the court's permission nor authenticated.

The government requested and was granted a waiver of Mr. Thompson's attorney-client privilege regarding the attorney who represented him at trial, Mr. Brett Poppen.  (Dockets 69, 71 & 73).  Mr. Poppen filed an affidavit responding to Mr. Thompson's ineffective assistance claims.  (Docket 77).  The government referred to Mr. Poppen's affidavit in its motion to dismiss.  (Docket 76).  Mr. Thompson responded to the government's motion to dismiss.  (Docket 85).

Mr. Thompson filed objections to the R&R.  (Docket 91).  He then filed a document styled as a motion to amend his objections, but which consisted solely of the amended objections with no request or justification for the amendment.  (Docket 93).  The court nevertheless accepted the amended objections and informed Mr. Thompson it would only consider the amended objections.  (Docket 94).  The court then declared the matter fully briefed.  Id.

## II.    Summary of Movant's Objections

As noted above, the court discerns five factual objections to the R&R from Mr. Thompson's factual recitations.  As summarized by the court, those objections contend:

1.    Dr. Qiquan Qiao logged into the NSF's website as Dr. Jing Li and submitted a grant proposal on behalf of Isosceles, LLC. ("Isosceles") listing Dr. Li as the grant's principal investigator ("PI").  (Docket 93 at p. 2).

2.    Dr. Qiao told Mr. Thompson South Dakota State University ("SDSU") would process the paperwork needed for Dr. Li to

5

be employed with Isosceles for purposes of the grant.  <u>Id.</u> at p. 3.

3.  Dr. Qiao falsely told Mr. Thompson he was required to apply for a certain visa to enable Dr. Li to work for Isosceles.  <u>Id.</u>

4.  Drs. Qiao and Li prepared the final report required by the NSF following the grant termination and included in that report false statements and plagiarized text.  <u>Id.</u>

5.  Mr. Thompson certified to the NSF that Dr. Li worked 160 hours on the grant but did not certify those hours were worked specifically on behalf of Isosceles.  <u>Id.</u> at p. 4.

The court will first address each factual objection in turn.

Mr. Thompson also raised 12 objections to the magistrate judge's legal conclusions.  As summarized by the court, those objections argue:

1.  Mr. Poppen's representation of Mr. Thompson was ineffective because he did not present evidence Mr. Thompson was not required to obtain any specific visa before hiring Dr. Li.  <u>Id.</u> at pp. 6-8.

2.  Mr. Poppen's representation was ineffective because he did not hire an expert witness to refute testimony by Dr. Prakesh Balan that NSF rules prohibited Mr. Thompson's use of grant funds.  <u>Id.</u> at pp. 9-10.

3.  Mr. Poppen's representation was ineffective because he did not fully advise Mr. Thompson of Dr. Dennis Helder's "hostile disposition" toward him before asking him to sign a waiver of conflict based on Mr. Poppen's friendship with Dr. Helder's son.  <u>Id.</u> at pp. 11-13.

4.  Mr. Poppen's representation was ineffective because he did not properly investigate NSF grant rules and consequently did not present evidence that Mr. Thompson's use of grant funding to pay credit card bills was permissible.  <u>Id.</u> at pp. 13-14.

5.  Mr. Poppen's representation was ineffective because his "unpreparedness" denied Mr. Thompson his right to testify.  <u>Id.</u> at pp. 14-15.

6.  Mr. Thompson was not required to obtain any specific visa before hiring Dr. Li.  <u>Id.</u> at p. 15.

7.    Mr. Thompson did in fact hire Dr. Li.  Id. at pp. 16-17.

8.    All expenses Mr. Thompson charged to the grant were permitted under NSF rules.  Id. at pp. 17-19.

9.    Trial testimony regarding Mr. Thompson using Dr. Li's credentials to submit a final report to the NSF improperly broadened the indictment.  Id. at p. 19.

10.   Mr. Thompson was actually innocent.  Id. at pp. 19-21.

11.   Prosecutors committed misconduct by presenting false evidence Mr. Thompson was required to obtain a visa before hiring Dr. Li.  Id. at pp. 21-22.

12.   Mr. Thompson did not procedurally default his non-ineffective assistance claims because the failure to raise his claims on direct appeal were due to Mr. Poppen's incompetence "and/or newly discovered evidence."  Id. at pp. 23-24.

Many of these legal objections center around two broad themes: whether Mr. Thompson was required to affirmatively obtain a specific visa before hiring Dr. Li to work on the Isosceles grant and whether NSF rules permitted Mr. Thompson to spend the grant funding as he did.  Accordingly, the court will address these two questions and the objections hinging on them before turning to the remainder of the legal objections.

## III.    Movant's Factual Objections

In the context of a § 2255 motion, "[a] petitioner's allegations must be accepted as true . . . unless they are contradicted by the record, inherently incredible, merely conclusory, or would not entitle the petitioner to relief." Garcia v. United States, 679 F.3d 1013, 1014 (8th Cir. 2012).  Reviewing Mr. Thompson's factual objections under this standard, the court overrules each of them.

## A.      Filing the grant proposal

Defendant asserts Dr. Qiao logged into the NSF's online portal as Dr. Li and submitted the grant proposal on behalf of Isosceles, listing Dr. Li as the PI. (Docket 93 at p. 2).  This assertion is belied by trial testimony and exhibits. The proposal shows Mr. Thompson electronically signed the proposal and submitted it on February 25, 2009, as Isosceles' authorized organizational representative.  Trial Ex. 1.  Dr. Qiao testified at trial he did not file the grant proposal.  (CR. Docket 240 at p. 27).[5]

The jury verdict is equivocal on this factual matter.  Mr. Thompson's version of the proposal filing contradicts the jury's verdict of guilty on count 4 of the indictment as it was presented to the jury.[6]  (CR. Docket 218 at p. 2). That count charged Mr. Thompson with submitting the proposal and falsely stating in the proposal that Steven Makrinos was the CEO for Isosceles.  (CR. Docket 208 at p. 9).  However, the jury found Mr. Thompson not guilty on count 7, which charged Mr. Thompson with wire fraud for submitting the grant

---

[5]The trial transcript consists of eight volumes filed as separate entries in the criminal docket.  See Dockets 238-245.  The magistrate judge cited to the transcript as a single, continuously paginated volume.  (Docket 86 at p. 4 n.1). For ease of reference by a reader with access to the criminal docket, the court will instead cite to the transcript at its individual docket entry and as paginated by the CM/ECF system.

[6]The court dismissed the original count 4 of the indictment on the motion of the government.  (CR. Dockets 179, 201, 203 & 204).  The counts presented to the jury were renumbered to account for the dismissal.  See Docket 208 at pp. 5-16 (listing the counts and their elements in the primary jury instructions).  The count 4 presented to the jury represents count 5 in the superseding indictment.  In general, this order will refer to counts of the indictment as they were presented to the jury.

proposal. (CR. Docket 218 at p. 2). The verdict form does not indicate the jury's reasoning for finding Mr. Thompson not guilty on count 7. Id. Given the jury's guilty verdict on count 4, however, the court deduces the jury's disagreement with the charge was not a factual one based on the question of who submitted the proposal.

Accordingly, the court finds Mr. Thompson submitted the grant proposal listing Dr. Li as the PI. The objection is overruled.

### B. SDSU & Dr. Li's visa

Mr. Thompson claims Dr. Qiao told him "SDSU would process the necessary paperwork for [Dr.] Li's employment in connection with the grant." (Docket 93 at p. 2). This claim is contradicted by the trial record. Dr. Qiao testified Mr. Thompson asked him to arrange for SDSU to obtain a visa allowing Dr. Li to work for Isosceles. See Docket 86 at pp. 27-30 (summarizing trial testimony regarding Mr. Thompson and Dr. Qiao's communications on Dr. Li's visa). Dr. Qiao at first referred Mr. Thompson to SDSU employees knowledgeable about international student and worker visas. Id. Dr. Qiao nevertheless made clear to Mr. Thompson that he was responsible for hiring Dr. Li. Id.

Trial exhibits make clear that both Dr. Qiao and SDSU employees informed Mr. Thompson it was his responsibility to obtain the proper visa for Dr. Li. In May of 2009, Dr. Qiao informed Mr. Thompson via e-mail he "would need to take care of [Dr. Li's] training visa or H4 visa. SDSU can not [sic] do that for your company . . . period." Trial Ex. 526AA at p. 2. Again via e-mail,

in September of 2009—after Isosceles was required to hire Dr. Li under NSF rules—Dr. Qiao referred Mr. Thompson to John Mann, an international student advisor for SDSU. Trial Ex. 526H at p. 4. Mr. Mann informed Mr. Thompson he would need to register as an exchange visitor sponsor with the State Department to transfer Dr. Li's J-1 visa—which he stated was not possible—or sponsor Dr. Li for an H-1 work visa. Id. at pp. 2-3. Dr. Qiao responded to that e-mail thread with a message clarifying Mr. Thompson would "need to transfer Dr. Jing Li's VISA [sic] from SDSU to Isosceles" and he "did not mention that John at SDSU will transfer [Dr. Li's] exchange VISA[.]" Id. at p. 2. Mr. Thompson then agreed to submit a visa application for Dr. Li. Id. at pp. 1-2.

The trial record is clear Dr. Qiao did not agree SDSU would process the paperwork needed for Isosceles to hire Dr. Li. The objection is overruled.

## C.    Dr. Qiao & Dr. Li's visa

Mr. Thompson alleges Dr. Qiao falsely told him he "was required to procure" Dr. Li's visa. (Docket 93 at p. 3). As described above, see supra Section III.B., Dr. Qiao did tell Mr. Thompson he was required to procure an appropriate visa in order to hire Dr. Li. Whether that statement was false is an underlying concern of much of Mr. Thompson's § 2255 motion. The court rejects Mr. Thompson's argument below. See infra Section IV.A. The objection is overruled.

## D.    Plagiarism in final report

Mr. Thompson claims that the portion of the final report he was required to submit to the NSF authored by Drs. Qiao & Li contained "false statements

and plagiarized text." (Docket 93 at p. 3). He does not explain what statements were false or what portions of the report were plagiarized. In his opening brief, Mr. Thompson asserts unspecified e-mails would show Dr. Qiao copied his portion of the final report from an individual named Yu Xie. (Docket 64 at p. 18). In his reply brief, Mr. Thompson asserted he instructed Mr. Poppen to "look for any . . . evidence the report was plagiarized." (Docket 85 at p. 10). He claims Mr. Poppen was provided the "plagiarized work." Id. In his objections, Mr. Thompson also argues Mr. Poppen should have used the "plagiarized report" to "impeach the testimony offered by most of the government's witnesses." (Docket 93 at p. 20).

Mr. Thompson's factual objection on this point is conclusory.[7] He never provides the court with any specific examples of plagiarism or false statements in the final report. The trial testimony regarding the final report was sparse and did not allege it contained plagiarism or false statements. The portions of the report authored by Drs. Qiao and Li are short and heavily technical in nature. Trial Exs. 736 & 737. There is no indication from the face of the reports that they contain false statements or plagiarized text. The factual objection is overruled.

---

[7]Additionally, the court cannot discern, even if this objection was true and the final report was plagiarized or false, how this factual matter would support Mr. Thompson's § 2255 motion. The jury did not convict him of lying regarding the final report's technical portions. The jury convicted him of lying in the final report regarding Dr. Li's employment with Isosceles. (CR. Dockets 208 at pp. 6, 9 & 218 at pp. 1-2).

### E.    Dr. Li's work for Isosceles

Mr. Thompson states he certified to the NSF that Dr. Li worked 160 hours on the grant, as required by NSF rules, but he argues he did not specifically certify Dr. Li worked those hours on behalf of Isosceles, as opposed to SDSU.  (Docket 93 at p. 4).  This assertion was the subject of testimony at trial and was rejected by the jury, as reflected in its verdict.

The final report submitted to the NSF in relation to this grant indicated, on its face, that it was filed by Dr. Li and that Dr. Li worked more than 160 hours on the project.  Trial Ex. 4.  The portion of the report stating it was filed by Dr. Li was automatically generated by the NSF's website because it was submitted by a person using Dr. Li's credentials.  (Docket 86 at p. 65).  Mr. Thompson submitted the report using Dr. Li's credentials.  (CR. Docket 279 at p. 6).  Dr. Li did not submit the report.  (Docket 86 at p. 39).  In its ruling on Mr. Thompson's motion for a judgment of acquittal at trial, the court concluded it was a question of fact for the jury as to whether Mr. Thompson "claimed Jing Li was employed as the principal investigator for Isosceles for the project and that he worked more than a 160 hours on the project knowing the claims were false in that Jing Li was not an employee of Isosceles LLC and had not worked 160 hours."  (CR. Docket 244 at p. 115).

The jury resolved this factual matter in its verdict.  The jury convicted Mr. Thompson on counts 3 and 6, both of which alleged Mr. Thompson falsely claimed Dr. Li was employed by Isosceles as the PI and worked 160 hours as the PI for Isosceles.  (CR. Docket 208 at pp. 6, 9).  Because the trial record

reflects the jury was presented with this factual question and resolved it in a manner contradicting Mr. Thompson's objection, the objection is overruled.

## IV.    Movant's Legal Objections

As noted above, two legal questions underlie much of Mr. Thompson's § 2255 motion: whether he was required to obtain a visa to employ Dr. Li and whether he was permitted to spend the Isosceles grant funds as he did.  As discussed below, the court concludes Dr. Li could not have worked for Isosceles on his exchange visitor visa at the time Mr. Thompson told the NSF Dr. Li was employed by Isosceles.  The court also concludes Mr. Thompson was not permitted to spend Isosceles' grant funds on his credit card bills.  The court accordingly overrules the objections grounded in these erroneous premises.

### A.    Whether Mr. Thompson was required to obtain Dr. Li's visa

Mr. Thompson strenuously argues he was not required to procure any particular visa before hiring Dr. Li.  See, e.g., Docket 93 at pp. 15-17.  He argues testimony to the jury that he was required to procure a visa "somehow supports a finding [Mr.] Thompson knew at the time he certified" documents to the NSF that "he had not hired [Dr.] Li." Id. at p. 20.  He believes the jury convicted him because they found he knew he had not hired Dr. Li due to the lack of an appropriate visa.  Id. at pp. 21-22.

Dr. Li came to the United States in 2008 as a post-doctoral student and researcher.  (CR. Docket 241 at p. 131).  He was present in the United States on a J-1 visa.  Id. at p. 132.  He believed he was unable to work for Isosceles without an H-1 visa.  Id. at pp. 138-39.  As noted above, Mr. Thompson was

13

given the same information by Dr. Qiao and Mr. Mann at SDSU.  See supra

Section III.B (citing Trial Ex. 526H).

J-1 visas are designed to "increase mutual understanding between the

people of the United States and the people of other countries by means of

educational and cultural exchanges."  22 C.F.R. § 62.1.  Only foreign persons

intending to engage in certain educational or cultural pursuits in the United

States are eligible for a J-1 visa.  See 22 C.F.R. § 62.4 (defining the categories

of persons eligible for a J-1 visa).  The regulations governing employment of J-1

visa holders depends on the category of visa held.  The trial record does not

contain a copy of Dr. Li's J-1 visa or the accompanying paperwork.  However,

given the trial testimony, it is apparent Dr. Li's visa was in either the category

"Professors and Research Scholars" or "College and University Students."[8]

Neither category of J-1 visa permits holders to seek general employment

outside their academic sponsoring institution.  J-1 visa holders in the professor

or research scholar category may only seek outside employment in "occasional

lectures and short-term consultations" which must be "incidental to the

exchange visitor's primary program activities."  22 C.F.R. § 62.20(g).  There is

no evidence Dr. Li's employment with Isosceles would have been a lecture or

short-term consultation, nor does Mr. Thompson make that argument.

---

[8]Mr. Thompson repeatedly refers to 22 C.F.R. § 62.23 as the basis for his argument he was not required to obtain a visa for Dr. Li.  See, e.g., Docket 93 at p. 8.  That regulation governs J-1 visas for college and university students. The court assumes Mr. Thompson is therefore claiming Dr. Li was present in the United States on a student J-1 visa.

Student J-1 visa holders may participate in "an academic training program for wages[.]" 22 C.F.R. §§ 62.23(f)(2). Mr. Thompson asserts Dr. Li was eligible to work for Isosceles under the academic training employment provision.[9] (Docket 93 at p. 15).

The most obvious problem with this argument is there is no evidence employment with Isosceles would have qualified as academic training under the regulations. To qualify as academic training, the proposed program must both relate to the student's major field of study and constitute "an integral or critical part of the academic program of the student." 22 C.F.R. §§ 62.23(f)(5)(i)(C), (D). There is no evidence Isosceles would have so qualified and a considerable amount of evidence in the trial record indicating that Isosceles was a profit-seeking venture not designed to provide academic training. See, e.g. Docket 86 at pp. 5-9 (summarizing trial testimony establishing the grant Isosceles received from NSF was designed to aid "startups and small businesses with innovative ideas.").

Furthermore, the academic institution sponsoring the student must permit the student to engage in the training. Id. at § 62.23(f)(5)(i). The

_____

[9]Mr. Thompson cites to portions of the evidentiary exhibits he provided in support of this assertion. (Docket 93 at p. 15) (citing Dockets 38-5 at p. 12 & 39-4 at pp. 5, 10-12). As noted above, see supra Section I, the court did not consider Mr. Thompson's exhibits. The court notes the proffered evidence is a page from the SDSU 2012-2013 international student handbook stating J-1 visa holders cannot be employed without "proper authorization" and a 2016 e-mail from an SDSU official stating J-1 visa holders can engage in academic training internships with school sponsorship. Even if the court were to consider the proffered documents, they do not prove SDSU authorized Dr. Li to work for Isosceles in 2009 as academic training.

student's "academic dean or advisor" must complete a letter of recommendation certifying the importance of the training program. Id. Dr. Qiao was Dr. Li's academic advisor.[10] (CR. Docket 240 at p. 18). The idea that Dr. Qiao authorized Dr. Li to work with Isosceles as academic training is wholly contradicted by the abundant evidence in the trial record that Dr. Qiao believed Dr. Li needed a separate visa to work for Isosceles. See, e.g., id. at p. 25.

The evidence in the trial record makes clear SDSU did not fulfill the conditions which would have allowed Dr. Li to be employed with Isosceles under the academic training provision of the J-1 visa regulations.[11] No other path to employment outside SDSU was open to Dr. Li while he was in the United States on a J-1 visa. See C.F.R. § 62.16 (stating unauthorized employment may result in J-1 visa termination). It is also uncontroverted that Dr. Li did not obtain any other type of visa before the Isosceles grant was awarded. The court must conclude Mr. Thompson could not have legally hired

---

[10]Because the trial record does not contain Dr. Li's visa or any visa paperwork, there may appear to be some uncertainty regarding whether Dr. Qiao was Dr. Li's academic advisor for visa purposes. Mr. Thompson provides no evidence that: 1. another SDSU professor was Dr. Li's academic advisor for visa purposes; and 2. that other professor authorized employment with Isosceles as academic training. Even if he had provided such evidence, it would be contradicted by the trial record, which makes abundantly clear Dr. Li came to SDSU from China to work with Dr. Qiao and that Dr. Qiao was Dr. Li's primary academic supervisor. See, e.g. CR. Docket 240 at p. 18, CR. Docket 241 at pp. 131-33. The court concludes Dr. Qiao was Dr. Li's academic advisor for visa purposes.

[11]The court is highly skeptical employment with Isosceles would have qualified as academic training even if SDSU had permitted Dr. Li to work there. That question does not impact the resolution of Mr. Thompson's § 2255 motion, so the court has no occasion to analyze it further.

Dr. Li as of the date the grant came into effect because Dr. Li's J-1 visa did not permit employment without SDSU authorization and because Dr. Li did not obtain any other visa.

The court need not resolve the question of whether Mr. Thompson was required to obtain a certain visa to permit employment to overrule Mr. Thompson's objections on this topic.[12] It is enough for the court to hold Dr. Li could not have been legally employed by Isosceles because SDSU did not authorize him to seek employment with Isosceles as academic training and because his J-1 visa did not permit any other form of outside employment. Put another way, *someone* had to obtain a different visa or SDSU approval before Isosceles could employ Dr. Li. Whether that someone was Mr. Thompson or another person is immaterial because *no one* acted to make Dr. Li eligible for outside employment prior to the date Mr. Thompson told the NSF Dr. Li was employed by Isosceles.

The jury convicted Mr. Thompson of lying to the NSF by stating Isosceles employed Dr. Li. (CR. Dockets 208 at pp. 6, 9 & 218 at pp. 1-2). That verdict

---

[12]H-1 visas authorize certain aliens to "come to the United States temporarily to perform services or labor for, or to receive training from, an employer, if petitioned for by that employer." 8 C.F.R. § 214.2(h)(1)(i). An H-1B visa permits aliens to reside in the United States to "perform services in a specialty occupation" when the "prospective employer has filed a labor condition application" that has been approved by the Secretary of Labor. Id. at § 214.2(h)(1)(ii)(B)(1). Mr. Thompson would have been required to apply for an H-1B visa for Dr. Li if that was the method he chose to employ Dr. Li. The court makes no findings regarding whether other options, aside from the H-1B visa or J-1 academic training program, would have permitted Isosceles to employ Dr. Li or whether Mr. Thompson would have been responsible for pursuing those options.

rested on a "fact question . . . as to whether, express or implied, Jing Li was hired by the company and whether the hiring encountered the impossibility of the visa problems." (CR. Docket 245 at p. 4). The court even gave a supplemental instruction allowing the jury to determine if Dr. Li was employed by Isosceles pursuant to an implied employment contract, over strenuous government objection. (CR. Dockets 211 at p. 4 & 245 at pp. 2-14). The jury obviously resolved that fact question against Mr. Thompson. Mr. Thompson has not shown testimony regarding Dr. Li's visa status was false, much less so willfully false as to be a constitutional violation.

Accordingly, the court overrules all of Mr. Thompson's objections to the R&R that rest on his visa argument. This includes his third factual objection, see supra Section III.C, and his first, sixth, seventh, tenth and eleventh legal objections. Mr. Thompson's first objection argues Mr. Poppen's representation was ineffective because he did not present Mr. Thompson's visa theory to the jury. (Docket 93 at pp. 6-8). It is not ineffective representation when defense counsel declines to present a legally erroneous theory to the jury. The other objections all contend the magistrate judge erred in rejecting arguments related to Mr. Thompson's visa theory. His sixth and seventh objections assert the magistrate judge erred by concluding Dr. Li needed a new visa to work at Isosceles and that Isosceles never hired Dr. Li. Id. at pp. 15-17. Mr. Thompson's tenth objection asserts the magistrate judge erred by concluding Mr. Thompson did not show actual innocence. Id. at pp. 19-21. He asserts his visa theory proves his innocence. Id. at pp. 20-21. Finally, his eleventh

18

objection asserts the magistrate judge erred by rejecting his argument prosecutors engaged in misconduct when they presented evidence contradicting his visa theory at trial.  Id. at pp. 21-22.  The court overrules all these objections.  The magistrate judge was correct in rejecting Mr. Thompson's visa theory.

**B.    Whether Mr. Thompson's use of NSF grant funding was permissible**

Mr. Thompson argues all the expenses he charged to the grant "were allowable under the NSF's grant conditions."  (Docket 93 at p. 18).  He argues the jury would not have convicted him of converting NSF funds had his theory been presented at trial.  Id. at p. 19.  These arguments are flatly contradicted by trial testimony and exhibits.

The award letter from the NSF regarding the grant states the funding is provided to Isosceles "for support of the project described in the proposal . . . as modified by revised budget dated May 10, 2009."  Trial Ex. 2 at p. 1.  The letter includes a summary of the approved budget.  Id. at p. 3.  The entire budget was received into evidence at trial.  Trial Ex. 1A.  Dr. Prakesh Balan, a NSF official, testified at trial the budget included in a grant proposal governs once the award is granted.  (CR. Docket 238 at pp. 72-73).  Dr. Balan also testified grant funds could not be transferred to a "purely personal account" after the grant had been terminated.  (CR. Docket 239 at p. 116).  Isosceles' grant was terminated as of December 20, 2009.  Trial Ex. 2B.

The government introduced abundant evidence showing Mr. Thompson spent thousands of dollars of grant funds on personal expenses before and

after the Isosceles grant was terminated.  Mr. Thompson opened an account for Isosceles at Dakotah Bank.  (CR. Docket 243 at p. 15).  The NSF deposited $100,000 connected with the grant into that account on July 6, 2009.  Id. at p. 17.  Mr. Thompson proceeded to spend tens of thousands of dollars on personal bills in his own name.  (Docket 86 at pp. 50-51) (summarizing trial testimony concerning use of grant funding).  The grant budget—approved by the NSF and binding on Mr. Thompson—allowed only $14,788 in direct labor costs for Mr. Thompson and $4,848 in fringe benefits for both Mr. Thompson and Dr. Li, for a total of $19,936 in possible compensation to Mr. Thompson. Trial Ex. 1A.  The magistrate judge calculated from trial exhibits that Mr. Thompson spent $56,781.52 on credit card bills alone.  (Docket 86 at p. 50).

Mr. Thompson asserts he used the grant funds for "insurance, retirement, phone bills, and service charges" which were all allowable expenses.  (Docket 93 at p. 14).  These were allowable expenses, but only as allocated by the grant budget.  Without even delving into the credit card expenditures, Mr. Thompson spent $23,460 on the costs he highlights—far in excess of the $19,936 in *total* compensation allowable for his personal use.[13] Trial Ex. 10.  He further asserts Mr. Poppen should have argued he had sufficient personal funds to repay the grant funds he spent on his credit card bills.  (Docket 93 at p. 14).  Even if true, this argument does not affect the fact Mr. Thompson spent $56,781.52 of grant funding on his credit card bills.

---

[13]In fact, the total budget for fringe benefits was $4,848—Mr. Thompson spent $16,847.01 on his health insurance and retirement benefits.

Whether he had the ability to pay the credit card bills using non-grant funding is immaterial.

Continuing this line of reasoning, Mr. Thompson argues he earned the grant funding he spent on the credit card bills and those cards were in his company's name. Id. He also argues his expenditures were allowable commercialization costs. Id. at pp. 18-19. These arguments are conclusory and belied by the trial record.[14] At trial, the government extensively examined Mr. Thompson's credit card expenditures. (CR. Docket 243 at pp. 27-57). That examination showed the use of these credit cards for shopping, dining, and travel. See, e.g. id. at p. 55-56. Mr. Thompson does not explain how any of these charges are related to Isosceles or the grant funding. The only possible budget item which might allow these expenses is the $14,788 in compensation to Mr. Thompson. Trial Ex. 1A. In total, as noted above, Mr. Thompson spent $56,781.52 on the credit card bills. Some of those credit cards were in the name of other companies owned by Mr. Thompson, Realtronics, Inc. and Black Hills Office and Computer Supply. (CR. Docket 243 at pp. 44-45). None of the credit cards were in Isosceles' name. Id. at p. 68. Mr. Thompson makes no effort to legitimize any of the specific charges to his credit cards that he paid using grant funding as approved by the grant budget.

_____

[14]Mr. Thompson points the court to federal acquisition regulations in support of this arguments. (Docket 93 at p. 19). The grant's general conditions specifically state the award was not subject to the regulations Mr. Thompson cites except in the case of contested costs incurred after grant termination. Trial Ex. 2A at p. 2. Additionally, Mr. Thompson's expenditures were unauthorized by the grant budget, regardless of their compliance with the proffered regulations.

Accordingly, Mr. Thompson's argument that his use of Isosceles' grant funding was legitimate is contradicted by the trial record. NSF rules clearly barred Mr. Thompson from spending tens of thousands of dollars over the binding budget on his personal expenses. This finding overrules Mr. Thompson's second, fourth and eighth objections to the R&R. In his second objection, Mr. Thompson argues Mr. Poppen's representation was ineffective because he did not hire an expert to contradict Dr. Balan's testimony that Mr. Thompson's use of grant funds was illegitimate. (Docket 93 at pp. 9-10). Mr. Poppen could not have ethically hired an expert to testify falsely—that is, to testify NSF rules allowed Mr. Thompson to spend grant funding on his personal expenses in excess of the budget. His fourth objection asserts Mr. Poppen's representation was ineffective because he did not present to the jury Mr. Thompson's theory that his use of grant funding was legitimate. Id. at pp. 13-14. Mr. Poppen had no obligation to present a false theory to the jury. Finally, Mr. Thompson's eighth objection asserts the magistrate judge erred in rejecting his theory. Id. at pp. 17-19. For the reasons given above, these objections are all overruled.

### C.     Remaining ineffective assistance claims

Three of Mr. Thompson's ineffective assistance claims survive the above inquiries. He argues Mr. Poppen was ineffective because he failed to disclose alleged conflicts of a potential government witness who was the father of Mr. Poppen's friend. (Docket 93 at pp. 11-13). Mr. Thompson then argues Mr. Poppen's "unpreparedness" denied him his right to testify. Id. at pp. 14-15.

Finally, he argues Mr. Poppen failed to object when the prosecution presented evidence broadening the scope of the indictment. Id. at p. 19. The court rejects these arguments.

To prevail on an ineffective assistance of counsel claim, Mr. Thompson must make two showings.

> First, [he] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed [him] by the Sixth Amendment. Second, [he] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984). "[T]he proper standard for attorney performance is that of reasonably effective assistance." Id. "Scrutiny of counsel's performance must be highly deferential. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Davis v. United States, 858 F.3d 529, 532 (8th Cir. 2017).

## 1. Dr. Helder conflict

Mr. Thompson claims a conflict was created when Dr. Dennis Helder, an SDSU employee and father of a friend of Mr. Poppen, appeared in documentation provided to Mr. Poppen in discovery. (Docket 64 at pp. 23-24). Dr. Helder originally agreed to allow SDSU to pay Dr. Li using funds provided by Isosceles. (Docket 77 at p. 7). This "payroll pass-through" was the subject of trial testimony. (Docket 86 at pp. 46-47). Mr. Poppen "made the strategic decision not to call" Dr. Helder as a witness because his personal knowledge

was limited and because other witnesses provided the necessary testimony. (Docket 77 at p. 7). Mr. Thompson signed a waiver before trial indicating Mr. Poppen explained his relationship with Dr. Helder and agreeing to continue the representation. (Docket 77-1). He now alleges Mr. Poppen's friendship with Dr. Helder's son caused him to "refrain[] from investigating and presenting exculpatory evidence showing [Dr.] Helder's involvement in fabricating fictitious receipts, timesheets, and other billing documents[.]" (Docket 93 at p. 12). He asserts Mr. Poppen's incompetence convicted him because his "failure to challenge [Dr.] Helder's efforts to conceal SDSU's lack of work on the grant . . . allow[ed] the jury to accept arguments he withheld payment to SDSU without cause." Id. at p. 13.

The factual underpinning of this claim—that Dr. Helder was part of a conspiracy to fabricate evidence against Mr. Thompson—is conclusory. Mr. Thompson does not explain what evidence Dr. Helder fabricated or how it prejudiced him. Even if these allegations were true, Mr. Thompson was not convicted of defrauding SDSU, but rather of converting the Isosceles grant funding to his own use. (CR. Dockets 208 at p. 15 & 218 at p. 3). As noted above, see supra Section IV.B, there was abundant evidence presented at trial showing Mr. Thompson's conversion of grant funding. How much, if any, of that money should have gone to SDSU does not alter the fact Mr. Thompson converted the money from the NSF.

If Mr. Thompson "can show that 'an actual conflict of interest adversely affected his lawyer's performance,' [the court] will presume prejudice rather

than require an affirmative showing[.]" <u>Winfield v. Roper</u>, 460 F.3d 1026, 1039

(8th Cir. 2006) (quoting <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348 (1980)).[15]  To

show an actual conflict of interest with an adverse effect, Mr. Thompson must

"identify a plausible alternative defense strategy or tactic that defense counsel

might have pursued, show that the alternative strategy was objectively

reasonable under the facts of the case, and establish that the defense counsel's

failure to pursue that strategy or tactic was linked to the actual conflict." <u>Id.</u>

(quoting <u>Covey v. United States</u>, 377 F.3d 903, 908 (8th Cir. 2004)).  Mr.

Thompson asserts Mr. Poppen should have called Dr. Helder and others as

witnesses to testify SDSU did no work on the grant and wrongly billed him.

(Docket 92 at p. 12).  This testimony would have impeached government

witnesses, in Mr. Thompson's view.  <u>Id.</u>

Mr. Thompson cannot meet the <u>Cuyler</u> standard entitling him to a

presumption of prejudice.  Even assuming it would have been a reasonable

defense to show SDSU was improperly seeking money from the Isosceles grant

for work Dr. Qiao or other SDSU employees did not perform, Mr. Thompson

does not explain why Mr. Poppen's friendship with Dr. Helder's son caused him

not to pursue that defense.  Mr. Thompson's conclusory assertions that Mr.

Poppen chose not to pursue the defense out of loyalty to the Helder family are

---

[15]The United States Court of Appeals for the Eighth Circuit repeatedly declined to extend the <u>Cuyler</u> standard quoted here to alleged conflicts outside the joint representation context.  <u>Winfield</u>, 460 F.3d at 1039; <u>see</u> <u>also</u> <u>Noe v. United States</u>, 601 F.3d 784, 790 (8th Cir. 2010).  That court has nevertheless analyzed conflicts under <u>Cuyler</u> to avoid deciding on the expansiveness of that standard.  <u>Id.</u>  The court will follow that example and analyze this conflict under <u>Cuyler</u>.

insufficient.  Id. at p. 11.  Additionally, as the magistrate judge noted, Mr. Poppen questioned other witnesses regarding the theory that SDSU employees failed to perform agreed upon work on the grant.  (Docket 86 at p. 111). Switching back to the Strickland standard, Mr. Thompson cannot show either deficiency or prejudice when the alleged conflict did not prevent Mr. Poppen from pursuing his proffered defense by questioning different witnesses. Finally, Mr. Thompson's waiver of any conflict was clear and informed.  Mr. Thompson's objection on this matter is overruled and the R&R is affirmed.

### 2.  Right to testify

Mr. Thompson asserts he would have testified in his own defense but for Mr. Poppen's unpreparedness.  (Docket 93 at pp. 14-15).  Mr. Thompson's version of events is that Mr. Poppen advised him not to testify, pleading unpreparedness, and he took that advice.  Id.  In his affidavit, Mr. Poppen states he "thoroughly advised Mr. Thompson regarding his right to testify" and that Mr. Thompson "alone" decided not to testify.  (Docket 77 at p. 7).

> [A] knowing and voluntary waiver of the right [to testify] may be found based on a defendant's silence when his counsel rests without calling him to testify. . . . [U]nder such circumstances the defendant must act affirmatively rather than apparently acquiescing in his counsel's advice that he not testify, and then later claiming that his will to testify was overcome.

Frey v. Schuetzle, 151 F.3d 893, 898 (8th Cir. 1998) (quoting United States v. Bernloehr, 833 F.2d 749, 751 (8th Cir. 1987)).  In the Eighth Circuit, there is no "bright-line rule requiring all defendants who do not testify to waive this right to testify on the record."  Berkovitz v. Minn., 505 F.3d 827, 828 (8th Cir. 2007).

Mr. Thompson acknowledges he made his desire to testify known to Mr. Poppen. (Docket 93 at p. 14). Mr. Poppen informed the court on the record at trial that he intended to call Mr. Thompson as a witness. (CR. Docket 243 at p. 209). In response, the prosecutor stated her cross-examination of Mr. Thompson would be "much more extensive" than other witnesses. Id. However, the defense rested its case without calling Mr. Thompson and without Mr. Thompson alerting the court to his desire to testify or any problems between him and Mr. Poppen. This conduct constitutes a waiver of the right to testify under Eighth Circuit case law.

In Mr. Thompson's view, his waiver of the right to testify was forced because Mr. Poppen told him he was unprepared to call him as a witness. (Docket 93 at pp. 14-15). The court finds this argument inherently incredible based on its observation of Mr. Poppen's performance during the trial. The court noted at Mr. Thompson's sentencing its belief that Mr. Thompson "could not have paid to have the quality of representation in this case that Mr. Poppen provided." (CR. Docket 301 at p. 89). In its order denying Mr. Poppen's motion to withdraw as counsel after trial, the court, "having observed Mr. Poppen's performance at trial," noted "the skill with which Mr. Thompson's defense was presented to the jury." (CR. Docket 252 at p. 3). The court finds Mr. Poppen was not unprepared to present Mr. Thompson's testimony to the jury. Regardless of this finding, Mr. Thompson cannot complain now about his waiver of his right to testify. His objection is overruled and the R&R is affirmed on this point.

### 3.     Broadening the indictment

Mr. Thompson asserts prosecutors constructively amended the indictment by eliciting testimony he signed into the NSF website using Dr. Li's credentials to submit the grant's final report.  (Docket 64 at p. 36).  He argues Mr. Poppen's failure to object to that testimony constitutes ineffective assistance of counsel.  Id. at pp. 21-28.  He also contends the alleged constructive amendment was a stand-alone constitutional violation meriting habeas relief.  Id. at pp. 35-38.  He now argues the magistrate judge erred in rejecting his arguments on this topic.  (Docket 93 at p. 19).

"A constructive amendment arises when the essential elements of the offense described in the charging instrument are altered, either actually or in effect, by the prosecutor or the court so that a substantial likelihood exists that the defendant was convicted of an uncharged offense."  United States v. McDill, 871 F.3d 628, 631 (8th Cir. 2017).  "A constructive amendment implicates a defendant's Fifth Amendment right to indictment by a grand jury and Sixth Amendment right to notice of the charges against him."[16]  Id.  A related concept is a "variance in the evidence" presented at trial.  United States v. Stuckey, 220 F.3d 976, 980 (8th Cir. 2000).

> A variance arises when the evidence presented proves facts that are materially different from those alleged in the indictment.  A variance

---

[16]The Eighth Circuit questions whether a finding of constructive amendment necessitates reversal.  United States v. Stephens, 888 F.3d 385, 388 (8th Cir. 2018) (citing United States v. Gill, 513 F.3d 835, 850 (8th Cir. 2008)).  Because the court concludes there was no constructive amendment here, the court need not decide whether such a finding would necessitate habeas relief.

> in the evidence affects the defendant's right to adequate notice under the Sixth Amendment. When a variance occurs, the charging document does not change, only the evidence against which the defendant expected to defend varies. Where the indictment fully and fairly apprises the defendant of the allegations against which he must defend, prejudice is absent and any variance is harmless error.

United States v. Buchanan, 574 F.3d 554, 564-65 (8th Cir. 2009) (internal quotations and citations omitted).

Testimony that Mr. Thompson submitted the final report using Dr. Li's credentials did not constructively amend the indictment or improperly vary the evidence. The government had to establish Mr. Thompson submitted the final report as an element in counts 3, 6 and 9 of the indictment. (CR. Docket 208 at pp. 6, 9, 12). Given that the final report indicates on its face it was submitted by Dr. Li, the government had no choice but to prove its case with evidence Mr. Thompson submitted the final report using Dr. Li's credentials. Trial Ex. 4. The government did successfully prove that proposition, see supra Section III.E, and Mr. Thompson agrees he used Dr. Li's credentials to submit the report. (Docket 93 at p. 4).

Mr. Thompson asserts a question asked by the jury during their deliberation is evidence of constructive amendment.[17] (Docket 64 at pp. 37-38). In his view, the jury question shows jurors convicted him for improperly using Dr. Li's credentials, not for the charged offenses. (Docket 85 at p. 14). The court disagrees. The jury may have been attempting to resolve the factual

---

[17]The question asked: "Please clarify if the PI is the only person who has access to the final report – or could Scott have signed in under his own name & completed the form?" (CR. Docket 215 at p. 1). The court responded by instructing the jury to use their own recollection of the evidence. Id. at p. 2.

questions of whether Mr. Thompson submitted the final report under Dr. Li's name or whether Mr. Thompson had the intent to lie to the NSF regarding Dr. Li's employment and hours worked when he submitted the final report.  In any case, the jurors had to grapple with questions about who submitted the report to render a verdict on counts 3, 6, and 9.  Their question is therefore not evidence of constructive amendment.

Because the evidence presented about Mr. Thompson's use of Dr. Li's credentials to submit the final report was critical to establishing an element of three charged offenses, the court finds that evidence did not constructively amend or vary the indictment to reach uncharged offenses.  Mr. Poppen's failure to raise this theory does not constitute ineffective assistance of counsel, nor does the government's presentation of this evidence violate Mr. Thompson's constitutional rights.  The objection is overruled.

### D.    Procedural default

The magistrate judge held Mr. Thompson procedurally defaulted on his claim that the government "subvert[ed] the fact-finding process" in violation of various constitutional and statutory provisions by presenting false evidence. (Docket 86 at pp. 117-26) (summarizing the defaulted claims).  The magistrate judge noted Mr. Thompson did not present this claim on direct appeal or show appropriate cause for his failure to do so.[18]  Id. at pp. 122, 126.  In his objections, Mr. Thompson argues his procedural default should be excused because of Mr. Poppen's alleged incompetence.  (Docket 93 at pp. 22-24).  He

---

[18]Mr. Thompson did not appeal his criminal conviction.

asserts Mr. Poppen's failure to "investigate law, expert witnesses, or exculpatory evidence" prevented him from appealing, presumably because the alleged failures resulted in a lack of appropriate evidence for direct appeal. Id. at p. 23. The court rejects these arguments.

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." Bousley v. United States, 523 U.S. 614, 621 (1998) (internal quotations omitted). "[A] petitioner may not raise an issue before the district court for the first time in a § 2255 motion if the issue was not presented on direct appeal from the conviction." Jennings v. United States, 696 F.3d 759, 762 (8th Cir. 2012). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice or that he is actually innocent." Bousley, 523 U.S. at 622 (internal quotations and citations omitted).

> In order to establish a valid claim of actual innocence, a defendant must show factual innocence, not simply legal insufficiency of evidence to support a conviction. Accordingly, [the court] will overturn [a] conviction only if he can demonstrate, in light of all the evidence, that it is more likely than not that no reasonable juror would have convicted him. This is a strict standard; generally, a petitioner cannot show actual innocence where the evidence is sufficient to support a [] conviction.

McNeal v. United States, 249 F.3d 747, 749-50 (8th Cir. 2001).

"The mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." Murray v. Carrier, 477 U.S. 478, 486 (1986).

[T]he question of cause for a procedural default does not turn on whether counsel erred or on the kind of error counsel may have made. So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in <u>Strickland v. Washington</u>, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default. Instead, we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts[.]"

<u>Id.</u> at 488. "If a prisoner fails to demonstrate cause, the court need not address prejudice." <u>Cagle v. Norris</u>, 474 F.3d 1090, 1099 (8th Cir. 2007).

Mr. Thompson did not show cause for his procedural default. Mr. Poppen's alleged errors do not constitute cause for default unless they rise to the level of ineffective assistance of counsel. <u>Murray</u>, 477 U.S. at 488. The court overruled all of Mr. Thompson's objections on the subject of ineffective assistance. <u>See</u> <u>supra</u> Sections IV.A-C. And as noted above, the court already expressed its view Mr. Poppen provided excellent assistance to Mr. Thompson. <u>See</u> <u>supra</u> Section IV.C.2. The court finally notes Mr. Thompson alleges Mr. Poppen advised him to "pursue a habeas appeal and NOT a direct appeal[.]" (Docket 93 at p. 20). If true, this is the exact sort of error internal to the attorney-client relationship the Supreme Court determined does not constitute cause for procedural default. <u>Murray</u>, 477 U.S. at 488. Mr. Thompson's argument his procedural default should be excused because of Mr. Poppen's alleged ineffective assistance of counsel is barred by case law and lacks factual

support.[19]  The court need not address whether the default actually prejudiced Mr. Thompson.

Because Mr. Thompson did not show cause for his default, the court must then consider whether his actual innocence opens the door to judicial scrutiny of his false evidence claims.  The court previously rejected Mr. Thompson's actual innocence argument, which he grounded in his visa theory. See supra Section IV.A.  Additionally, the court rejected Mr. Thompson's motions for acquittal and for a new trial.  (CR. Docket 279).  Mr. Thompson proffers no evidence on this point the court has not already reviewed and rejected.

Mr. Thompson can neither show cause for his procedural default nor his actual innocence.  Accordingly, his false evidence claims are procedurally defaulted.  His objection to the R&R on this point is overruled.

### E.    Evidentiary hearing

The magistrate judge concluded Mr. Thompson's motion did not merit an evidentiary hearing.  (Docket 86 at p. 137).  Mr. Thompson objects.  (Docket 93 at p. 25).  Mr. Thompson's objection does not grapple with the law on habeas

---

[19]Mr. Thompson asserts "procedural default does not apply to claims that require development of facts outside the trial record."  (Docket 93 at p. 22) (emphasis removed).  He supports this argument with a citation to Bousley.  Id. The cited page distinguishes Waley v. Johnston, a 1942 case where the Supreme Court held a habeas petition can extend to procedurally defaulted cases where the facts are outside the scope of the "record and their effect on the judgment was not open to consideration and review on appeal."  316 U.S. 101, 104 (1942).  Like the petition at issue in Bousley, Mr. Thompson's claim could have been "fully and completely addressed on direct review based on the record" had he raised his false evidence claims to the court during or after his trial and thence to the Eighth Circuit.  Bousley, 523 U.S. at 622.

evidentiary hearings, but instead relates to his argument against procedural default.  Id.  Given his *pro se* status, the court will nevertheless examine the magistrate judge's conclusion on this point.

"Ordinarily, the district court must hold an evidentiary hearing and make factual findings before ruling on the merits of the motion."  Adejumo v. United States, 908 F.3d 357, 361 (8th Cir. 2018).

> A § 2255 motion may be dismissed without a hearing if (1) the criminal defendant's allegations, accepted as true, would not entitle him or her to relief; or (2) the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact.

Hyles v. United States, 754 F.3d 530, 534 (8th Cir. 2014).

For the reasons given throughout this order, the court finds the facts Mr. Thompson alleges are "contradicted by the record," "inherently incredible," "conclusions rather than statements of fact," or, even if true, would not merit habeas relief.  Id.  As the magistrate judge found, "[t]here is no issue of fact or credibility to be determined by holding an evidentiary hearing."[20]  (Docket 86 at p. 137).  The court overrules Mr. Thompson's objection and denies his request for a hearing.

---

[20]The court carefully reviewed Mr. Thompson's filings and did not discern any allegation that Mr. Poppen refused to file a direct appeal of Mr. Thompson's conviction against his will.  Such a claim would merit an evidentiary hearing.  Witthar v. United States, 793 F.3d 920, 923 (8th Cir. 2015) ("Because failure to file a requested appeal is deficient performance and because we presume prejudice, these allegations alone generally are sufficient to warrant a hearing.").  Mr. Thompson instead argues other supposed deficiencies in Mr. Poppen's performance resulted in his failure to appeal.  (Docket 93 at pp. 22-24).  Under these circumstances, the court does not believe Eighth Circuit case law requires an evidentiary hearing into the question of Mr. Thompson's failure to appeal.

**ORDER**

For the reasons given above, it is

ORDERED that Mr. Thompson's objections to the magistrate judge's report and recommendation (Docket 93) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 86) is adopted in full.

IT IS FURTHER ORDERED that the government's motion to dismiss Mr. Thompson's § 2255 motion (Docket 75) is granted.

IT IS FURTHER ORDERED that Mr. Thompson's amended § 2255 motion (Docket 36) is denied with prejudice.

IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. § 2253(c) and Rule 11 of the Rules Governing Section 2255 Cases, the court declines to issue a certificate of appealability. A certificate may issue "only if the applicant has made a *substantial showing* of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (emphasis added). A "substantial showing" under this section is a showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). In other words, a "substantial showing" is made if a "court could resolve the issues differently, or the issues deserve further proceedings." Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997). Mr. Thompson has not made a substantial showing of the denial of a constitutional right.

Although the court declines to issue a certificate of appealability, Mr. Thompson may timely seek a certificate of appealability from the United States

35

Court of Appeals for the Eighth Circuit under Federal Rule of Appellate

Procedure 22. <u>See</u> Governing Rule 11(a); Fed. R. App. P. 22.

Dated May 29, 2019.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE